E-FILED
Monday, 9 April, 2007 01:43:44 PM
Clerk, U.S. District Court, ILCD



DEFENDANT'S EXHIBIT

OFFICE OF THE MEDICAL EXAMINER
COUNTY OF COOK
2121 WEST HARRISON STREET
CHICAGO, ILLINOIS 60612-3705



MEDICAL EXAMINER'S – CORONER'S
CERTIFICATE OF DEATH

PERMANENT CERTIFICATE
TEMPORARY CERTIFICATE

REGISTRATION DISTRICT NO.
REGISTERED NUMBER

**DECEASED**

DECEASED–NAME: FIRST KIMBERLY   MIDDLE COVIL   LAST DAVIS-WELLS

SEX: FEMALE

DATE OF DEATH (MONTH, DAY, YEAR): 11-5-03

COUNTY OF DEATH

AGE–LAST BIRTHDAY (YRS) · UNDER 1 YEAR MOS/DAYS · UNDER 1 DAY HOURS/MIN

DATE OF BIRTH (MONTH, DAY, YEAR)

HOSPITAL OR OTHER INSTITUTION: UNIV. OF ILLINOIS

NAME OF SURVIVING SPOUSE (MAIDEN NAME, IF WIFE)

IF HOSP. OR INST. INDICATE D.O.A., OR EMER. RM. (IN PT) OR OUT-PATIENT (SPECIFY)

WAS DECEASED EVER IN U.S. ARMED FORCES? (YES/NO)

CITY, TOWN, TWP., OR ROAD DISTRICT NUMBER

BIRTHPLACE (CITY AND STATE OR FOREIGN COUNTRY)

MARRIED, NEVER MARRIED, WIDOWED, DIVORCED (SPECIFY)

KIND OF BUSINESS OR INDUSTRY

EDUCATION (SPECIFY ONLY HIGHEST GRADE COMPLETED) Elementary/Secondary (0-12) · College (1-4 5+)

SOCIAL SECURITY NUMBER

USUAL OCCUPATION

CITY, TOWN, TWP., OR ROAD DISTRICT NO.

INSIDE CITY (YES/NO)

COUNTY

RESIDENCE (STREET AND NUMBER)

STATE   ZIP CODE

RACE (WHITE, BLACK, AMERICAN INDIAN, etc.) (SPECIFY) BLACK

OF HISPANIC ORIGIN? (SPECIFY NO OR YES—IF YES, SPECIFY CUBAN, MEXICAN, PUERTO RICAN, etc.) NO □ YES

**PARENTS**

FATHER–NAME: FIRST   MIDDLE   LAST

MOTHER–NAME: FIRST   MIDDLE (MAIDEN) LAST

MAILING ADDRESS (STREET AND NO., OR A.P.O., CITY OR TOWN, STATE, ZIP)

INFORMANT'S NAME (TYPE OR PRINT)

RELATIONSHIP

**CAUSE**

PART I. Enter the diseases, injuries, or complications that caused the death. Do not enter the mode of dying, such as cardiac or respiratory arrest, shock, or heart failure. List only one cause on each line.

Immediate Cause (Final disease or condition resulting in death)
(a) INTRACEREBRAL HEMORRHAGE

DUE TO, OR AS A CONSEQUENCE OF:
(b) HYPERTENSIVE CARDIOVASCULAR DISEASE

DUE TO, OR AS A CONSEQUENCE OF:
(c)

CONDITIONS, IF ANY, WHICH GIVE RISE TO IMMEDIATE CAUSE (a) STATING THE UNDERLYING CAUSE LAST

PART II. Other significant conditions contributing to death but not resulting in the underlying cause given in PART I.

DATE OF INJURY (MONTH, DAY, YEAR)

HOUR

HOW INJURY OCCURRED (ENTER NATURE OF INJURY MENTIONED IN PART I OR PART II, ITEM 18)

NATURAL, ACCIDENT, HOMICIDE, SUICIDE, UNDETERMINED (SPECIFY)

INJURY AT WORK (YES/NO)

PLACE OF INJURY (AT HOME, FARM, STREET, FACTORY, OFFICE BUILDING, ETC.) (SPECIFY)

LOCATION (CITY, VIL. OR TOWN) (CNTRY, OR RD. DIST. NO., COUNTY, STATE)

AUTOPSY (YES/NO): YES

(FEMALE, WAS THERE A PREGNANCY IN PAST THREE MONTHS?) YES □ NO □

THE DECEDENT WAS PRONOUNCED DEAD ON: 11-5-03   AT 21:45 p   M.

I CERTIFY THAT IN MY OPINION BASED UPON MY INVESTIGATION AND/OR THE INQUISITION, THIS DEATH OCCURRED ON THE DATE, AT THE PLACE, AND DUE TO THE CAUSE(S) STATED, AND THAT

s/Adrienne Segovia

CORONER   s/Coroner

CORONER'S/PHYSICIAN'S NAME (TYPE OR PRINT): ADRIENNE SEGOVIA, M.D.

DATE SIGNED: 11-6-03

**CERTIFIER**

BURIAL, CREMATION, REMOVAL (SPECIFY)

CEMETERY OR CREMATORY–NAME

LOCATION (CITY OR TOWN) (STATE)

DATE (MONTH, DAY, YEAR)

**DISPOSITION**

FUNERAL HOME

STREET AND NUMBER OR R.F.D.

FUNERAL DIRECTOR'S SIGNATURE

FUNERAL DIRECTOR'S ILLINOIS LICENSE NO.

DATE FILED BY LOCAL REGISTRAR (MONTH, DAY, YEAR)

LOCAL REGISTRAR'S SIGNATURE

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF LIVINGSTON.  )

*Timm v. IDOC*
*Case No. 05-1276*

## AFFIDAVIT OF TED CONKLING

I, **TED CONKLING**, being first duly sworn upon oath, depose and state that I am competent to testify and, if called to testify, would state as follows:

1. From October 1999 to May 2004, I was employed by the Illinois Department of Corrections as an Assistant Warden at Dwight Correctional Center.

2. On November 4, 2003, Kimberly Davis-Bills, N57280, was an offender housed at the Dwight Correctional Center.

3. Dwight Correctional Center houses female offenders who are in the custody of the Illinois Department of Corrections.

4. On November 4, 2003, offender Davis Bills, N57280, was housed in the C12 Cottage at Dwight Correctional Center.

5. On November 4, 2003, offender Davis Bills, N57280, was transported by ambulance to an outside hospital.

6. The Illinois Department of Corrections conducted an investigation, case number 04-DWI-097, into the events on November 4, 2003, prior to offender Davis Bills, N57280, being taken to the hospital.

7. The investigation resulted in charges of negligence against Correctional Sergeant Alan Timm and Correctional Officers Barbara Hoffmeyer and Larry Ford.

8. On January 15, 2004, employee review hearings were held with respect to the reported misconduct of Sergeant Alan Timm and Correctional Officers Barbara Hoffmeyer and Larry Ford.


DEFENDANT'S EXHIBIT 2

9.    I was the Employee Review Officer for these hearings.

10.    After the hearings, I recommended that Sergeant Timm be discharged due to the "severity of the incident and the overall failure of Sgt. Alan Timm to complete his supervisory responsibilities", noting as follows:

> The external investigation case number 04-DWI-097 clearly substantiates negligence and a failure to follow written guidelines. Sgt. Timm's failure to accurately report the incident is completely evident in the fact that his incident report dated November 4, 2003 (attachment 41) recorded only events beginning at 2:00 PM. Sgt. Timm did admit in 04-DWI-097 involvement in relevant events beginning as early as 11:00 AM, on that date. Sgt. Timm additionally admitted in 04-DWI-097 that the offender Davis-Bells, N57280 had suffered a seizure when he checked her at approximately 11:00 AM, yet he never contacted the Health Care Unit before medical staff arrived at 2:00 P.M.

11.    I recommended that Officer Hoffmeyer be discharged due to the "severity of the incident", noting as follows:

> The External Investigation Case Number 04-DWI-097 clearly substantiates negligence and a failure to follow written guidelines. Additionally, Officer Barbara Hoffmeyer's incident report dated November 4, 2003 (Attachment 25) records events only beginning at 2:00 PM, however, during

-2-

the investigation interview Officer Hoffmeyer admitted involvement in relevant events beginning as early as 11:00 AM on November 4, 2003. This hearing officer notes that Officer Barbara Hoffmeyer made several trips to C-12, Room C-1 to check on Offender Davis-Bells, N57280 noticing little or no change in Offender Davis-Bells condition. Following the visits to Room C-1 Officer Hoffmeyer called nursing staff and advised her supervisor Sgt. Alan Timm. The problem existed that Offender Davis-Bells actions and conditions persisted with no further follow-up from Officer Hoffmeyer. Officer Hoffmeyer should have immediately sought out another supervisor other than Sgt. Alan Timm.

12.    I recommended that Officer Ford receive a 10 day suspension, stating as follows:

The External Investigation Case Number 04-DWI-097 clearly substantiates negligence and a failure to follow written guidelines. C/O Larry Ford failed to record any entries in the C-12 Panel logbook from 10:20 AM to 12:35 PM on 11/4/03. This included what time he, C/O Ford, was relieved for lunch. The fact that pertinent entries were not placed in the C-12 Panel logbook on 11/4/03 is extremely serious in light of the incident that took place.

13.    Alyssa B. Williams, the Warden at Dwight Correctional Center, concurred with my recommendations with respect to Sergeant Timm, and officers Ford and Hoffmeyer.

14.    I had no involvement in the subsequent decision, which reduced officer Hoffmeyer's discipline to a fifteen day suspension, instead of discharging her as I had recommended. I also have no personal knowledge as to the basis for that decision, which was made by personnel in Springfield, and not by management at the Dwight Correctional Center.

**FURTHER AFFIANT SAYETH NOT.**

s/Ted Conkling

_____

**TED CONKLING**

Subscribed and sworn to before me
this _Xoth_ day of April, 2007.

s/Michelle Rae Clark
_____
Notary Public

OFFICIAL SEAL
MICHELLE RAE CLARK
Notary Public · State of Illinois
My Commission Expires Sep. 13, 2008

1

1    UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF ILLINOIS
2         PEORIA DIVISION

3

ALAN TIMM,                    )
4                             )
             Plaintiff,       )
5                             )
     Vs.                      )    No. 05-1276
6                             )
ILLINOIS DEPARTMENT OF        )
7    CORRECTIONS,             )
                              )
8            Defendant.       )

9

10       Discovery deposition of ALAN TIMM, taken

11   before Tammy S. Wagahoff, CSR, at the instance of the

12   Defendant, on the 12th day of February, 2007, at the

13   hour of 1:00 P.M., at the Law Offices of Baker, Baker

14   & Krajewski, 415 South Seventh Street, Springfield,

15   Illinois, pursuant to attached stipulation.

16

17            ASSOCIATED COURT REPORTERS
18               1-800-252-9915
                 P.O. Box 684
19          Taylorville, Illinois 62568

20

21

22

23

24



DEFENDANT'S
EXHIBIT
3

**Page 1**

```
                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF ILLINOIS
                          PEORIA DIVISION

ALAN TIMM,                          )
                                    )
              Plaintiff,            )
                                    )
    vs.                             )   No. 05-1276
                                    )
ILLINOIS DEPARTMENT OF              )
CORRECTIONS,                        )
                                    )
              Defendant.            )
```

Discovery deposition of ALAN TIMM, taken before Tammy S. Wagahoff, CSR, at the instance of the Defendant, on the 12th day of February, 2007, at the hour of 1:00 P.M., at the Law Offices of Baker, Baker & Krajewski, 415 South Seventh Street, Springfield, Illinois, pursuant to attached stipulation.

ASSOCIATED COURT REPORTERS
1-800-252-9915
P.O. Box 684
Taylorville, Illinois 62568

---

**Page 2**

S T I P U L A T I O N

It is stipulated between the parties herein, through their attorneys, that the discovery deposition of ALAN TIMM may hereby be taken upon oral interrogatories, on the 12th day of February, 2007, at the hour of 1:00 P.M., at the Law Offices of Baker, Baker and Krajewski, 415 South Seventh Street, Springfield, Illinois, before the instance of the Defendant, and before Tammy S. Wagahoff, CSR and RPR.

That the oral interrogatories and the answers of the witness may be taken down in shorthand by the Reporter and afterwards transcribed.

That the reading and signing of said deposition is not waived.

That the deposition or any portions thereof may be used by any of the parties hereto, without foundation proof, for any purpose for which depositions are competent.

That copies of the deposition may be furnished to any of the parties at this or her own expense.

---

**Page 3**

APPEARANCES:   (February 12, 2007).

BAKER, BAKER & KRAJEWSKI
By Mr. James Baker
Attorney at Law
415 South Seventh Street
Springfield, Illinois  62701
    Appeared on behalf of the Plaintiff;

OFFICE OF THE ATTORNEY GENERAL
By Mr. David Walter
Assistant Attorney General
500 South Second
Springfield, Illinois  62701
    Appeared on behalf of the Defendant.

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT |
|---------|--------|-------|----------|
| Alan Timm | 4 | 97 | |

E X H I B I T S

| EXHIBIT | Marked |
|---------|--------|
| Exhibit One | Prior to Deposition |
| Exhibit Two | Prior to Deposition |
| Exhibit Four | Prior to Deposition |
| Exhibit Five | Prior to Deposition |
| Exhibit Six | Prior to Deposition |

***EXHIBITS ATTACHED***

---

**Page 4**

*ALAN TIMM,*

Called as a witness herein, at the instance of the Defendant, having been duly sworn on his oath, testified as follows:

DIRECT EXAMINATION

CONDUCTED BY MR. WALTER:

Q.  Good afternoon.  My name is David Walter, and I represent the Illinois Department of corrections.

Have you been deposed before?  This is a deposition.

A.  Is that what you mean by deposed?

Q.  Yeah.  I'm asking if you have had your deposition taken.

A.  One, yes.

Q.  Just the one time?

A.  Yes.

Q.  And what was the name of that case if you recall?

A.  It was a case against the neighbor in Kankakee County.

Q.  The case that you brought against the neighbor?

A.  Yes.

**5**

1    Q. Okay. Do you recall the name of the

2  neighbor?

3    A. Keith Tatro.

4    Q. I believe you reference the case in your

5  interrogatories. Is that the same case?

6    A. Yes. Here she put Duane, but it's Keith.

7    Q. What was the last name?

8    A. Tatro, T-a-t-r-o.

9    Q. Although you've been through a deposition

10  before, I'm going to summarize for you what the

11  process is about. Although this is an informal

12  setting, you realize that you're under oath?

13    A. (Witness shakes head yes.)

14    Q. You need to answer verbally out loud so she

15  can take it down.

16    A. Oh, I'm sorry.

17    Q. That's actually one of the next things I was

18  going to tell you. You have to answer verbally out

19  loud so the Court Reporter can take it down. It makes

20  her job easier. Make sure we create a record of

21  today.

22    A. Okay.

23    Q. Also avoid phrases such as uh-huh and

24  huh-uh. Answer yes and no, that way it will be

**6**

1  clearer in the record.

2        If you don't understand a question that

3  I ask, be sure and ask me to rephrase the question,

4  and I'll be happy to do that. I want to make sure

5  that you understand the question that you're

6  answering. So if you have any problems understanding

7  the question, I'll be happy to rephrase it or clarify

8  it. Sometimes I fumble around with words, and it

9  doesn't come across clear. So feel free to ask if you

10  don't understand anything.

11        And when we finish your deposition, the

12  Court Reporter will prepare a transcript of the

13  testimony that's given here. You'll have an

14  opportunity to review it and make any corrections or

15  changes. If you do make changes, counsel will comment

16  on those changes at trial. So it's important that you

17  give us correct testimony now. Do you understand

18  this?

19    A. Yes, sir.

20    Q. Is there anything that would impair your

21  ability to testify truthfully and accurately here

22  today such as that you're ill or that you've recently

23  lost a loved one or that you're taking medications?

24    A. No; no, sir.

**7**

1    Q. Did you file a complaint against the

2  Illinois Department of Corrections?

3    A. Yes.

4    Q. I'm going to show you what's been marked for

5  identification purposes as Timm Exhibit Two and ask

6  you if you recognize that?

7    A. Yes.

8    Q. Okay. Is that the complaint that you filed

9  in this case against the Illinois Department of

10  Corrections?

11    A. Yes.

12    Q. Now it's my understanding that you filed the

13  complaint pro se, is that accurate?

14    A. Meaning?

15    Q. Meaning you were representing yourself at

16  the time that you filed the complaint.

17    A. Yes.

18    Q. Okay. And did you draft the complaint

19  yourself?

20    A. No.

21    Q. Who prepared it?

22    A. Mr. Baker.

23    Q. Okay. Are there any things in the complaint

24  that are inaccurate? I'm not asking about the legal

**8**

1  part. I'm asking about the factual parts.

2    A. No.

3    Q. Okay. Now in your complaint you indicate

4  that you were treated less favorably than a female

5  nurse and a female correctional officer because you

6  were a male. Is that accurate?

7    A. Yes.

8    Q. Okay. There's also a reference on the front

9  page of the complaint, I believe it is to race, color,

10  religion and national origin. Do you see that?

11    A. Yes.

12    Q. Now are you claiming that you were treated

13  less favorably because of your race?

14    A. Yes.

15    Q. Okay. Are you claiming that you were

16  treated --

17    A. Oh, I'm sorry, race?

18    Q. Yes.

19    A. No, no. I'm sorry.

20    Q. Are you claiming you were treated less

21  favorably because of your color?

22    A. No.

23    Q. And are you claiming you were treated less

24  favorably because of your religion?

9

1      A.  No.

2      Q.  Are you claiming you were treated less

3  favorably because of your national origin?

4      A.  No.

5      Q.  Is it fair to say then that the allegations

6  in your complaint concern discrimination because of

7  sex?

8      A.  Yes.

9      Q.  Now why do you believe you were treated less

10  favorably than the female nurse that you reference?

11      A.  I, uhm, wasn't required to be on the unit

12  the whole time that I was there.  If I wanted to walk

13  off the unit, I could without being properly relieved

14  or somebody else taking my place.  I was not in direct

15  contact with the inmates.

16      Q.  Let's back up a little bit if you would.

17  Who is the female nurse that you reference?

18      A.  Janice Miller.

19      Q.  Do you know what type of training she had?

20      A.  She is a correctional --

21      Q.  Correctional med tech, is that right?

22      A.  I don't want to say med tech.

23  Correctional -- on the street she would be an LPN.  So

24  a CNT, she might be a correctional nurse technician.

10

1      Q.  Okay.  But your understanding is she was a

2  licensed practical nurse?

3      A.  Correct, yes.

4      Q.  Now is that the only nurse that you believe

5  was treated more favorably than you as it relates to

6  this case?

7      A.  She was, yes.

8      Q.  Now you also reference a female correctional

9  officer in your complaint, correct?

10      A.  Yes.

11      Q.  And who is that female correctional officer?

12      A.  Barbara Hoffmeyer.

13      Q.  And she's another person who you state in

14  your complaint was treated more favorably than you

15  were, correct?

16      A.  Yes.

17      Q.  Are there any other correctional staff that

18  you're claiming were treated more favorably than you

19  were with respect to this incident?

20      A.  No.

21      Q.  Okay.  Now Barbara Hoffmeyer was a

22  correctional officer, is that correct?

23      A.  Yes.

24      Q.  Do you know when she started with the

11

1  department?

2      A.  I would say middle 80's roughly, not for

3  sure.

4      Q.  Okay.  Do you know if she held any rank

5  other than correctional officer during the time she

6  was with DOC?

7      A.  No.

8      Q.  Let's go to the actual date of the incident

9  alleged in your complaint.

10          There was an incident involving an

11  inmate at Dwight Correctional Center, correct?

12      A.  Yes.

13      Q.  Do you recall what the date was when that

14  incident occurred?

15      A.  November 4th, 2003.

16      Q.  Okay.  And what was your rank on November

17  the 4th of 2003?

18      A.  Correctional sergeant.

19      Q.  Just generally what were your

20  responsibilities as a correctional sergeant working at

21  Dwight Correctional Center?

22          MR. BAKER:  Generally or on

23  that date?

24          MR. WALTER:  Generally, not

12

1  just restricted to that date.  We'll cover that date

2  next.

3          THE WITNESS:  Basically the

4  gate house supervisor, sally port operator.  Sergeant

5  maintained any visual, or not visual, but any gate

6  opening to the facility, let's see, gate house, and

7  the seg units supervisor.

8      Q.  Okay.  Now when you say gate house, are you

9  referring to the gate house as you enter Dwight

10  Correctional Center?

11      A.  Yes, the main entrance for employees and

12  visitors.

13      Q.  Okay.  So on some days you would man the

14  gate house?

15      A.  Yes.

16      Q.  And would you have correctional staff

17  working with you at the gate house?

18      A.  At some point, yes.

19      Q.  And did you supervise those individuals?

20      A.  Worked along with them, yes.

21      Q.  Did you have any sort of supervisory

22  responsibility over the individuals when you worked

23  the gate house?

24      A.  No, no.

---

**13**

1    Q.  Okay.  And the sally port would be an area
2   where vehicles come into the prison, is that correct?
3    A.  Correct.
4    Q.  And you at times would work at the sally
5   port?
6    A.  Correct.
7    Q.  Did you have correctional staff working with
8   you when you worked at the sally port?
9    A.  Yes.
10    Q.  How many correctional staff would work with
11   you when you worked at the sally port?
12    A.  One.
13    Q.  And did you supervise that individual?
14    A.  Yes.
15    Q.  What sort of supervision of that individual
16   did you have?
17    A.  Uhm, the truck would come in.  The officer
18   would, we would do our search, and I'd log the person,
19   the visitor or the vehicle in.  And then the officer
20   would go be an escort with the vehicle onto the
21   grounds.  He'd stay with him until he came back out
22   off the grounds.
23    Q.  Any other supervisory duties that you had
24   when you were working the sally port?

---

**14**

1    A.  Uhm, at some, it was the intake method for
2   new arrivals for inmates.  The inmates would come in
3   through the sally port and --
4    Q.  Were they in a vehicle?
5    A.  Yes.
6    Q.  A van or a bus?
7    A.  Correct.
8    Q.  And then what kind of supervision did you
9   have whenever the van or bus would come in?
10    A.  Just to call the appropriate people that
11   would come and take the inmates.
12    Q.  Okay.  Now you also mentioned segregation,
13   is that correct?
14    A.  Yes.
15    Q.  And what is segregation?
16    A.  It's a temporary, I don't know if it would
17   be, a temporary confinement area for troubled inmates,
18   not troubled inmates, but inmates that receive
19   tickets, disciplinary reports, and are sent to seg.
20    Q.  Okay.  And I have not been to Dwight, but is
21   there just one segregation area at Dwight or are there
22   multiple segregation areas?
23    A.  There was two, C15 and C12 and MHU, mental
24   health unit, also a segregation unit.

---

**15**

1    Q.  So C15 and C12?
2    A.  Correct.
3          MR. BAKER:  I'm sorry, what was
4   the other one?
5          THE WITNESS:  MHU, mental
6   health.
7          MR. BAKER:  C15 and C?
8          THE WITNESS:  C12.
9          MR. WALTER:  Now is C the name
10   of a house or is that --
11          THE WITNESS:  It's the cottage,
12   it's the building number.
13    Q.  Okay.  And within that, would there be
14   galleries named 15 and 12?
15    A.  No, the unit is called, like C15 is the
16   building.  And then each building would have four
17   wings to it.
18    Q.  Okay.
19    A.  All one level.
20    Q.  When did you start working at Illinois
21   Department of Corrections?
22    A.  November 3rd.  No, November 9th, '91, 1991.
23    Q.  Did you work at any correctional facilities
24   other than Dwight?

---

**16**

1    A.  No.
2    Q.  Have you been to any correctional centers
3   other than Dwight?
4    A.  Yes.
5    Q.  What other facilities have you been to?
6    A.  Been to Pontiac and Joliet.
7    Q.  Have you been to any of the segregation
8   wings at Pontiac?
9    A.  No.
10    Q.  Now because I'm unfamiliar with Dwight,
11   I'll try to get an understanding of it from you.
12          How many -- you have the gate house,
13   right?
14    A.  Right.
15    Q.  Is that a separate building at Dwight?
16    A.  Yes.
17    Q.  And then you have an administration
18   building?
19    A.  Yes.
20    Q.  Then how many houses or how many buildings
21   are there at Dwight that house inmates?
22    A.  Let's see, you have eight on the south end.
23   They're called cottages.  You have mental health unit,
24   let's see, it would be C9, C17, health care unit, C10,

---

17

1    C11, C12, 14, 15 and 16.

2        Q.  And are all of these described as cottages

3    or --

4        A.  No, the cottages are --

5        Q.  Just on the south end?

6        A.  On the south end.

7        Q.  Okay.  Now what about 12 and 15, are they

8    considered cottages?

9        A.  Not, no.

10       Q.  And then within 12 and 15, there are

11   separate wings, is that correct?

12       A.  Each unit has four wings.

13       Q.  Is it the X format?

14       A.  It's like a K, like a K.

15       Q.  Okay.  So in the center would there be a

16   control area?

17       A.  Correct.

18       Q.  And is there a bubble, you know what I mean?

19       A.  That would be the control area.

20       Q.  Okay.  And from there, there's an individual

21   that controls the doors to all the various wings, is

22   that right?

23       A.  Correct.

24       Q.  Where were you working on November 4th of

18

1    2003?

2        A.  C12.  I was assigned to C12.

3        Q.  And that entire C12 unit is segregation, is

4    that correct?

5        A.  Correct.

6        Q.  Now in that segregation unit, are inmates

7    single celled or are they double celled?

8        A.  Double celled.

9        Q.  Okay.  And there are then four wings to C12?

10       A.  Yes.

11       Q.  And where was your position where you were

12   stationed on C12 on November 4th, 2003?

13       A.  Usually in the panel, the bubble.

14       Q.  So whenever you say panel, it's --

15       A.  The bubble.  We call it the panel.  I mean,

16   other places would probably -- because of the layout,

17   we never used it like a bubble.  I mean, it's, the

18   layout of the building is, like I said, like a K.  And

19   we just call them panels.

20       Q.  Okay.  So are there windows in the panel?

21       A.  Yes, it's all windows.

22       Q.  So you can see onto the various wings of the

23   K that make up the building?

24       A.  Correct.

19

1        Q.  Is there anyone else in the panel other than

2    the correctional sergeant?

3        A.  Panel officer.

4        Q.  Okay.  And would it be his responsibility

5    then to open and shut doors to allow people to access

6    the various wings of the building?

7        A.  Uhm, just the front door and the panel door.

8    Otherwise, the wing officer would have keys for the

9    panel, the wing gates and individual cells.

10       Q.  Okay.  Does the wing officer carry those

11   keys with him?

12       A.  Yes.

13       Q.  Okay.  Now I asked you earlier what your

14   responsibilities in general were as a correctional

15   sergeant.  Can you tell me what your responsibilities

16   were as a correctional sergeant on November the 4th,

17   2003 working in C12?

18       A.  I was assigned to the segregation unit.

19   Inmates needed to come out of their rooms, a

20   supervisor had to be present to -- how would you

21   describe it?

22       Q.  Take your time.

23       A.  Basically trying to figure out how to put

24   it.  I mean, you were there to supervise the unit for

20

1    like for showers.  We did showers in the morning.  We

2    had, you know, if they needed soap and stuff like

3    that, we gave them soap.  And --

4        Q.  What about for food?

5        A.  Didn't have to be on the unit for them to

6    receive food because they had food slots, and they

7    could open their food slots without a supervisor being

8    present.

9        Q.  They, you mean?

10       A.  Officers.  Sorry.

11       Q.  Now we have this K shaped unit; and there's

12   four wings on the unit, correct?

13       A.  Correct.

14       Q.  Is there a wing officer assigned to each of

15   those four wings?

16       A.  No.

17       Q.  Okay.

18       A.  One officer to two wings.

19       Q.  Are those wings of the K, do they have any

20   sort of numeric identifier?

21       A.  Just be A, B, C and D.

22       Q.  And where was the inmate that subsequently

23   died?  Which of those wings, A, B, C and D was she

24   housed on that day?

---

**21**

1    A.   C wing.

2    Q.   And who was the gallery officer -- is that

3  the wrong term?  You guys didn't use gallery.  Wing

4  officer?

5    A.   It's different.  I understand it when you're

6  used to talking about male institutions, that's what

7  they call them, galleries.  But wing was Hoffmeyer,

8  wing officer was Hoffmeyer.

9    Q.   And which wings did she have?

10    A.   She had the C and D.

11    Q.   Then who had A and B?

12    A.   Stephens, I think his name was.

13    Q.   And then who was the panel officer?

14    A.   Ford.

15    Q.   What's Stephens first name, do you know?

16    A.   No, I don't.

17    Q.   Was he also a correctional officer?

18    A.   Yes.

19    Q.   Male?

20    A.   Male.

21    Q.   And what about Ford?

22    A.   Male.

23    Q.   And do you know his first name?

24    A.   Larry.

---

**22**

1    Q.   Now other than you, Correctional Officer

2  Stephens, Correctional Officer Ford and Correctional

3  Officer Hoffmeyer, was there anyone else who was

4  assigned to that particular unit, C12, on that date,

5  November 4th, 2003?

6    A.   For the day?

7    Q.   Right.

8    A.   Officer Jim DeMattia was assigned at first

9  from 7:00 o'clock until 8:15 or 8:00 o'clock.  And I

10  had to call and say I need a female on the unit.  And

11  that's when they sent Hoffmeyer over.  They switched

12  Hoffmeyer and DeMattia.

13    Q.   Okay.  And he was working from 7:00 a.m. to

14  8:15 p.m.?

15    A.   A.M., 8:00 A.M. or 7:00 A.M.

16    Q.   And what shift were your working on that

17  date?

18    A.   Working day shift.

19    Q.   So 7:00 A.M. to 3:00?

20    A.   Correct.

21    Q.   And is that also the shift that Officer

22  Stephens, Ford and Hoffmeyer were working if you

23  recall?

24    A.   Yes.  We were all on overtime.

---

**23**

1    Q.   What do you mean you were all on overtime?

2    A.   Yes, Ford and myself, we worked the midnight

3  shift, 11:00 to 7:00, 11:00 P to 7:00 A.  We worked

4  the previous night and stayed over for the day shift

5  on the 4th.

6         And Stephens is a 3:00 to 11:00

7  officer, and he was working overtime also.  And

8  Hoffmeyer was regular, the only day person.

9    Q.   What was your -- in 2003, what was your

10  customary shift?  What shift did you typically work?

11    A.   Midnights, 11:00 to 7:00, 11:00 P to 7:00 A.

12    Q.   And you started with the Department of

13  Corrections in the 1990's, is that correct?

14    A.   '91.

15    Q.   Had you ever worked day shift before?

16    A.   Yes.

17    Q.   When did you work day shift if you recall?

18    A.   You mean in an overtime period or as

19  assigned?

20    Q.   Assigned shift.

21    A.   Assigned to day shift, that would be, that

22  would be probably middle 90's probably a two year

23  stretch or something like that, two or three year

24  stretch maybe.

---

**24**

1    Q.   And that was at Dwight, correct?

2    A.   Correct.

3    Q.   And did you ever work the segregation unit

4  during that two year stretch?

5    A.   I don't -- you mean the whole time period or

6  from '91 on or --

7    Q.   During that two year time you were working

8  days, were you ever assigned to the segregation unit?

9    A.   I mean, we were assigned everywhere.  I

10  mean, there's no particular place that we worked.

11    Q.   So you may have been?

12    A.   Could have been, yeah.  One day we could

13  have been, and the next day we were someplace else.

14    Q.   You don't recall if you worked there or not?

15    A.   No.

16    Q.   Now going back to November the 4th of 2003,

17  were there any lieutenants working on that day,

18  November 4th, 2003?

19    A.   Lieutenant Kuhse.

20    Q.   How do you spell that last name?

21    A.   K-u-h-s-e.

22    Q.   And where was he assigned on that day?

23    A.   She's a female.

24    Q.   She.

---

**25**

1    A. She was -- I'm not sure. She could have

2  been the ground supervisor maybe.

3    Q. So she wasn't in the C12 unit?

4    A. She came in.

5    Q. That entire 7:00 A.M. to 3:00 P.M. shift?

6    A. For that shift, she did make an appearance

7  because I remember her signing in on the books, in the

8  visitors log or the staff logbook that we have to sign

9  in on.

10    Q. Now earlier you were talking about taking

11  inmates to showers, getting them soap, that sort of

12  thing. Do you recall that?

13    A. Yes.

14    Q. If an inmate is going to be taken out of

15  their cell to go to showers, what's the procedure?

16  Can you describe that for me?

17    A. Uhm, going, they're cuffed, and they're

18  given --

19    Q. Who handcuffs them?

20    A. The officer does.

21    Q. So the wing officer?

22    A. The wing officer, correct.

23    Q. Are they cuffed before they come out the

24  door?

**26**

1    A. Yes.

2    Q. So they would back up to the door?

3    A. Back up, cuff them.

4    Q. Put their hands through the slot, right?

5    A. Correct.

6    Q. And handcuffs applied?

7    A. Correct.

8    Q. And then who opens the door?

9    A. The wing officer.

10    Q. Okay. Is there anyone else present whenever

11  the wing officer opens the door?

12    A. No.

13    Q. So the wing officer would take the inmate

14  out of the cell by themself?

15    A. Yes.

16    Q. Okay. And where would you be as sergeant?

17    A. Just on the ground, in the building. No

18  specific place. I mean, you'd just be on the unit.

19    Q. Okay. So a sergeant would not need to be

20  present whenever a wing officer would go open a door

21  to the cell to take an inmate out?

22    A. No, just, no.

23    Q. And what about for soap, can you describe

24  the procedure for providing soap to an inmate?

**27**

1    A. They would tell you when they would come

2  out, and they say they need soap or sanitary napkins

3  or whatever. And you would just give it to them. If

4  you have it on the unit, you give it to them while

5  they're in the shower. I mean, they would stand there

6  at the gate in the shower, and then you just hand them

7  a bar of soap.

8    Q. If an inmate is going to be taken to the

9  health care unit, what's the procedure for that?

10    A. Uhm, you mean if they want to go to the

11  health care unit or --

12    Q. Well, either, let's start with that. If

13  they want to go to the health care unit, what's the

14  procedure?

15    A. You give them a referral, and they fill out

16  their complaint and send it to the health care unit.

17  You use the referral system.

18    Q. Does P 96, does that sound like what the

19  form is?

20    A. Oh, I have no idea.

21    Q. So they send a request form over to the

22  health care unit?

23    A. Uh-huh (affirmative).

24    Q. Now if an inmate has a medical emergency and

**28**

1  needs to go to the health care unit not because

2  they're asking to go but because they're being taken,

3  what's the procedure for that?

4    A. Uhm, define a medical emergency.

5    Q. Well, during the time that you worked from

6  1991 to 2004, did you ever encounter any emergency

7  situations where an inmate was taken to the health

8  care unit?

9    A. Yes.

10    Q. Okay.

11    A. Inmate was bleeding. She was in labor. She

12  was bleeding. She was having a discharge from labor.

13  One lady had heart trouble that we knew.

14    Q. Okay. And what was the procedure in

15  emergency situations like that for taking an inmate to

16  the health care unit?

17    A. You would call up the nurse. Or what we

18  would do on the midnight shift is we would call up the

19  nurse and say, hey, we got a lady that's bleeding or

20  she's a known heart patient. And they would say,

21  okay, get her a ride and get her over here right away.

22    Q. Okay. And how would you get her a ride and

23  what procedures would you use to get her over there as

24  the correctional sergeant?

29

1     A.  We would call -- uhm, you would just -- as
2  the correctional sergeant, you would just make sure
3  that the inmate was, if she was taken over to the
4  clinic.  I mean, there was no particular, anything in
5  particular that you had to do as a sergeant to get her
6  over there.  The officers would make the phone call
7  and then listen.  I mean, not listen, but let the
8  nurse know what's going on.  And they, the nurse,
9  would say, okay, get her over here.  And I guess
10  either the panel officer or the sergeant could call
11  base, control center, and tell them that we had an
12  inmate to go to the clinic right away.  And you'd say
13  per the nurse.  And as long as you said per the nurse,
14  you know, no questions were asked.
15     Q.  Okay.  How do you get the inmate -- I'm
16  sorry, I want to know the procedure.  How did you get
17  the inmate out of the cell in a medical emergency
18  situation?
19     A.  You don't cuff pregnant inmates.  You let
20  her walk out.  I mean, there again, you're asking a
21  broad statement for segregation units or for general
22  population.
23     Q.  Let's talk about the segregation unit.  If
24  you have an emergency situation such as a pregnant

30

1  woman bleeding or someone having heart trouble, how
2  would you physically get them out of the cell and get
3  them to the health unit?  I want you to describe for
4  me if you would the process.
5     A.  A pregnant inmate you wouldn't cuff them
6  because you would have a chain, a waist chain to where
7  they couldn't use their hands in case they fell, so
8  you wouldn't cuff a pregnant lady.  And --
9     Q.  Are their arms secured to the waist chain?
10     A.  Right.  Well, no, they're different than the
11  male institutions.  I mean, I'm sure you've seen the
12  male institutions.  But what the women have are a set
13  of handcuffs.  And then on the chain there's a piece
14  where it loops through, and it just holds them to
15  their waist.
16     Q.  Okay.
17     A.  So the pregnant one wouldn't get cuffed.
18  But if she was bleeding or something and you would
19  just ask, I mean you would just cuff her with the
20  waist chain.  You also had to leave the unit in the
21  waist chain.
22     Q.  And what about someone with heart trouble,
23  what's the procedure there, again, in the segregation
24  unit?

31

1     A.  Never had one in the segregation unit.  Had
2  some out in general pop, but not in the segregation
3  unit.
4     Q.  Did you ever have anything that you
5  considered to be an emergency medical situation while
6  you were working in the segregation unit?
7     A.  Once on a mental health unit had an inmate
8  who looked like she had a broken foot, broken ankle.
9  And the assistant warden who was, at that time it was
10  Matriana.  He said under no circumstances do you open
11  that door unless she's handcuffed.  He goes I don't
12  care what she does, but you do not open that door
13  unless she's handcuffed.
14     Q.  I don't think that answers my question.
15  What was the procedure that you used in that instance?
16            MR. BAKER:  In that specific
17  situation?
18            MR. WALTER:  Sure.  What
19  procedure did you use?
20            THE WITNESS:  She didn't get
21  out unless she got handcuffed.  And she knew with him
22  standing there, she was not going to get the door open
23  unless she backed up to the door and got handcuffed.
24     Q.  So what did you do in that situation?

32

1     A.  What did she do?
2     Q.  Right.
3     A.  She -- I don't know if she backed up at that
4  time, but I know she didn't go to the clinic right
5  away because she wouldn't cuff up.
6     Q.  Was she taken to the health care unit?
7     A.  Eventually she did back up and got cuffed.
8     Q.  Okay.  Now you also mentioned an incident
9  whenever a person was having heart trouble.  How did
10  you get the inmate out of the cell in that particular
11  incident?
12     A.  In segregation I don't remember having any
13  inmates with heart trouble.
14     Q.  I'm not asking about segregation.  You had
15  another incident.  Was that in segregation?
16     A.  No.  I don't remember.
17     Q.  The inmate was in a cell, correct?
18     A.  Right.  They're all in cells.
19     Q.  How did you get them out of the cell?
20     A.  If it's general population, you just open
21  the door, and you let them go.  I mean, you can let
22  them walk to the clinic.  Or if it's like a heart
23  trouble, you would give them a ride to the clinic and
24  keep an eye on them.

33

1    Q.  Have you ever had an inmate when you were
2  working in the segregation unit who refused to cuff
3  up?
4    A.  Oh, yes.
5    Q.  And what was your procedure when you had an
6  inmate who refused to cuff up?
7    A.  You just give them a direct order, tell them
8  to cuff up or they're not coming out of their cell.
9    Q.  If you have an inmate who you want to come
10  out of the cell and you give them a direct order to
11  cuff up and they refuse, what do you --
12    A.  Leave them there.  Write them a ticket and
13  leave them there, refusing a direct order.
14    Q.  In your experience working at Dwight
15  Correctional Center both as a correctional officer and
16  as correctional sergeant from 1991 through 2004, was
17  there ever an incident where an inmate was removed
18  from a cell even though they did not cuff up?
19    A.  I'm sure there was.  There's probably a
20  couple -- I mean no, offhand, no.
21       But I know with the mental health there
22  were always with the, you know, the segs over there
23  always acting up.  And I know that a couple times a
24  lieutenant emptied pepper spray on them, you know,

34

1  then they probably cuffed them after that.  They
2  refused to cuff up; and then, you know, they would
3  spray them to get them to cuff up.  And then they
4  would cuff them and then take them out.
5    Q.  How would the lieutenant become aware of the
6  fact that an inmate was refusing to cuff up?
7    A.  You would -- if you get a refusal to cuff
8  up, you would notify your superior and then let them
9  take it from there.
10    Q.  Okay.  Let's go back to November the 4th of
11  2003.  You started at -- actually, you worked another
12  shift earlier than that?
13    A.  Correct.
14    Q.  But we'll start at the day shift, the 7 A.M.
15  to 3:00 P.M. shift.  What happened that day?  You
16  started your shift.  Tell me what you did.
17    A.  Uhm, roughly between 8:00 and 9:00 o'clock,
18  took out the A and B side for rec.  They go outside
19  for an hour.
20    Q.  You went out with them?
21    A.  I escorted them with an officer out to the
22  rec yard.  And then once they got in the rec yard and
23  all the cuffs were taken off, then I came back in to
24  the unit.

35

1    Q.  What did you do next?
2    A.  About 10:00 o'clock or roughly right around
3  10:00 o'clock, LTS, leisure time service, Harper came
4  on the unit to hear tickets and got inmates out to
5  hear tickets.
6    Q.  You said tickets, you're talking about
7  disciplinary tickets?
8    A.  Yes, disciplinary tickets.  Inmates had
9  gotten out one at a time to hear their tickets.
10    Q.  And where were those being heard?
11    A.  Right out in the day room.
12    Q.  And where was the day room located in this K
13  shape?  Is there a day room on each of the legs of the
14  K?
15    A.  C and D have one day room.  A and B have a
16  day room.
17    Q.  Can someone in the A wing walk over, an
18  inmate -- I guess they're locked up, so they can't
19  walk out.  But I guess the question is to go from the
20  A wing to the B wing, do you have to go through any
21  secure doors?
22    A.  Each wing has a gate that's secured at all
23  times if the officer is not down the wing.
24    Q.  And so the day room is in between the two

36

1  wings, is that roughly correct?
2    A.  Yes, yes.
3    Q.  All right.  So the LTS individual came in.
4  You said his name was Harper?
5    A.  Correct.
6    Q.  Came in and was hearing tickets.  What did
7  you then do at that point?
8    A.  Got, watched the officer get the inmates out
9  one at a time to hear the tickets and then probably
10  was in the panel.
11    Q.  Okay.  And which wing or which wings were
12  having their tickets heard?
13    A.  C and D side.
14    Q.  So who was the officer assisting with the
15  hearing of tickets?
16    A.  Hoffmeyer.
17    Q.  Okay.  And at what point approximately did
18  the hearing of tickets cease and Mr. Harper or
19  Mrs. Harper, whichever it is, leave?
20    A.  He was probably gone -- he was probably
21  there no longer than an hour.
22    Q.  So he would have been gone by about what
23  time?
24    A.  I'd say 11:00 o'clock.

**37**

1    Q.  Okay.  What happened next?

2    A.  And in the meantime, probably around 10:00

3  o'clock also, we took the C and D side out to the rec

yard.  And a little after 11:00 brought them back in.

4

5    Q.  What happened next?

6    A.  Let's see, in between when, well,

7  Bills-Davis came out to hear a ticket about 10:30,

8  10:15, 10:30, in that time.  And she went back to her

9  cell.  Hoffmeyer put her back in her room.  And then,

10  let's see.

11        Hoffmeyer made a statement that

12  Bills-Davis wanted some medication or was feeling

13  dizzy.  I told her, I said, well, call the nurse and

14  see what the nurse says.  So she called and talked to

15  Janice.  And I told her, I said, well, whatever she

16  told you to do, go tell Davis to do it.  And so she

17  went down to tell Davis what happened or not what

18  happened but what the nurse said.  And that was the

19  last I heard of it for, that instance for, oh,

20  probably an hour or so.

21    Q.  And then what happened?

22    A.  Uhm, --

23        MR. BAKER:  What happened

24  generally or what happened with Bills-Davis?

**38**

1        MR. WALTER:  What happened

2  next.  He said Hoffmeyer went back to tell

3  Bills-Davis.  I want to know what he was doing that

4  day.

5        MR. BAKER:  You don't want

6  specifically with respect to the Bills-Davis incident?

7  You want to know everything else?

8        MR. WALTER:  Everything he was

9  doing.

10        MR. BAKER:  Do you understand

11  the question?

12        THE WITNESS:  Yes.  I was in

13  the panel.  Hoffmeyer was in the panel because she

14  came in to use the phone.  And I told her to call the

15  nurse and whatever you find out, go back and tell her.

16  And I remember her going down and telling her.  And

17  then we brought, went back and brought the rec line

18  in, which would have been after 11:00 o'clock.

19    Q.  So that's the C and D?

20    A.  Right, C and D side came in.

21    Q.  About what time is that?

22    A.  11:00, 11:30, somewhere in there.

23    Q.  Okay.  Then what happened?

24    A.  Uhm, then we sat down, I mean not sat down;

**39**

1  but the day got a little relaxed, a little relaxing

2  because the, we had the showers done, we had rec lines

3  done, and we were waiting for the mental health

4  counselors to come over and see the two inmates that

5  were on suicide watch on the unit.

6    Q.  And where would you have been at this point,

7  11:00, 11:30?

8    A.  In the panel.

9    Q.  Okay.  And then what do you recall happening

10  at that point?  Showers are done, the lines, rec lines

11  are done.  What happens next?

12    A.  We were waiting for the food to arrive, and

13  we knew it was going to be late because it was chicken

14  day, and chicken is always late.

15        So then we -- let me see, I don't know

16  what time.  I knew there was two phone calls that

17  Hoffmeyer made to the clinic about Bills-Davis.

18    Q.  Would she have made those calls from the

19  panel?

20    A.  Yes.

21    Q.  And were you present when she made those

22  calls?  Were you present in the panel?

23    A.  I was there for the first one or, yeah, the

24  first one because I remember her saying something

**40**

1  about she wanted to see the nurse.  I said, well, you

2  know, she can't go see the nurse.  Call the nurse and

3  see what she says and go back and tell the nurse or go

4  back and tell Davis what the nurse says.

5    Q.  So I believe your testimony was you recall

6  two phone calls that Hoffmeyer made to the clinic.

7  What happened after the second phone call?

8    A.  I don't remember what time the second phone

9  call was, but I remember going down the wings.  I walk

10  down the wing, you know, maybe once or twice, and

11  talking to the one inmate on the B, in B5, which was

12  the pink room, that she was on a suicide watch.  And

13  she wanted to see the mental health people because

14  they had to see them in order to come off suicide

15  watch.  And then there was another one on the D wing

16  that was on suicide watch.  And she started acting up

17  a little bit.  And I told her, I says, you know, keep

18  acting up, I said they're going to keep you on watch.

19  They won't take you off.  And so she quieted down.

20    Q.  Okay.  How many times did you tour the wings

21  on that day?

22    A.  Maybe twice, three times.  I don't know.  I

23  don't recall.

24    Q.  Would you have gone down all four wings two

**41**

1  or three times?

2      A.  Not necessarily.  I mean, you weren't

3  required to go down the wings.

4      Q.  Okay.  After you described meeting with an

5  inmate in the pink room and meeting with another

6  inmate on the D wing who was also on suicide watch,

7  what happened next?

8      A.  I know, if I'm not mistaken, I think I

9  called mental health and told them that or told Larry

10  to call mental health.

11     Q.  By Larry, you mean Larry Ford?

12     A.  Yeah, the panel officer, to call and see

13  when mental health was coming over to talk to them

14  because, you know, they wanted to get off their

15  watches and stuff because it was additional duties

16  that the officers had to, you know, I don't recall if

17  they were on ten minute watches, thirty minute watches

18  or what kind of watch they were on.  But if they were

19  coming off of a watch, they had to be on thirty

20  minute, if I'm not mistaken, at that time they had to

21  be upgraded to a thirty minute watch to come off.

22  Because I know Jones, I remember her making a

23  commotion.  And we just said, you know, you got to

24  wait for mental health to get here.

**42**

1      Q.  Jones is the inmate?

2      A.  Yeah, she was the one in B5.  I said she's a

3  known one to cry, I mean not cry, but complain and to

4  go on watches because she don't like her roommate or

5  something.

6      Q.  And what did you do then after touring the

7  wings and talking to those individuals on suicide

8  watch?

9      A.  I remember going down the C wing, and

10  Hoffmeyer told me that Davis was laying on the floor.

11  And I told her, went and told Davis -- well, I looked

12  in her little window.  And I told her, I said, you

13  know, you need to get up off the floor, you can't lay

14  on the floor.  And I opened up the food chuck, food

15  slot, and was talking to her.  And she just laid

16  there.  And I asked her inmate, I said what's going

17  on?  And she says nothing, we're just talking.  And I

18  says is everything okay?  And her roommate said yes.

19  So I shut the food slot, and I left.

20     Q.  What did you observe about Inmate Davis?

21  Describe her for me.

22     A.  She was laying on the floor on her side like

23  she had a seizure.  And that's what we assumed that

24  she had, she had a seizure, because that's what she usually

**43**

1  what the inmates would do is if their cellmate had a

2  seizure, the other one would roll them up on their

3  side, you know, and put a pillow underneath their head

4  so they wouldn't hit their head.

5      Q.  Did she have a pillow under her head?

6      A.  I don't recall that.

7      Q.  Okay.  What else do you recall observing

8  with respect to her other than her laying on her side?

9      A.  Her roommate put her red maroon winter

10  jacket that they issued, the state issued the inmates,

11  that she laid that over her like for a blanket.

12     Q.  Anything else that you recall observing with

13  respect to Inmate Davis?

14     A.  Everything else was nice and calm in there.

15  Nothing was out of place or anything.

16     Q.  Did the inmate ever say anything to you, the

17  Inmate Davis, I'm sorry.

18     A.  Davis, yeah.  I asked her, I said are you

19  all right?  And she says yeah, and she waved her arm.

20  And I said okay, you need to get up off the floor.

21  And that's the way I left it.

22     Q.  So Inmate Davis told you that she was okay?

23     A.  Yeah.

24     Q.  Okay.  About what time was it that you went

**44**

1  down and spoke with Inmate Davis?

2      A.  Oh, I don't really remember what time.

3      Q.  Okay.  It was after you had finished the

4  lines, is that right?

5      A.  Yeah, rec lines, yes.

6      Q.  Okay.  And what time was that done?

7      A.  11:00, 11:30.

8      Q.  And do you recall how long after you

9  finished the rec lines that you went down?

10     A.  No.

11     Q.  Was it two hours later?

12     A.  No, because two hours later I was off the

13  unit.

14     Q.  Okay.  Was it one hour later?

15     A.  To put an exact time on it, I couldn't do

16  it.

17     Q.  You think it was less than one hour or more

18  than one hour?

19     A.  Let's see, it would be noon.  I'd say it

20  would be within an hour after the rec line came back.

21     Q.  So approximately between 11:00 o'clock and

22  noon?

23     A.  Yeah, somewhere in that time.

24     Q.  Okay.  So you spoke with Ms. Davis, and she

45

1  told that you she was okay. And then what did you do?
2      A. I shut the slot; and then I left, left the
3  wing, closed the wing gate and went back in the panel.
4      Q. Who all heard, who all was present that
5  could hear Ms. Davis tell you that she was okay?
6      A. Her roommate.
7      Q. And what was that offender's name?
8      A. Oh, I'd have to look in the report for that.
9      Q. Actually, I have a copy of your initial
10 report here that I received today. Why don't you look
11 at that and see if it refreshes your recollection as
12 to the name of the inmate.
13     A. Christine Kazmirzak.
14     Q. Can you just spell that for the Court
15 Reporter?
16     A. K-a-z-m-i-r-z-a-k.
17     Q. Okay. Now other than that offender, and I'm
18 not going to try to pronounce the name.
19             MR. BAKER: Kazmirzak.
20             MR. WALTER: Kazmirzak. Was
21 there anyone else who was able to hear when Ms. Davis
22 said to you that she was okay?
23             THE WITNESS: No, because you
24 wouldn't -- not unless you're hollering you can't hear

46

1  outside the rooms.
2      Q. So there would be cells on either side of
3  Ms. Davis?
4      A. Right, right.
5      Q. And Ms. Kazmirzak's cell. But they would
6  not be able to hear what you said or what she said?
7      A. No, I kind of doubt it.
8      Q. And were there any other correctional staff
9  present whenever she said this to you?
10     A. Hoffmeyer could have been there. I'm not
11 sure if she was down the wing with me.
12     Q. You don't recall one way or the other?
13     A. No.
14     Q. Is there anything that would refresh your
15 recollection as to whether or not she was there?
16     A. No, because it was -- I mean because
17 sometimes we'd walk down and sometimes we wouldn't go
18 down the wing together. I mean, it wasn't, you didn't
19 have to go down there with, you know, the coworker or
20 the wing officer every time you went down the wing.
21 Anybody could just go down the wing and come back.
22     Q. Now I believe you told me that you told her
23 to get off the floor, is that correct?
24     A. Yes.

47

1      Q. Okay. And she didn't get off the floor?
2      A. No.
3      Q. Did you write any sort of incident report
4  about that?
5      A. No. It wasn't unusual for the females to
6  lay on the floor because at that time they turned the
7  heat on. And when they turned the heat on, it gets
8  hot in the rooms. And sometimes it's cooler on the
9  floor than it is -- because the heat comes out of the
10 vent on top of the room. And she was assigned to a
11 top bunk. And that's where her bunk was. So I
12 figured she was on the floor because it was cooler on
13 the floor.
14     Q. What happened then after you shut the
15 chuckhole and left?
16     A. Just went probably into the panel and sat
17 down and waited for the noon food to show up.
18     Q. Okay. And did it show up?
19     A. At 12:45 or something like that.
20     Q. Okay. Was it chicken?
21     A. Yep.
22     Q. Okay. So the inmates were then fed, is that
23 right?
24     A. Yes. I wasn't -- I wasn't on the unit when

48

1  the food arrived.
2      Q. Okay. Where were you at?
3      A. I was up in the administration building.
4      Q. What were you doing there?
5      A. Talking to the assistant warden of
6  operations.
7      Q. And who was that at the time?
8      A. Dottie Culkin.
9      Q. What were you talking to her about?
10     A. Security issue. Being I worked the midnight
11 shift, there was some things about that. And she was
12 the warden of operations, so she would be the one that
13 we'd take security concerns to. And that's -- I went
14 up and had a few minutes to go up and talk to her, so
15 I was talking to her.
16     Q. Anything unusual about that conversation?
17     A. Unusual?
18     Q. Yeah.
19     A. No.
20     Q. So you told her what you wanted to tell her,
21 is that right?
22     A. We talked for maybe fifteen, twenty minutes
23 and then got a phone call that Lissa Black wanted to
24 talk to me, who was the shift commander's, I don't

49

1 want to call her a secretary, but office girl. And
2 she worked in the shift commander's office. And I
3 went over and talked to her.
4          I was a union vice-president and she
5 wanted, she was the EBF, employee benefit committee,
6 EBF, I don't know what the F stands for, but it's
7 employee benefit program.
8     Q. That's good enough.
9     A. And she wanted -- every year they try to
10 get, they ask the union to donate for the Christmas
11 party, the Dwight Christmas party. And being I was
12 vice-president, she was asking me questions to take,
13 you know, to the president or to the executive board.
14 And then we were talking ten, fifteen minutes. And
15 then I got a phone call that they wanted, Sila was on
16 the unit to get --
17     Q. Can you spell that name?
18     A. Sila, S-I-L-A. And he wanted --
19     Q. And what rank was Sila?
20     A. Officer.
21     Q. Okay.
22     A. He wanted, he was on the unit to get segs
23 out to take to health care unit.
24     Q. Okay. Approximately what time was it that

50

1 you received that phone call?
2     A. 12:00, not 12:00, 1:30, somewhere in there,
3 1:30, 2:00 o'clock, somewhere in there, I think.
4     Q. And then what happened?
5     A. Uhm, I get on the unit. He says he's got
6 to take Bills-Davis. I said, okay, you can go get
7 her. So he goes down to get her. And he says she's
8 laying on the floor. I says, well, you know, you
9 can't take them out of the unit, you can't take them
10 out unless they're dressed. He said she's not
11 dressed, she's not ready to go. I said, well, go take
12 somebody else.
13          So I went down and checked on her.
14 And she didn't move, she didn't do anything. She
15 didn't respond like she responded before. And then
16 I opened the door. I checked, I nudged her. She
17 didn't flinch or anything. So then I went and checked
18 her, you know, checked her pulse in her neck and
19 didn't get no pulse. So then I don't know if I left
20 the door open or if I shut the door. And I went in to
21 the panel to call the nurses. And when I looked out
22 the window, the nurses were already coming in the
23 door. And I don't know if Sila told them or how they
24 got informed. But the next thing I knew, they were on

51

1 the unit. That was about 2:00 o'clock.
2     Q. You mentioned something about Offender Davis
3 not being dressed. Do you recall that?
4     A. Uhm, yes, because when we took the coat off,
5 she wasn't, the coat was covering her body. And her
6 jump suit was down to her knees. But her coat was
7 covering that up. You couldn't tell that looking in
8 through the food slot.
9     Q. Okay. So when you observed her some time
10 between 11:00 and 12:00 o'clock, did she appear to be
11 dressed to you at that point?
12     A. The roommate had her covered with the coat.
13     Q. So you couldn't see?
14     A. No.
15     Q. Okay. And what about whenever you went to
16 the cell after Sila had called you, did you look in
17 the cell when you got to the cell?
18     A. I opened the food slot, and I asked her, I
19 said you want to go to the clinic, I said you got to
20 get up and you got to get dressed. And she didn't
21 respond. Roommate just sat there. And she -- I said
22 again, I said if you want to go to the clinic, I said
23 you've got to get up.
24     Q. Could you observe her at that point?

52

1     A. Probably not the first time. But the second
2 time I went back down and told her you got to get up,
3 I opened the door. After she didn't move or anything,
4 that's when I opened the door and checked her. And
5 that's when the whole day unraveled.
6     Q. Prior to the coat being removed from her,
7 could you determine that she was undressed?
8     A. No.
9     Q. Okay. Had anyone told you prior to the coat
10 being removed from her that Ms. Davis was undressed?
11     A. I don't think so. I don't recall.
12     Q. Is it possible that someone did tell you
13 that, but you had forgotten?
14     A. Could be.
15     Q. Okay. Is there anything that would refresh
16 your recollection?
17     A. Uhm, I'd have to just check my report. I
18 mean, that's all.
19     Q. Your incident report?
20     A. My incident report.
21     Q. 434?
22     A. Yes. I know -- well, you're not going to
23 find anything on mine, I'll guarantee you that one.
24     Q. I'm going to show you what's been marked for

53

1  identification purposes as Defendant's Exhibit Four.
2  Do you recognize that document?
3      A.  Yes.
4      Q.  And how do you recognize it?
5      A.  My signature.
6      Q.  Okay.  And that's your signature that
7  appears on the, towards the bottom on the left hand
8  side?
9      A.  Yes.
10     Q.  Okay.  And what is this?
11     A.  What do you mean what is it?
12     Q.  Yeah, what is this document?  What type of
13 document is this?
14     A.  An incident report.
15     Q.  And what are incident reports used for
16 within the Illinois Department of Corrections?
17     A.  Unusual incidents.
18     Q.  Okay.  And was this report prepared on
19 November the 4th, 2003?
20     A.  Yes.
21     Q.  At approximately 2:00 P.M.?
22     A.  That was the day of the incident, at the
23 time of the incident.
24     Q.  When was it actually prepared, do you know?

54

1      A.  I turned it in at 3:10 on November 4th.
2      Q.  Now on the right hand side there's something
3  written that I can't read.  Can you read that?
4      A.  On the right?
5      Q.  You see it, right hand side on the bottom?
6      A.  Do you mean --
7              MR. BAKER:  Right above the
8  signature.
9              THE WITNESS:  It looks like
10 it's the major signed.
11             MR. WALTER:  Major Rebecca
12 Edwards, offender departed, I would probably say
13 institution, via ambulance at 3:05 en route to Morris
14 hospital.
15     Q.  Okay.  Now that handwriting appears to be a
16 little different than the handwriting up in the body
17 of the report.  Is that your handwriting?
18     A.  No.
19     Q.  Okay.  Now above that it says statement of
20 facts, and there's a statement.  Is that your
21 handwriting there?
22     A.  Oh, yes.
23     Q.  Okay.  It begins on the above date.
24     A.  Right, correct.

55

1      Q.  And then it ends notified Lieutenant Kuhse
2  of incident?
3      A.  Correct.
4      Q.  Okay.  And is that the report that you
5  prepared on November 4th, 2003 about the incident
6  regarding Inmate Bills-Davis?
7      A.  Yes.
8      Q.  Did you prepare any other incident reports
9  regarding the events involving Davis-Bills on November
10 the 4th, 2003?
11     A.  They wouldn't let me.
12     Q.  They wouldn't let you.  Who would not let
13 you?
14     A.  Administration.
15     Q.  Okay.  And who specifically in
16 administration would not let you write an incident
17 report?
18     A.  The investigators, the state investigators.
19     Q.  Okay.  And who were those state
20 investigators?
21     A.  One of them was Emerick and the other one I
22 think was Pronger, Proeger, Pronger, something.  I
23 think that was their name.  One male and female.
24     Q.  And do you recall which one was male and

56

1  which one was female?
2      A.  No.  I think -- well, no.
3      Q.  And did you ask them about writing an
4  incident report?
5      A.  Well, I asked them, I heard a rumor that
6  Officer Hoffmeyer was given three chances, was told to
7  rewrite her incident report, three, four times because
8  I turned in Hoffmeyer's initial incident report that
9  was never to be found.  And before she left the
10 institution that night, she was told that she had to
11 write it, another one.  And she was told to rewrite it
12 three or four times until Major Edwards got what she
13 wanted in the report.
14     Q.  And who told you that?
15     A.  Other officers, Ford told me and Hoffmeyer
16 told me.
17     Q.  So Hoffmeyer told you that she was
18 instructed to rewrite her report three or four times?
19     A.  Yes.
20     Q.  And what did Ford tell you?
21     A.  The same thing, that they would not accept,
22 they would not accept her initial incident report.
23     Q.  And it's your understanding that they who
24 would not accept the incident report was this Major

57

1   Edwards?

2       A.  I would presume so.

3       Q.  Well, I want to know what they told you.

4       A.  Well, I mean, after we turn them in, I have

5   no idea who -- I mean, she was the person that we give

6   it to.  And she's the one that signs it; and then it

7   goes up to administration.

8       Q.  But you spoke with Correctional Officer

9   Ford, correct?

10      A.  Right, after.

11      Q.  And who did he tell you had told Hoffmeyer

12  to resubmit that report?

13      A.  He didn't say.  He just told me that they

14  wouldn't accept her report.  Because I know her

15  incident report was maybe only three, four lines.

16  Hers was shorter than what mine was.

17      Q.  Now on Hoffmeyer, you also spoke with her,

18  and she told you that someone had told her to resubmit

19  her incident report, is that correct?

20      A.  Yes.

21      Q.  Who did she tell you had instructed her to

22  do that?

23      A.  She just said they wouldn't let me, Major

24  Edwards wouldn't accept it, that she had to write more

58

1   detail.

2       Q.  Okay.  Now at some point you wanted to add

3   detail to yours, is that correct?

4       A.  Yes.  After I saw, in the write up I saw

5   Hoffmeyer's incident report.  And I asked them, I

6   said this isn't what she turned in.  And they go,

7   well, that's what we got.  And I says can I change

8   mine?  And they said no.

9       Q.  In the write up, what do you mean by the

10  write up?

11      A.  In the ERO packet.

12      Q.  Okay.  And so when would this conversation

13  have taken place when you asked to rewrite yours?

14      A.  It would have been November 6th is when they

15  came in and did the investigation.

16      Q.  So a couple days after the incident?

17      A.  Correct.

18      Q.  On November the 4th of 2003, did you write

19  anything in addition to what is on Timm Exhibit Four?

20      A.  No.

21      Q.  Okay.  And did you attempt to write anything

22  in addition to what's on Timm Exhibit Four?

23      A.  No.

24      Q.  Did you keep any personal notes regarding

59

1   the events that took place on November 4th of '03?

2       A.  Yes.

3       Q.  And have you turned those over to your

4   counsel?

5       A.  No.

6       Q.  Okay.  I would ask that you do that; and,

7   counsel, that those be provided to us.

8           I'm sorry, it's going to take me a

9   minute here.

10          (Recess Taken.)

11          MR. WALTER:  I'm going to show

12  you what's been marked for identification purposes as

13  exhibit, Timm Exhibit Six, and ask you if you

14  recognize that document.

15          THE WITNESS:  Yes.

16      Q.  How do you recognize it?  What is it?

17      A.  Uhm, notes that I wrote three weeks after or

18  roughly a month after the incident.

19      Q.  Okay.  And did those describe what you

20  recalled at that time with respect to the incident on

21  November the 4th, 2003?

22      A.  Yes, yes.

23      Q.  Is this your handwriting?

24      A.  Yes.

60

1       Q.  How many pages total are there?

2       A.  First one is eleven, and the second one I

3   think is three.  So there would be a total of fourteen

4   pages.

5       Q.  What's the second one about?

6       A.  Uhm, basically what I did, I kept calling

7   and asking what was going on with my status.  And what

8   happened on November 6th, I wrote down what took place

9   that day with Conkling telling me I couldn't leave the

10  institution.

11      Q.  Okay.  Now I want to draw your attention to

12  the top of the page on the second one where it starts

13  I kept calling and talking to AWO.  I'm assuming

14  that's Assistant Warden of Operations Conkling?

15      A.  Correct.

16      Q.  What's the date on the top of that page?

17      A.  12/4/03.

18      Q.  And then turning to the next page, what's

19  the date on that page?

20      A.  12/4/03.

21      Q.  And the last page, what's the date on that?

22      A.  12/4/03.

23      Q.  What's the significance of 12/4/03?

24      A.  That was the date that I wrote them.

**61**

1    Q. So that's the date that you wrote these
2  three pages?
3    A. Yes.
4    Q. Okay. Now drawing your attention to the
5  first page of Exhibit Six, there's a date at the top
6  of it. What's the significance of that date?
7    A. That's the date I wrote the first eleven
8  pages.
9    Q. Okay. And what date appears there?
10    A. 12/1 of '03.
11    Q. Is it possible that you wrote these pages on
12  dates other than December the 1st, 2003 and December
13  the 4th of 2003 and have simply forgotten?
14    A. No.
15    Q. Okay. So you wrote the first eleven pages
16  on December the 1st of 2003, correct?
17    A. Yes.
18    Q. And you wrote the last three pages on
19  December 4th, 2003?
20    A. Yes.
21    Q. And it's not possible you wrote them on
22  different days?
23    A. No.
24    Q. I don't have an exhibit number for this,

**62**

1  these are your Rule 26 disclosures, and there's just
2  some names on there. And if you would, if you can
3  turn it so I can look with you?
4        MR. BAKER: Here.
5        MR. WALTER: That would be
6  great. Thanks. Go ahead and look at that. I want to
7  go through here and have you briefly tell me what this
8  person knows with respect to your case and different
9  individuals who have discoverable information.
10        Warden Alyssa Williams. What does she
11  know with respect to this case just generally?
12        THE WITNESS: She was the
13  warden at the time of the incident.
14    Q. Okay. And did you have any discussions with
15  her?
16    A. No.
17    Q. Okay. Did she make any statements that
18  you're aware of that led you to believe that you were
19  being discriminated against because of your sex?
20    A. Not that I can recall, no.
21    Q. Is there anything that would refresh your
22  recollection?
23    A. Not that I have.
24    Q. Okay. Is there anything within DOC that

**63**

1  you're aware of that would refresh your recollection
2  as to whether or not she made any statements?
3    A. That would be in the arbitration hearing
4  notes.
5    Q. Okay. So other than that, you're not aware
6  of any statements that she made?
7    A. No, no.
8    Q. And what about Assistant Warden Ted
9  Conkling? What discoverable information do you
10  believe that he has with respect to this case?
11    A. This is -- I ran into him at the mall in
12  Bradley one day, one evening. And he asked me what
13  was going on with my case or what I was doing. And I
14  told him, I asked him why? And he goes, well, he goes
15  because my name is on the packet. He goes I just want
16  to know if my name is going to be involved in a
17  lawsuit.
18        And I says, well, I says why would I go
19  after you? He said, well, because my name is on it,
20  the signature on it. And I says oh. I said, no, it's
21  not you, I said it's the department. And he goes oh,
22  okay. And I says why? And he says, well, he says you
23  know why they got rid of you? And I says, I said why,
24  because I can't keep my mouth shut? I voice my

**64**

1  opinion? And he goes no. He goes it's because you're
2  a male. And I says what do you mean because I'm a
3  male? And he goes because you're a male, and he says
4  you're in a female institution. And I says, well,
5  what does that have anything to do with anything? And
6  he says you're a male at a female institution. He
7  says I'll leave it at that. And that's all he said.
8        And I didn't ask him anything else
9  because, you know, I wasn't going to pump him any more
10  than what he already told me. And that's basically
11  what we talked about. And then I can't remember if
12  his wife was standing there with me, with us when we
13  were talking or if she just walked out and then he
14  says, well, we got to go.
15    Q. So it would have been -- you believe his
16  wife may have been present during the conversation?
17    A. Yes. I mean, I know she was around; but I'm
18  not sure if she just walked up or if she was, you
19  know, how much of it she heard.
20    Q. And this was at the mall in Bradley?
21    A. Yes.
22    Q. And where at in the mall in Bradley?
23    A. The south court, south court.
24    Q. In front of any particular store?

65

1     A.  Uhm, right outside of Le Nails. She was
2  getting -- he said she was in there getting her nails
3  done and stuff.
4     Q.  Was there anyone else present that could
5  hear the conversation?
6     A.  No.
7     Q.  What other information are you aware of that
8  Assistant Warden Ted Conkling has with respect to this
9  case?
10    A.  Uhm, that's mainly what I know, I mean,
11  because I really never talked to anybody after I
12  received the packet.
13    Q.  And by the packet?
14    A.  The ERO packet.
15    Q.  Okay.  Now Mary Hodge, she's over
16  investigations?
17    A.  Oh, okay.
18    Q.  Correct?
19    A.  Yes.
20    Q.  Okay.  Did you ever meet with her
21  personally?
22    A.  No.
23    Q.  Okay.  Formerly, I believe.  I don't know
24  that she still is, but formerly over investigations.

66

1        What about Cheryl Tall Hawkins, what
2  information does she have with respect to this case?
3     A.  At the time she was like the internal
4  investigator at Dwight.  She's the one that would have
5  interviewed all the inmates.
6     Q.  Okay.  And then I know the next one is the
7  inmate that was in the cell with Ms. Davis-Bills?
8     A.  Yes.
9     Q.  What about Michelle Vancil?
10    A.  She lived across the hall.  I can't remember
11  which one.  They're numbered.  If they went down or
12  they went across.  She would have been, I know she
13  lived right across the hall from C1.
14    Q.  So across the hall from the cell in which
15  Davis-Bills was housed?
16    A.  Right.
17    Q.  Now we've talked about Dottie Culkin.  You
18  were speaking with her on November the 4th, 2003,
19  correct?
20    A.  Correct.
21    Q.  Did she know anything else about this case
22  to your knowledge?
23    A.  Uhm, I have no idea.  I mean, it's just, I
24  mean, I know I've talked to her at her office.

67

1        After she left Dwight, they transferred
2  her to Pontiac.  She worked out of the district, what
3  district is that, District 6 headquarters, the state
4  police headquarters over there.  And I remember we,
5  being my ex-wife, we, I can't remember if we went to
6  Macomb or if we went to Bloomington to see our
7  daughter.  And we stopped, I stopped and talked to her
8  one morning.  And she told me that I needed to pursue
9  the case.
10    Q.  To pursue a lawsuit?
11    A.  Or to pursue it.  She didn't say
12  specifically a lawsuit.  But she said you need to
13  pursue it because she said you got treated wrong.
14    Q.  Okay.  And that was after she had left IDOC,
15  is that correct?
16    A.  Well, she was still an IDOC employee.  She's
17  like the -- I think her title is Livingston County
18  Investigator or something, for, might just be for
19  Pontiac or something.  I don't know what her official
20  title is.
21    Q.  And what about Patric L. McElroy?
22    A.  McElroy, he was the relief officer that came
23  in and relieved Hoffmeyer and Stephens for that day.
24    Q.  So he would have come in at 3:00 o'clock, is

68

1  that correct?
2     A.  No, he would have been there -- well, he was
3  also the rec person.  He's the one that took the rec
4  lines out.
5     Q.  So what shift would he have worked?
6     A.  7:00 to 3:00.
7     Q.  Okay.  And then Mark Sila, we spoke about
8  him already?
9     A.  Yes, he was the seg movement officer 7:00 to
10  3:00.
11    Q.  What about Rosemary Sutton, what does she
12  know about this case to your knowledge?
13    A.  She was on the unit.  I mean, I know she was
14  on the D wing.
15    Q.  D wing?
16    A.  Right.
17    Q.  On November 4th, 2003?
18    A.  Right.  She signed in on the staff sign in
19  book that she was on the unit because C12 was her
20  unit.  She was mental -- I'm not sure if she was a
21  mental health counselor at that time or if she's just
22  a clinical counselor.
23    Q.  Okay.  What about Christine Taylor, what
24  does she know about this case?

69

1    A.  She was a nurse that came over with Janice
2  Miller.

3    Q.  Okay.  So this was after the door was opened
and the nurses came in?

5    A.  Yes.

6    Q.  What about Roger Clemens, what does he know
7  about this case?

8    A.  Uhm, --

9    Q.  Again, all these are just basically what
10  you're aware of.

11    A.  Right.  He was, he transferred to Lincoln, I
12  think, whichever is the female place, Lincoln now.

13    Q.  I don't know.

14    A.  I worked with him on midnight shift at
15  Dwight; and he transferred to Lincoln Correctional
16  Center, I think.

17    Q.  And what would -- to the best of your
18  knowledge, what does Roger Clemens know about the
19  facts of your case, this case right here, the November
20  4th incident?

21    A.  How I treated inmates.

22    Q.  Okay.  Just in general?

23    A.  Yes.

24    Q.  Not specific to this particular incident?

70

1    A.  I'm not sure when he transferred.  I know
2  somewhere, I'd have to check and see when he
3  transferred.

4    Q.  Okay.  So you don't know whether he has any
5  personal knowledge about the events on November 4th,
6  2003?

7    A.  That's been three years ago.  I'm not sure.

8    Q.  Okay.  Louise Todd, what does she know about
9  this case?

10    A.  She's the nurse practitioner that came over
11  and helped with Bills-Davis when we had her out in the
12  day room.

13    Q.  Elizabeth Thorson or Thornson?

14    A.  Thorson.  She was -- she is a correctional
15  officer at Dwight.

16    Q.  Okay.  And what to your knowledge does she
17  know about this incident?

18    A.  She was, at one time she was one of my
19  supervisors when she was a captain.

20    Q.  Okay.  And do you know whether she worked on
21  November 4th, 2003?

22    A.  I'd have to check the notes of the roster
23  for that day.

24    Q.  So as you sit here today, you don't know?

71

1    A.  No, I don't know today.

2    Q.  We've already discussed Barbara Hoffmeyer.
3  Sherry Lewis, who is that?

4    A.  She's a former sergeant.  She would just
5  be -- she has no personal knowledge of this case.  She
6  retired, I'm not even sure, maybe '98, '99, something
7  like that.

8    Q.  Okay.  So she wasn't working at Dwight in
9  '04?

10    A.  No, no.

11    Q.  And Gail Humbert?

12    A.  She is a counselor.

13    Q.  The one that came out on November 4th, 2003,
14  is that right?

15    A.  No.  That was Rosemary Sutton that came out
16  on the unit.  Gail would have been a counselor that if
17  inmates would have a question, you tell them to write
18  their counselor, you know.

19    Q.  So for grievances, they would send
20  grievances to her?

21    A.  Right, right.

22    Q.  Do you know whether she was Davis-Bills
23  counselor?

24    A.  I have no idea.

72

1    Q.  We talked about Janice Miller.  Electrician
2  Jeff Milbauer, what does he know about this case?

3    A.  He -- the electrical, I think he repaired
4  the call box in the room that the inmates have in
5  their rooms to where if there's an emergency or
6  something, that they push a button and it rings in the
7  panel.

8    Q.  Okay.

9    A.  So quick knowledge.

10    Q.  Did Davis-Bills have one of those call boxes
11  in her room?

12    A.  Yes.

13    Q.  Is that the one he repaired?

14    A.  Yes, I'm pretty sure.

15    Q.  And when did he repair it to your knowledge?

16    A.  After -- I'm not sure.  I don't want to say
17  if it was before or if it was after; but I know he was
18  down there after, I think.  It was either before or
19  after.  I know it's in the initial ERO packet.

20    Q.  So you're not sure whether it was before or
21  after November 4th, 2003?

22    A.  No, no.

23    Q.  Investigator Pronger is one of the
24  individuals who investigated this matter, correct?

73

1    A. Correct.

2    Q. What about Correctional Officer Angel Park?

3    A. She was an internal investigator also.

4    Q. Do you know if she was out of Dwight or out

5  of Concordia?

6    A. Dwight.

7    Q. Demetrius Harper, that was a counselor?

8    A. He was a counselor that came and heard the

9  ticket.

10    Q. On November 4th, 2003 he came and heard

11  tickets.

12    A. Correct.

13    Q. And Harry Bennett?

14    A. I presume that he's -- I shouldn't say

15  presume. But he's the guy that came in with Demetrius

16  Harper to hear the ticket on Davis. He's now probably

17  back at Sheridan.

18    Q. And Larry Ford is the other correctional,

19  one of the correctional officers working in C12 that

20  day?

21    A. Correct.

22    Q. James?

23    A. Kolodziej.

24    Q. It's K-o-l-o-d-z-i-e-j. Who is that?

74

1    A. Coworker on the midnight shift.

2    Q. Was he working on November the 4th, 2003?

3    A. I don't recall. I'd have to check the

4  roster.

5    Q. Okay. What about Shirley Clardy?

6    A. Clardy. Uhm, she was a day shift employee.

7  I'm not sure if she was working that day either.

8    Q. Okay. Now before we started the deposition

9  I had shown you your interrogatory answers and asked

10  you to look through those. Do you recall that?

11    A. Yes.

12    Q. Did you have a chance to look through those?

13  I believe they're marked as, sorry, counsel, didn't

14  get your copy back. I believe they're marked as Timm

15  Exhibit One.

16    A. Correct.

17    Q. Okay. Are those answers true? And I

18  understand that for objections, your counsel makes

19  objections, so I'm only asking as to the answers, the

20  factual information provided. Are those answers true

21  and correct to the best of your knowledge?

22    A. Yes, to the best of my knowledge.

23    Q. Okay. And reading through that, did you see

24  anything that was inaccurate?

75

1    A. I haven't really had a chance to read it.

2    Q. Okay. Had you ever seen those before today?

3    A. No.

4    Q. Okay. Why don't we take a minute and let

5  you read through.

6        (Recess Taken.)

7    A. Okay.

8    Q. Have you had an opportunity to look through

9  your answers to Defendant's first set of

10  interrogatories?

11    A. Yes.

12    Q. Is there any information in those answers

13  that's inaccurate?

14    A. No.

15    Q. I want to draw your attention to the answer

16  to interrogatory number two, which references a case

17  in Kankakee County Circuit Court. Do you recall that

18  court case where you were the plaintiff?

19    A. Yes.

20    Q. Okay. Do you remember what year that case

21  was filed?

22    A. Late 90's.

23    Q. Okay. And that was in Kankakee County?

24    A. Yes.

76

1    Q. Do you recall the court number of the case?

2    A. No.

3    Q. Now I want to draw your attention to your

4  answer to interrogatory number four. You discussed a

5  conversation that you had had with Mr. Conkling, Ted

6  Conkling, wherein he had indicated to you that your

7  discharge was based upon your sex. Are you aware of

8  any other statements by any DOC employees or officials

9  to the effect that your discharge was based upon your

10  sex?

11    A. No.

12    Q. So only that conversation with Ted Conkling

13  at the mall in Bradley? Take your time.

14    A. State the question again.

15    Q. Sure. You had testified about a

16  conversation you had with Ted Conkling at the mall in

17  Bradley where he had indicated that you were

18  discharged because you were male, correct?

19    A. Correct.

20    Q. Are you aware of any other statements from

21  any, we'll start with correctional employees, to the

22  effect that you were discharged because you were a

23  male?

24    A. Not that I can recollect, not that I can

77

1    remember.

2        Q.  Okay.  Is there anything that would refresh

3    your recollection?

4        A.  No, nothing in writing anywhere that I have.

5        Q.  Is there anything that's not in writing that

6    would refresh your recollection?

7        A.  Just if somebody would have told me, I mean.

8        Q.  But as you sit here today, you don't recall

9    anyone ever saying, other than Ted Conkling, that you

10   were discharged because you were male?

11       A.  No.

12       Q.  Okay.  And then I'll ask the same question

13   this time with respect to prison officials just to

14   distinguish basically between correctional staff and

15   directors, assistant wardens and so forth to make it

16   clear.

17              MR. BAKER:  And that's your

18   definition of prison officials, directors --

19              MR. WALTER:  For purposes of

20   this question only.

21              MR. BAKER:  Okay.

22              MR. WALTER:  Are you aware of

23   any prison officials, wardens, assistant wardens, so

24   forth, anyone along those lines making any statements

78

1    that your discharge was because of you being a male

2    other than again Ted Conkling?

3              THE WITNESS:  No, not other

4    than Ted.

5              MR. WALTER:  Okay.  So the only

6    statement by any prison official or employee that

7    you're aware of that your discharge was based on your

8    sex, you being a male, was from Ted Conkling?

9              MR. BAKER:  Objection, asked

10   and answered.  Go ahead and answer.

11             THE WITNESS:  Not unless in my

12   conversation with Dottie or Major Quinley something

13   like that came up.

14       Q.  This case has been pretty important to you?

15       A.  Yes.

16       Q.  In fact, you've made notes about the events

17   that have transpired?

18       A.  Yes.

19       Q.  In any of your notes do you have anything

20   that indicates that Major Quinley or Dottie Culkin

21   indicated that your discharge was based on you being a

22   male?

23       A.  No.

24       Q.  Have you received any written communications

79

1    from any DOC employees or officials indicating that

2    your discharge was based on you being a male?

3        A.  No.

4        Q.  Okay.  Now I want to draw your attention to

5    your answer to interrogatory number nine.  And if you

6    look at Page 4 of 7, the third line, actually it

7    begins on the second line down, the first full

8    sentence, the Plaintiff followed the direction of the

9    nursing staff by Correctional Officer Hoffmeyer and

10   relied upon information provided to him.  What

11   information was provided to you that you were relying

12   upon?

13       A.  Repeat the question.

14       Q.  Sure.  In your answer, the first full

15   sentence that begins on Line Two on Page 4 of 7, the

16   Plaintiff followed the direction of the nursing staff

17   by Correctional Officer Hoffmeyer and relied upon

18   information provided to him.  What information were

19   you relying upon that was provided to you?

20       A.  What Officer Hoffmeyer told me what the

21   nurse had said.  And I told her to just pass that on

22   to the inmate.

23       Q.  Okay.  And what was it that Hoffmeyer told

24   you that the nurse said?

80

1        A.  That the nurse told her to have her lay down

2    and elevate her legs.

3        Q.  Now was this before or after you went down

4    to Ms. Davis's cell and spoke with her and Ms. Davis

5    told that you she was okay?

6        A.  That would have been the time of the first

7    phone call.

8        Q.  Okay.  But when did that phone call occur?

9    Was it before or after you went down to Ms. Davis's

10   cell and talked with her and she told you she was

11   okay?

12       A.  It would have been before.

13       Q.  Now I want to draw your attention to --

14   actually, let's back up.

15             Is there any other information that

16   Correctional Officer Hoffmeyer provided to you that

17   you relied upon?

18       A.  Just that she was, that she was calling the

19   nurses and following, and telling her what to do.

20   What the nurse told her is what she told the inmate.

21       Q.  Okay.  Is there any other information that

22   Correctional Officer Hoffmeyer provided to you that

23   you were relying upon besides what the nurse told?

24       A.  No, that's all we had to go on.

81

Q. Okay. Is it possible that Correctional Officer Hoffmeyer provided you with additional information that you relied upon that you've simply forgotten?

A. No, not that I recall.

Q. Is there anything that would refresh your recollection as to information that Correctional Officer Hoffmeyer provided to you that you relied upon?

A. No, because if she made a phone call to the nurse, she told me she was calling the nurse. And I said, well, whatever the nurse tells you, go tell the inmate.

Q. So the only information from Correctional Officer Hoffmeyer that you relied upon was information that Correctional Officer Hoffmeyer received from the nurse, is that correct?

A. Say that again.

Q. The only information from Correctional Officer Hoffmeyer that you relied upon was information that she had received from the nurse?

A. Pertaining to what the nurse had said?

Q. No, and maybe that's the problem. I'm trying to figure out what information from

82

Correctional Officer Hoffmeyer you relied upon, not just what she received from the nurse. If there's anything else, I'd like to know what it is.

A. I mean, it's -- I'm not sure if I understand your question, I mean.

Q. Well, in your answer it says that you were relying upon information that Correctional Officer Hoffmeyer provided to you, correct?

A. Right, for the situation.

Q. Okay. And you've told me that you relied upon the information that Correctional Officer Hoffmeyer provided to you that she had received from the nurses.

Was there any other information that Correctional Officer Hoffmeyer provided to you that you were relying upon?

A. Not that we had to help with the medical of the inmate. I'm not really sure.

Q. Did Correctional Officer Hoffmeyer tell you about her observations of Davis?

A. She just told me that she was laying on the floor, and she wouldn't get up off the floor.

Q. Did she ever ask you for help?

A. Yeah, she asked me for help.

83

Q. Correctional Officer Hoffmeyer asked you for help?

A. Yes.

Q. What kind of help did she ask you for?

A. She asked if I would help her to put her up in her bed. And I said no, I won't do that.

Q. Did she ask you for any other help with respect to Inmate Davis?

A. Not that I would have to do any like physical work or anything, I mean not physical work, but anything physical or anything like that because in a situation like that, we would not, a male officer would not assist in a situation.

Q. Did Correctional Officer Hoffmeyer appear concerned about Ms. Davis at any point during the day on November 4th, 2003?

A. No, she kept telling me that she thought she was -- she kept coming back and saying that the inmate or her roommate says that she's okay, she's just sleeping on the floor.

Q. So at any point during November 4th, 2003, did Correctional Officer Hoffmeyer appear to you to be concerned about Ms. Davis's condition?

A. Just when we -- we got really concerned when

84

Sila came over, and she wouldn't get up to get dressed because that's one of the stipulations that the inmates have to be, you know, they have to get dressed on their own and back up to the cell door food slot to get cuffed before they can come out.

Q. I want to draw your attention to your answer to interrogatory number thirteen. In that interrogatory we had asked for information regarding the assertion in Paragraph Nine of the complaint that Dwight Correctional Center has a practice in which female employees receive less severe forms of discipline than male employees for similar types of misconduct.

And the answer says investigation continues.

The question that I have for you today is as you sit here today, are you aware of any facts or any information that Dwight Correctional Center has a policy or a practice in which female employees receive less severe forms of discipline than male employees for similar types of misconduct?

A. Similar types of misconduct?

Q. Right.

A. When you're talking similar types, I mean

85

```
 1   it's -- there hasn't been but one other inmate that I
 2   know that has died on the institutional grounds since
 3   I've been there.
 4        Q.  No, I'm sorry, let me explain to you what
 5   I'm looking for.  The allegation is that if there's
 6   a male and a female who have the same type of
 7   misconduct --
 8        A.  Oh, okay.
 9        Q.  The female is going to be treated more
10   favorably than the male.  That's what you've claimed
11   in your complaint.
12            Are you aware of any facts or
13   information to support your claim that there's a
14   practice at Dwight Correctional Center to favor the
15   females over the males?
16        A.  When it comes to overtime issues, some of
17   the females don't get wrote up.  The male officer will
18   get wrote up.
19        Q.  And who does that?
20        A.  Who writes them up?
21        Q.  Right.
22        A.  The shift commander who is running the
23   shift, which would be --
24        Q.  All shift commanders or just one shift
```

86

```
 1   commander?
 2        A.  Whoever is running the shift that day.  The
 3   shift commander is responsible for the shift, for
 4   running the shift.  Even though you may have two,
 5   three majors out there on shift, but the main shift
 6   commander runs the shift and is responsible for the
 7   write-ups.
 8        Q.  Okay.  And are all the shift commanders at
 9   Dwight favorable to females as opposed to males?
10        A.  Are all of them favorable to females as
11   opposed to males?
12        Q.  Sure.  That's what you're claiming.  You're
13   claiming they have a practice in which female
14   employees receive less severe forms of discipline than
15   male employees.  Now is that true of all shift
16   commanders, do all shift commanders --
17        A.  No, I can't say that all of them act the
18   same way.  I mean, there are certain --
19        Q.  Which shift commanders engage in this
20   practice?
21        A.  Well, I know Major Cranford, the last year
22   he wouldn't write females up on the midnight shift
23   because they refused overtime; but he'd write the
24   males up.
```

87

```
 1        Q.  Okay.  Any other shift commanders that
 2   you're aware of who were discriminatory against males?
 3            MR. BAKER:  Still talking about
 4   overtime or anything?
 5            MR. WALTER:  Anything.
 6            THE WITNESS:  Not that I can
 7   recall, I mean.
 8        Q.  Okay.  Now we've talked about the overtime
 9   issue.
10        A.  Okay.
11        Q.  We've talked about Ted Conkling's statements
12   to you at the mall in Bradley.  Is there any other
13   facts or information that you have to suggest that at
14   Dwight Correctional Center female employees receive
15   less severe forms of discipline than male employees
16   for similar misconduct?
17        A.  An incident with, let's see, at the time it
18   was Lieutenant Johnson got locked out because a female
19   officer made an accusation.  He got fired.  And the
20   courts proved that there was no allegation to it.  And
21   she received nothing for making the allegations.  That
22   case was just solved in '06.
23        Q.  Okay.  And other than the Lieutenant Johnson
24   incident, Ted Conkling speaking with you, the overtime
```

88

```
 1   issue, are there any other facts upon which you base
 2   your statement that Dwight Correctional Center has a
 3   practice in which female employees receive less severe
 4   forms of discipline than male employees for similar
 5   types of misconduct?
 6        A.  Not right now, no.
 7        Q.  Is there anything that would refresh your
 8   recollection?
 9        A.  Not that I have, no.
10        Q.  Okay.  Is there anything that you're aware
11   of, not necessarily that you have, that you could go
12   look at that would refresh your recollection?
13        A.  Not that I have, no.
14        Q.  Is there anything that DOC has that you're
15   aware of?
16        A.  Now you're opening up a whole new can of
17   worms.  I don't know.
18        Q.  So as you sit here today, there's nothing
19   that you're aware of that would refresh your
20   recollection?
21        A.  No.
22        Q.  Now I want to draw your attention to your
23   answer to interrogatory number fourteen, which states
24   after the Plaintiff was terminated in the spring of
```

89

1  2004, he was placed on medication because he was
2  suffering from high blood pressure. When were you
3  first diagnosed as having high blood pressure?
4      A. It was in the late fall or early winter of
5  '03.
6      Q. Okay. And had you seen a doctor prior to
7  that diagnosis?
8      A. Yes.
9      Q. And what had your blood pressure been prior
10 to the late fall of '03?
11     A. Prior to that, he said everything was
12 normal, you know, pretty good for a guy my size and
13 the job that I do.
14             And then after, it just, you know, I
15 can't say it skyrocketed; but then the medication
16 started.
17     Q. So in the fall of '03 you were diagnosed
18 with high blood pressure, correct?
19     A. Right.
20     Q. Was that prior to or after November 4th of
21 '03?
22     A. I'm not sure.
23     Q. Okay. And who is your doctor that diagnosed
24 you with high blood pressure?

90

1      A. Doctor Villegas.
2      Q. How do you spell that?
3      A. V-i-l-l-e-g-a-s.
4      Q. And are you currently taking any medication
5  for high blood pressure?
6      A. Yes.
7      Q. What are you taking?
8      A. Toprol, I think it's 50 milligrams.
9      Q. Can you spell that for me?
10     A. I think it's T-o-p-r-o-l.
11     Q. It's not a spelling test. We're just trying
12 to help the Court Reporter.
13     A. Yeah, I know.
14     Q. Have you been taking that same medication
15 since the fall of '03?
16     A. Yes, yes.
17     Q. And is your blood pressure controlled with
18 the medication?
19     A. Yes.
20     Q. I want to draw your attention to your answer
21 to interrogatory number sixteen where you list Burns
22 Security as an employer.
23     A. Okay.
24     Q. You were employed by Burns Security from

91

1  June of '04 through September of '05, is that correct?
2      A. Correct.
3      Q. Okay. And why did you leave Burns Security?
4      A. I went to Wackahut at the nuclear plant.
5      Q. Okay. And then it looks like you were also
6  working for IPC International?
7      A. Correct.
8      Q. Okay. So you're actually working two jobs
9  currently?
10     A. Correct.
11     Q. I want to draw your attention to your answer
12 to interrogatory number twenty where you list your
13 ex-wife and your daughter, Rachel?
14     A. Okay.
15     Q. Are you currently supporting your daughter,
16 Rachel?
17     A. No, she's twenty-three years old.
18     Q. And what about your ex-wife, do you support
19 her?
20     A. Do I support her?
21     Q. Yeah.
22     A. No.
23     Q. Okay. Now I previously showed you your
24 complaint, which was marked for identification

92

1  purposes as Timm Exhibit Two. And now I draw your
2  attention to paragraph eight of that complaint.
3      A. Oh, paragraph eight.
4      Q. Page 3, paragraph eight, the last full
5  sentence, the involvement and conduct of each of those
6  female employees with respect to the incident giving
7  rise to the discharge of the Plaintiff, Alan Timm, was
8  as or more serious than that of the Plaintiff, Alan
9  Timm.
10             So the first question I have for you is
11 with respect to Correctional Officer Hoffmeyer. What
12 conduct of hers was more serious than that of yours in
13 this incident?
14     A. That if there was a concern of a medical
15 emergency, that she did not have to have my approval
16 to open the door. She could have opened the door by
17 herself, and she didn't need me there on an emergency.
18     Q. Okay. Is there anything else upon which you
19 base that statement that her conduct was as or more
20 serious than yours?
21     A. Uhm, meaning why I say that, is that what
22 you mean?
23     Q. Right. Why do you say that her conduct was
24 as or more serious than yours?

93

1     A.  Because in the course of your duties, if
2  there's a medical emergency, you don't need a
3  supervisor to check on a medical emergency if there is
4  a medical emergency.  But, then again, the state
5  cannot define a medical emergency.
6     Q.  All right.  Other than you feel she had a
7  responsibility to respond regardless of whether or not
8  you were involved, is there anything else that you
9  base this statement upon than her conduct was as or
10  more serious than yours?
11     A.  I don't know.
12     Q.  You don't know or no?
13     A.  Well, the fact, the fact of the discipline
14  as I was reading the whole sentence, the fact that the
15  discipline that was handed down and how the state
16  reduced hers without a bat of an eye after the initial
17  discipline was handed out and before it went to
18  arbitration, the state reduced hers before it even got
19  to arbitration.  And it just seemed like they were
20  favoring her before they even or after they heard
21  mine.
22     Q.  Okay.  Now about the nurse?  And, again,
23  what was the name of the nurse?
24     A.  Janice Miller.

94

1     Q.  Okay.  And what was it about her conduct
2  that was as or more serious than that of you?
3     A.  She's medically trained.  She's got the
4  medical degree.  We don't have the medical degree.
5  And yet we inform the nursing staff what's going on.
6  And all we can do is just rely on what we're told.
7  And that's what we did on this case.  We told the
8  nurse what was happening, and she told us what to do.
9  And that's what we did.
10     Q.  Earlier you mentioned that you nudged Davis.
11  Do you recall that?
12     A.  Yes.
13     Q.  How did you nudge her?
14     A.  Uhm, I think if I'm not mistaken, beings I
15  was standing up and so tall, I think in the report I
16  nudged her with my foot on the hip.  And I didn't feel
17  nothing, you know, no movement in my leg.  So then I
18  went down, and I nudged her on the hip and still
19  didn't feel anything.  And then that's when I went up
20  and felt her pulse on her neck.
21     Q.  You said you went down and nudged her, were
22  you indicating with your arm at that point?  What did
23  you mean by you went down and nudged her?
24     A.  Yes, I went down and nudged her with my hand

95

1  on her hip.  And she didn't move.  And then I went up
2  to her neck.
3     Q.  That's what I thought, but she can't take
4  down, you were moving your arm, but you weren't saying
5  with your arm.  That's what I was trying to clarify.
6     A.  Okay.
7     Q.  Let me check here real quick.  I want to
8  show you what I've marked for identification purposes
9  as Timm Exhibit Five and ask you if you recognize that
10  document?
11     A.  Oh, yes.
12     Q.  And what is it?
13     A.  Uhm, it's my investigation by Emerick.
14     Q.  Okay.  There are eleven pages to this,
15  correct?
16     A.  Yes.
17     Q.  And down on the bottom left hand corner of
18  Pages 2 through 11, is that your signature that
19  appears?
20     A.  Yes.
21     Q.  And then there's another signature that says
22  interview signature, and there is a witness.  Do you
23  know whose signature that is, the witness?
24     A.  Jim Stison.

96

1     Q.  Was he your Afscme steward?
2     A.  Yes.
3     Q.  Now if you look on the second page of
4  this exhibit, let's see, six rows up from the bottom
5  there's a correction.  And then to the right it looks
6  like the initials ALT.  Are those your initials?
7     A.  Where?
8     Q.  Do you see what I'm --
9     A.  Yes.
10        MR. BAKER:  What page are you
11  referring to?
12     Q.  Page 2, I'm sorry.  It's six lines up from
13  the bottom on the right hand side.  I'm sorry.  Are
14  those your initials?
15     A.  Yes.
16     Q.  And is this a report that was written up
17  following an interview with you during which time your
18  shop steward was present?
19        MR. BAKER:  Objection, asked
20  and answered.
21        MR. WALTER:  You can answer if
22  you can.
23        THE WITNESS:  It was written
24  during, not after.  It was written during as we went.

1          MR. WALTER:  Are there any

2    misstatements in here that you're aware of?

3          MR. BAKER:  Out of fairness, I

4    think he should have an opportunity to read it, to go

5    through it.

6          MR. WALTER:  That's fine if he

7    wants to take the time to read it.

8          MR. BAKER:  I want him to take

9    the time before he answers your question.

10         MR. WALTER:  Sure.

11         MR. BAKER:  We can take a short

12   break.

13         (Recess Taken.)

14         THE WITNESS:  Just besides the

15   fact how she worded a couple of things; but I know she

16   was writing as fast as we were talking, so.

17    Q.   Substantively it appears accurate?

18    A.   Yes.

19    Q.   I don't have any additional questions at

20   this time.

21         CROSS EXAMINATION.

22         CONDUCTED BY MR. BAKER:

23    Q.   I just have a couple questions to clarify

24   the record.

1          Alan, do I understand that Officer

2    Hoffmeyer was the wing officer in the segregation unit

3    on November 4th?

4     A.   Yes.

5     Q.   And she had responsibility for two wings in

6    K building or in the segregation unit?

7     A.   Yes.

8     Q.   And those are C and D wings?

9     A.   Yes.

10    Q.   How many inmates were housed on November 4th

11   in each of those units if you remember?

12    A.   It could hold a hundred.  That would be

13   fifty on a side would be the capacity.

14    Q.   Fifty in each wing?

15    A.   No, fifty.

16    Q.   In the building as a whole?

17    A.   Right.

18    Q.   Okay.  So does that mean there would be

19   twenty-five on a wing if it was fully occupied?

20    A.   Yeah, one wing had 12 rooms and the other

21   wing had 13 rooms.

22    Q.   Okay.  Now would a wing officer spend her

23   work time actually being on the wing she was assigned?

24    A.   No.

1     Q.   Okay.  What would she do?

2     A.   You're required to do a wing check, which is

3    every twenty minutes.  And you make notation of that

4    in a wing checkbook.

5     Q.   Okay.  So can you take us through what a

6    wing check is?

7     A.   You just walk, you walk down the wing; and

8    you don't hear nothing, you don't -- you can look in

9    the cells if you want or you can just walk in down and

10   walk around and walk back off the wing.

11    Q.   Would you walk into the cells?

12    A.   No, no, the doors are locked, the doors are

13   shut.

14    Q.   Okay.  And does the wing officer have keys

15   to the cells?

16    A.   Yes.

17    Q.   Now if a wing officer has reason to believe

18   that an inmate has some health care emergency, can a

19   wing officer contact the medical unit or the nursing

20   unit without getting clearance from her sergeant?

21    A.   Yes.

22    Q.   Okay.  Now if a wing officer or for that

23   matter a sergeant out in any unit but particularly a

24   segregation unit has some reason to believe that an

1    inmate needs prompt medical attention or might need

2    prompt medical attention, can those officers take an

3    inmate to the medical unit or to the nurses on their

4    own volition?

5     A.   No.

6     Q.   What do they have to do before they can get

7    an inmate to that unit?

8     A.   Are you talking general or seg?

9     Q.   Well, let's talk about seg.

10    A.   Uhm, the seg, to get to the clinic, they

11   have to drop a note, a referral, and be put on the

12   sick call list.

13    Q.   What about if it's something where you think

14   it's not something that can wait a couple days, I

15   think the inmate needs some medical attention right

16   away?

17    A.   You can call and inform them what's going

18   on, and they will advise you what to do.

19    Q.   Okay.  But I take it you cannot take the

20   inmate to the medical unit in that situation without

21   the approval of the nurses or some physician?

22    A.   Correct.

23    Q.   Okay.  The sergeant in the segregation unit,

24   what responsibility do you have to periodically walk

101

1    down the wings to check on inmates?

2        A.    Can you --

3        Q.    Let me back up for a moment.

4               My understanding from your testimony is

5    that a wing officer has to make periodic checks of the

6    wing?

7        A.    Correct.

8        Q.    And I think you said that they have to do it

9    every twenty minutes?

10       A.    Correct.

11       Q.    So a wing officer in a matter of twenty

12   minute intervals would check on each of the wings he

13   or she was assigned, am I correct?

14       A.    Correct.

15       Q.    So in a given hour, a wing officer if he's

16   doing his job or she's doing her job would make three

17   checks on each wing that he or she was assigned?

18       A.    Correct.

19       Q.    Okay.  What about a sergeant?  What are your

20   responsibilities in making wing checks?

21       A.    You're mainly there just to supervise the

22   officer and not necessarily required to make wing

23   checks.

24       Q.    You say not necessarily required.  What do

102

1    you mean by that?

2        A.    There's nothing in writing that says that we

3    had to, like the officers have a book they have to

4    sign for every twenty minutes.

5        Q.    Okay.

6        A.    There's nothing that we have to initial or

7    sign or anything that says that we have to do a wing

8    check.

9        Q.    Okay.  Now I believe you indicated on this

10   particular day, November 4th, 2003, there was a period

11   of time where you were away from the segregation unit.

12   I think you saw an assistant warden for a little

13   while, and then you saw someone else concerning a

14   Christmas party as I recall.  I don't recall the names

15   of the individuals.  Am I correct?

16       A.    Yes.

17       Q.    If someone working on your unit that day had

18   needed to communicate with you while you were away

19   from the unit, what would the process be for doing

20   that?

21       A.    They could either call me on the radio

22   because all staff has radios or they could call the

23   control center and have control center call me on the

24   radio.

103

1        Q.    Okay.  But I think you indicated that you

2    did receive a call that Correctional Officer Sila --

3        A.    Sila, yes.

4        Q.    -- Sila was on the unit.  And you returned

5    to the unit at that time, am I correct?

6        A.    Correct.

7        Q.    Prior to that, had you received any calls

8    from either Correctional Officer Hoffmeyer or anyone

9    else concerning anything related to the unit?

10       A.    No.

11       Q.    Okay.  One last area.

12              I'm trying to get a visual picture

13   painted in my mind of a room in the segregation unit.

14   I tend to call them cells.  Is that what they used to

15   be called?

16       A.    Yes.

17       Q.    Okay.  Now I'm assuming that the cell has a

18   door which is an entry way?

19       A.    Correct.

20       Q.    Can you describe the door for me?

21       A.    It's -- they're not a solid door, but

22   they're a steel door, probably, I don't know what kind

23   of metal they're made out of or the thickness, I mean.

24   They're locked with a, I think the length is I think

104

1    three inches, it's four.  Size wise, I would say maybe

2    handicapped size, if not bigger than a handicapped

3    sized door.

4        Q.    Now it's a door rather than bars?

5        A.    Correct.

6        Q.    Okay.  So if I want to see into that

7    particular room or cell through the door, how do I do

8    it?

9        A.    You either, up at the top of the door you

10   have a, I think it's 9 by 9 window or you can open the

11   food slot, which is down at the waist level.

12       Q.    Okay.  And if I wanted to look into the

13   cell, is there any other way to do it?  Are there any

14   windows on the walls?

15       A.    No, no.

16       Q.    Okay.  That day did you ever receive any

17   information that might suggest that Inmate Davis might

18   be faking an illness?

19       A.    Just her roommate, just from her roommate.

20       Q.    What about Hoffmeyer, did she ever say

21   anything to suggest --

22              MR. WALTER:  Objection,

23   leading.  You can answer.

24              THE WITNESS:  She, Hoffmeyer

105

1  did come back and say that her roommate did say that
2  she was faking it.
3      Q. Do you recall when Hoffmeyer told you that
4  in relation to the time you visited the inmate's cell
5  for the first time?
6      A. It was after I had visited the cell the
7  first time.
8      Q. Okay. Lastly, I want to count the number of
9  times that you saw this inmate in her cell that day
10 beginning with when she returned from her ticket
11 hearing, okay?
12     A. Okay.
13     Q. Were you present when the inmate returned
14 from her hearing and went into the cell?
15     A. I'm not sure if I was on a unit or if I took
16 the rec line out, was out with the rec line at that
17 time.
18     Q. Okay. When was the first time you saw this
19 inmate in the cell after she came back from her
20 hearing?
21     A. Probably 11:00, 11:30 after we brought the
22 rec line back because the rec line, some of the rec
23 line that was out had to go down the C wing. And when
24 they come in, they went and stood by their doors and

106

1  then I helped them put the inmates back in their room.
2      Q. Okay. Now I understand that you went down
3  to check on this inmate with Officer Hoffmeyer at one
4  time?
5      A. Yes.
6      Q. Would that have been after the inmate's
7  return from the recreation?
8      A. Yes.
9      Q. Would that have been the second time you saw
10 the inmate after she came back from her ticket
11 hearing?
12     A. Was that the first time I saw her after the
13 ticket hearing? Is that what you asked?
14     Q. No, I'm asking if that was the second time
15 you saw her after the ticket hearing.
16     A. Oh, the second time. With Hoffmeyer, no,
17 that would have been the first time.
18     Q. First time with Hoffmeyer?
19     A. Yes, first time, I'm pretty sure.
20     Q. Okay. And then I'm a little confused. Did
21 you see her when you brought inmates back from the
22 recreation session?
23     A. No, we didn't have to look in her door
24 because her roommate was in there.

107

1      Q. Okay. So the first time you saw her then
2  was when you went down with Officer Hoffmeyer?
3      A. Yes.
4      Q. Okay. And you've already testified what
5  occurred then, I believe.
6          And I understand then you saw her again
7  or you went into her cell and you nudged her. And she
8  was non-responsive. And it was about that time that
9  the medical people were coming down, am I correct?
10     A. Correct.
11     Q. And that was after you came back from your
12 lunch or from your visit?
13     A. Correct.
14     Q. With the two people outside your unit?
15     A. Correct.
16     Q. Are those the only two times you saw this
17 inmate?
18     A. That's what I can recall, yes.
19     Q. Okay. I have nothing further.
20          MR. WALTER: No additional.
21          (Signature Reserved).
22          (Deposition Concluded).
23
24

108

1          SIGNATURE AND ERRATA SHEET.
2      I, ALAN TIMM, have read the foregoing testimony,
   given by me, taken on February 12, 2007, at the Law
3  Offices of Baker, Baker & Krajewski, 415 South Seventh
4  Street, Springfield, Illinois, in the case of Timm vs.
   Illinois Department of Corrections, Case No. 05-1276,
5  and have made any and all necessary corrections below:
6  Page No._____  _____ Line No._.  Reason for Change:_.
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20     _____
            Signature of Witness
21
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS_____DAY OF_____, 2007.
23
24     _____
       Notary Public

1

2   STATE OF ILLINOIS      )
    COUNTY OF CHRISTIAN    )

4                    CERTIFICATE

5
6        I, Tammy S. Wagahoff, CSR and RPR,
7   affiliated with Associated Court Reporters,
8   P.O. Box 684, Taylorville, Illinois, do hereby
9   certify that I reported in shorthand the
10  foregoing proceedings and the foregoing is a
11  true and correct transcript of my shorthand
12  notes.
13        I further certify that I am in no
14  way related to or associated with any of the
15  parties or attorneys involved herein, nor am I
16  financially interested in the action.
17
18
19
20          s/Tammy Wagahoff

21          ————— TAMMY S. WAGAHOFF, CSR
                  CSR License No. 084-002841

22

23
    Dated this ___25th___ day
    of ___February___ 2007.