E-FILED
Monday, 2 January, 11:44:50 PM
Clerk, U.S. District Court, ILCD

DEFENDANT'S
EXHIBIT



Illinois Department of Corrections
INTERNAL INVESTIGATIONS

## REPORT OF INVESTIGATION

| Case Number | Institution | Case Investigator |
|---|---|---|
| 04-DWI-097 | Dwight Correctional Center | EMRICH |

Time, Date and Nature of Incident

11/04/03; Conduct of Individual/Negligence, Death of a Person in IDOC Custody

| | Name (Last, first, middle) | Complainant ☐ | Victim ☐ | Inmate ☐ |
|---|---|---|---|---|
| **S U B J** | HOFFMEYER, BARBARA M. (Correctional Officer) | Offender ☒ | Witness ☐ | Employee ☒ |
| | Institution Number | Institutional Nickname (s) | | |

REPORT STATUS:    Initial Open ☒        Final ☒

Interviewed:
1. KAZMIRZAK, CHRISTINE (NMN), Inmate, R-38998
2. VANCIL, MICHELLE A., Inmate, B-49771
3. PARK, ANGEL M., Correctional Officer
4. HOFFMEYER, BARBARA M., Correctional Officer
5. HARPER, DEMETRIUS (NMN), Corrections Leisure Activities Specialist II
6. FORD, LARRY G., Correctional Officer
7. MCELROY, PATRIC C., Correctional Officer
8. SILA, MARK A., Correctional Officer
9. SUTTON, ROSEMARY D., Correctional Counselor II
10. MILLER, JANICE F., Corrections Medical Technician
11. TAYLOR, CHRISTINE (NMN), Registered Nurse
12. TIMM, ALAN L., Correctional Sergeant
13. MILBAUER, JEFF M., Electrician

Case Summary:
This investigation was conducted at the request of Assistant Warden DOROTHY CULKIN, Dwight Correctional Center, when inmates alleged that, on 11/04/03, staff left Inmate KIMBERLY DAVIS-BILLS, N-57280, laying on her cell floor, partially clothed, for several hours before notifying medical staff. DAVIS-BILLS was subsequently transported by ambulance to Morris Hospital and then to UIC Hospital where she was pronounced dead on 11/05/03 (Attachments #1 & #2).

Inmate Kimberly DAVIS-BILLS, N-57280, a black female, was 41 years old. DAVIS-BILLS was serving a 30 month sentence for Forgery with a Minimum Projected Outdate of 11/08/03 (Attachment #3).

The 11/06/03e Cook County Medical Examiner Certificate of Death indicated that DAVIS-BILLS' death was Natural. The cause of death was Intracerebral Hemorrhage due to Hypertensive Cardiovascular Disease (Attachment #4).

Copies of DAVIS-BILLS' medical records were obtained. Health Care Administrator DORRETTA O'BRIEN commented that DAVIS-BILLS arrived at Dwight Correctional Center on 07/01/03 with "out-of-control" hypertension. A cardiac database was done on 07/02/03 and she was seen by the Medical Director. DAVIS-BILLS resided in the Infirmary from 07/03/03 to 07/07/03. She was prescribed Vasotec, Lasix, Atenolol, and Aspirin for her blood pressure. By 07/14/03, DAVIS-BILLS' blood pressure was 120/88. A "stress echo" was done at UIC Hospital on 09/05/03. DAVIS-BILLS complained of depression on 09/18/03 and she was prescribed Rimeron. Her blood pressure was being check every three days and was creeping up as of

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

09/29/03. DAVIS-BILLS was seen by a nurse on 10/11/03 to prepare for her upcoming release. On 10/16/03, DAVIS-BILLS reported that she was doing well and the depression was under control (Attachment #5).

On 11/04/03, at 4:40 p.m., Correctional Officer CHERYL TALL-HAWKINS, Internal Affairs removed several blister packs of medication issued to DAVIS-BILLS from her Cell #C-1. A total of 63 tablets were transferred to Corrections Nurse II HELEN FRANKLIN in the Health Care Unit. FRANKLIN determined that DAVIS-BILLS was short four Atenolol, short four Lasix, and short four aspirin. Also, there was an excess of 28 Vasotec (Attachments #6 & #7).

A copy of the Unit #C-12 Log for 11/04/03, showed the Adjustment Committee in the unit from 9:50 a.m. to 10:40 a.m. There were no new entries from 10:20 a.m. to 12:35 p.m. (Attachment #8).

A copy of the Unit #C-12 Wing Checks Log for 11/04/03, reflected the required "check" every 30 minutes (Attachment #9).

A copy of the #C-12 Staff Sign-In Log for 11/04/03 was also provided (Attachment #10).

Based on the 11/04/03 Daily Roster, photos of Unit #C-12, Segregation Supervisor Sergeant ALAN TIMM, C/D-Wings Officer BARBARA HOFFMEYER, and Panel Officer LARRY FORD, were obtained. Photos of #C-12 Recreation Officer PATRIC MCELROY and Segregation Movement Officer MARK SILA were also obtained (Attachments #11 through #16).

Correctional Officer TALL-HAWKINS, Internal Affairs, provided a copy of her 11/04/03 interview of DAVIS-BILLS' cellmate, Inmate CHRISTINE KAZMIRZAK, R-38998. KAZMIRZAK stated, substantially, the same information as in her interview that follows. A photo of KAZMIRZAK was obtained (Attachments #17 & #18).

Inmate CHRISTINE KAZMIRZAK stated that Inmate KIMBERLY DAVIS-BILLS, N-57280, moved in with her in Cell #C-1 a week earlier. KAZMIRZAK stated that DAVIS-BILLS was "high strung," didn't sleep well, and took medication for high blood pressure. KAZMIRZAK related that, at about 10:00 a.m., on 11/04/03, DAVIS-BILLS had her Disciplinary Ticket heard. KAZMIRZAK stated that DAVIS-BILLS told the white female officer, who returned her to their cell 20 minutes later, that she felt dizzy. KAZMIRZAK stated that the officer told DAVIS-BILLS to lay down and asked her (KAZMIRZAK) to help her up on her bunk. KAZMIRZAK stated that the officer left and DAVIS-BILLS sat on the toilet and said her cheek and tongue felt numb, as she squeezed the side of her face. KAZMIRZAK remembered saying, "Oh roommate, don't be diagnosing yourself." KAZMIRZAK stated that DAVIS-BILLS said that she had to pee and she stood and pulled her pants down. KAZMIRZAK stated that she turned and, as she opened their window, DAVIS-BILLS said she just fell on the floor. KAZMIRZAK stated that she turned back and saw DAVIS-BILLS lying on her left side on the floor with her jumpsuit and under pants down around her knees. KAZMIRZAK stated that she pressed their call button and banged on their door. KAZMIRZAK stated that she yelled, "This woman is laying on the floor" and another inmate yelled back that she should stop banging or she (KAZMIRZAK) would get into trouble. KAZMIRZAK stated that DAVIS-BILLS said that she needed a nurse and after about ten minutes Officer BARBARA HOFFMEYER, the same white female from earlier, opened the food slot and asked what was wrong. KAZMIRZAK stated that she told HOFFMEYER that she had been talking to DAVIS-BILLS, who thought that she was having a stroke. KAZMIRZAK added that she had laid a coat over DAVIS-BILLS' bare bottom prior to HOFFMEYER's arrival. KAZMIRZAK stated that DAVIS-BILLS' back was toward the door and she turned her head a little and asked HOFFMEYER to call a nurse. KAZMIRZAK stated that HOFFMEYER told DAVIS-BILLS to try to get up and she left. KAZMIRZAK stated that she continued talking to DAVIS-BILLS and telling her to pull herself up, but she never touched DAVIS-BILLS. KAZMIRZAK stated that DAVIS-BILLS kept asking if a nurse had been called and even asked if lunch had come. KAZMIRZAK wasn't sure what or even if anything was wrong with her. KAZMIRZAK stated that, after waiting a half hour, she banged on their door again and

DC 346
IL 426-0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

HOFFMEYER returned and opened the food slot. KAZMIRZAK stated that DAVIS-BILLS asked what the nurse said and HOFFMEYER responded that she needed to get up and go to the Health Care Unit. KAZMIRZAK stated that the coat on DAVIS-BILLS had slipped and HOFFMEYER told her to pick her pants up and said that she would call the nurse. KAZMIRZAK stated that DAVIS-BILLS' color was okay, but she remained on her side and made slight attempts to grab the bed. KAZMIRZAK stated that she talked to (DAVIS-BILLS) who didn't say much for another half an hour and then she banged again and yelled, "This woman is still on the floor." KAZMIRZAK stated that a 35-year-old, tall white male officer looked in and said, "Get up, or are you going to lay there all fucking day until the next shift comes" and he left. KAZMIRZAK stated that two minutes later, an older white male officer with glasses and a cap opened their door, leaned down and made a loud screaming sound at DAVIS-BILLS and slammed the door. KAZMIRZAK stated that a chubby blonde officer looked in and laughed at them. KAZMIRZAK stated that, at one point, the 35-year-old officer returned, opened the door, placed his foot on DAVIS-BILLS' buttocks, shook her and said, "Come on, you can get up" and he left. According to KAZMIRZAK, DAVIS-BILLS' upper body was uncovered, but the coat was still partially covering her bottom. KAZMIRZAK related that, during the next 20 minutes, DAVIS-BILLS didn't talk, but gurgled like she was snoring. KAZMIRZAK yelled and banged again and HOFFMEYER arrived with two female nurses. KAZMIRZAK stated that they moved DAVIS-BILLS around and she saw that she had urinated on the floor and something had come out of her mouth. KAZMIRZAK stated that a nurse said that her blood pressure was okay and that she had a stroke. KAZMIRZAK stated that the nurses rolled DAVIS-BILLS onto a blanket and they and the 35-year-old officer helped drag DAVIS-BILLS down the hall. KAZMIRZAK asked for a bucket to clean up, an officer gave her one and shut the door. KAZMIRZAK stated that lunch trays arrived late and at about 2:00 p.m. she heard the ambulance arrive. KAZMIRZAK stated that she was taken to the holding cage at 2:45 p.m. and asked if she and DAVIS-BILLS had taken each other's medication, which they hadn't. KAZMIRZAK stated that she told the Internal Affairs Officer most of the information in this interview and she was returned to her cell at 8:00 p.m. KAZMIRZAK added that there were no cameras in the hall or Dayroom, there were no speakers in their cell and she heard that the call button in their cell didn't work (Attachment #19).

Correctional Officer TALL-HAWKINS, Internal Affairs, provided a copy of her 11/04/03 interview of Inmate MICHELLE VANCIL, B-49771, who lived across the hall from DAVIS-BILLS. VANCIL related, substantially, the same information as in her interview that follows (Attachment #20).

Inmate MICHELLE VANCIL, B-49771, from Cell #C-2, stated that 10 minutes after the inmates on her wing had left for "recreation," Officer HOFFMEYER yelled into Cell #C-1, "Get up off the floor, put your clothes on, this is a direct order, get off the floor." VANCIL stated that HOFFMEYER left and returned 20 minutes later with two other officers. VANCIL heard them say, through the "chuckhole" of Cell #C-1, that she should get off the floor and that she must be slow; however, she did not hear an answer from the cell. VANCIL stated that HOFFMEYER came on the wing at least two times and asked Cell #C-1, "What the hell are you still doing on the floor, wait until the Major gets my ticket, you aren't going home on Friday." VANCIL stated that at about 2:00 p.m., HOFFMEYER and Sergeant TIMM were at Cell #C-1 and TIMM said, "Get off the floor, are you retarded?" VANCIL stated that TIMM opened the door and nudged DAVIS-BILLS, who was lying on the floor, with his foot. VANCIL stated that DAVIS-BILLS was naked and TIMM bent down and took her pulse on her neck. VANCIL stated that the officers laughed that DAVIS-BILLS had defecated and urinated on herself. VANCIL stated that TIMM said, "If you are doing this for sympathy, you got the wrong supervisor cause I ain't the one." VANCIL stated that the nurses arrived a few minutes later and commented that DAVIS-BILLS couldn't pass an "unconscious person test" and both nurses laughed that DAVIS-BILLS had defecated and urinated on herself. VANCIL heard one nurse say that DAVIS-BILLS' blood pressure was 140/90. VANCIL stated that TIMM became angry when attempts were made to place DAVIS-BILLS in a wheelchair and then she was wrapped in a blanket and carried into the Dayroom. VANCIL added that no one opened the door to Cell #C-1 prior to TIMM opening it (Attachment #21).

Correctional Officer ANGEL PARK, Internal Affairs, stated that she was in the panel of Unit #C-12 at abou

DC 346
IL 426-0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

10:40 a.m., on 11/04/03. According to PARK, HOFFMEYER entered and said to Sergeant TIMM, "Did you hear all that noise down there? DAVIS-BILLS is down there beating on her door. She's laying on the floor with her underwear down and claiming she fell off the toilet. I told her to get up, she said she couldn't get up. I think this is (a) game, she just heard her ticket and she goes home soon." PARK stated that she didn't hear TIMM's response because Panel Officer LARRY FORD asked her (PARK) which inmate she needed to see. PARK stated that HOFFMEYER sat down, smoked a cigarette, and then brought Inmate SKILLING to the holding cell for PARK to interview. PARK stated that she was in the control panel when the C/D-Wings "recreation" lines came in. PARK observed HOFFMEYER and Correctional Officer PATRIC MCELROY return inmates to their cells on C-Wing. PARK stated that she interviewed an inmate on the A/B-Wings and it was noon when she left the unit and walked with TIMM toward the Administration Building. PARK recalled that TIMM said that he was going to talk to Assistant Warden DOTTIE CULKIN. PARK stated that she learned later that DAVIS-BILLS was taken out in an ambulance at about 2:30 p.m. PARK stated that she saw TIMM at 3:10 p.m. and asked him if the inmate who went out in the ambulance was the same one HOFFMEYER said fell off the toilet that morning and TIMM said he didn't know what she was talking about. PARK stated that she said, "No code was called" and TIMM said, "We thought she was having a seizure, I'm from the old school, you don't call a code for a seizure, you call the nurses, we called the nurses to come over." (Attachment #22).

PARK wrote an Incident Report on 11/05/03 that stated, substantially, the same information as her interview (Attachment #23).

Correctional Officer BARBARA HOFFMEYER stated that DAVIS-BILLS' "ticket" was heard in the morning of 11/04/03 and she returned to her Cell #1. HOFFMEYER related that, during a routine wing check she saw DAVIS-BILLS on the floor of her cell. HOFFMEYER stated that she opened the "chuckhole" and asked DAVIS-BILLS what was wrong and DAVIS-BILLS said, "I fell from the toilet." HOFFMEYER stated that DAVIS-BILLS' jumpsuit and underwear were down. HOFFMEYER stated that she called the Health Care Unit and, per Nurse JANICE MILLER, she instructed DAVIS-BILLS to get up in her bed, lie down, and elevate her legs. HOFFMEYER stated that DAVIS-BILLS said that she didn't feel well and she could not get up. HOFFMEYER stated that she asked her cellmate (KAZMIRZAK) to help, but she shook her head, no. HOFFMEYER added that the KAZMIRZAK did cover DAVIS-BILLS' exposed bottom with a coat. HOFFMEYER stated that she informed Sergeant TIMM, but TIMM did not care that there was an inmate lying on the floor. HOFFMEYER stated that DAVIS-BILLS was on her left side, she remained responsive by moving, talking, moaning and breathing. HOFFMEYER stated that DAVIS-BILLS kept trying to reach for the bed and KAZMIRZAK kept saying that DAVIS-BILLS was faking. HOFFMEYER stated that she gave DAVIS-BILLS a direct order to get up off the floor, but she never threatened to write her a "ticket." HOFFMEYER stated that she asked TIMM a second time to help get DAVIS-BILLS off the floor and TIMM said, "Fuck her." HOFFMEYER stated that, after finding DAVIS-BILLS on the floor, she checked on her about every five minutes and she remained responsive. HOFFMEYER explained that she did not open the cell door because there was no supervisor present and DAVIS-BILLS was responsive until about 2:00 p.m. HOFFMEYER stated that there didn't seem to be a medical emergency because DAVIS-BILLS was responsive, she didn't see her fall, and TIMM was aware of the situation. HOFFMEYER stated that the noise level (on the wing) was not bad during the incident. HOFFMEYER could not recall a time line of events. HOFFMEYER stated that she did not see FORD leave the panel and check on DAVIS-BILLS. HOFFMEYER stated that MCELROY helped secure the inmates when they came in from recreation. HOFFMEYER remembered that, at one point, TIMM asked, "Why do you keep going down there, (referring to Cell #C-1) it just causes problems" and she responded that it was her job (Attachment #24).

HOFFMEYER wrote an Incident Report on 11/04/03 and reported just that, at approximately 2:00 p.m., she went to Cell #1 to tell DAVIS-BILLS to get ready to go to the Health Care Unit. DAVIS-BILLS told her she was using the toilet and fell to the floor. HOFFMEYER told her to get up and get ready, but when she returned a couple minutes later, DAVIS-BILLS was unresponsive (Attachment #25).

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

A copy of DAVIS-BILLS' 11/04/03 Adjustment Committee Summary was provided. DAVIS-BILLS was found Guilty of Intimidation or Threats and Insolence; however, the time of the hearing was not documented (Attachments #26 & #27).

Corrections Leisure Activities Specialist II DEMETRIUS HARPER stated that he and Counselor BENNETT went to Unit #C-12 at 10:00 a.m., on 11/04/03, to hear three or four inmates' tickets. HARPER estimated that each ticket took about five minutes and DAVIS-BILLS' was heard next to last. HARPER thought that they left the unit at about 10:15 p.m. HARPER added that DAVIS-BILLS said that she was going home soon and she seemed fine; however, she was worried about her son who was going to prison (Attachment #28).

The record of telephone calls made on 11/04/03 from the two extensions in Unit #C-12 was obtained. There was one, 56 second call from the panel to the pharmacy at 10:11 a.m. and one, almost two minute call to the nurses' station at 2:46 p.m. There was also a call at 1:12 p.m. to "base" (Attachment #29).

Correctional Officer LARRY FORD initially stated that he stayed in the panel of Unit #C-12 during the entire day shift on 11/04/03 except for when he left the building for his break at about 11:00 a.m. FORD then stated that it seemed like he was on C-Wing that day, maybe to get cleaning supplies from the closet. FORD stated that, usually if an inmate had a problem like DAVIS-BILLS had, the cellmate made a lot of noise, but that didn't happen on 11/04/03. FORD stated that HOFFMEYER worked on the C/D-Wings during the shift and was in and out of the panel once in a while. FORD stated that HOFFMEYER usually pulled the telephone out onto the Dayroom side of the panel glass to make phone calls. FORD added that he didn't hear who HOFFMEYER called or what the calls were about. FORD stated that HOFFMEYER was on the wings more often than for the required 30-minute checks; however, he didn't notice her at any particular cell. FORD stated that, toward the end of the shift, HOFFMEYER said that a nurse was coming to check on an inmate and within a few minutes, Nurse MILLER and another female nurse went to Cell #C-1. FORD stated that they pulled DAVIS-BILLS out into the Dayroom on a blanket and she appeared to be breathing. FORD estimated that the nurses tended to DAVIS-BILLS for 15 minutes, a medical emergency was not called, and then at 2:45 p.m., she was taken out by ambulance. FORD continued to relate that TIMM was in the unit most of the day, except for his break. FORD stated that he never called to locate TIMM and thought that HOFFMEYER probably did since she asked him for TIMM's radio number. According to FORD, TIMM went down all the wings on 11/04/03. FORD added that Counselor SUTTON and Psychologist PETERSON were also in the unit that day. FORD maintained that he never heard any conversations about an inmate in Cell #C-1 not feeling well, needing medical attention or anything else by anyone, anywhere on 11/04/03. When it was pointed out that there were no entries in the unit's log book from 10:20 a.m. to 12:35 p.m., FORD said that it was busy, it was a Segregation Unit and he was unaware of which staff was on the unit. FORD ended by saying that he didn't believe that he looked into Cell #C-1 on 11/04/03 (Attachment #30).

Correctional Officer PATRIC MCELROY stated that he was the Segregation Recreation Officer on 11/04/03. MCELROY realized, after the fact, that the inmates in Cell #C-1 did not go out for recreation and he was sure they were both up when the line went out at 10:00 a.m. MCELROY stayed out on the yard with the inmates for an hour and then escorted them back to their cells on C/D-Wings. MCELROY stated that, when he finished putting inmates into the C-Wing cells, he glanced into the other cells, which was his routine. MCELROY stated that, in Cell #C-1 he saw a black female laying on the floor just inside the door. MCELROY noted that she was naked from the waist up and he stepped back. MCELROY stated that he knocked on the door and the inmate on the floor moved slightly. MCELROY stated that the white cellmate was sitting the bottom bunk and said, "She's faking." MCELROY stated that HOFFMEYER was still down the wing locking up inmates. MCELROY stated that he went to the panel and asked Sergeant TIMM, "What's up with her in #C-1, she's on the floor" and TIMM said, "We know about it." MCELROY stated that he continued his duties in other units, and after his break, he returned to #C-12 where he relieved, he thought Officer FORD for a break. MCELROY stated that Transport Officer SILA came to #C-12 to take DAVIS-BILLS to the Health Care Unit. MCELROY saw SILA

DC 346
IL 426-0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

knock on Cell #C-1, but then he returned to the panel, said, "Try to get her up, I'm taking the other inmate MCELROY stated that TIMM then went and kicked the door of Cell #C-1 a couple of times and said loudly to get up. MCELROY stated that TIMM opened the door and 30 seconds later shut it. MCELROY could see TIMM just stand there as he continued to tell her to get up. MCELROY stated that SILA left with the other inmate and there was no unusual noise from Cell #C-1 or even from C-Wing. MCELROY stated that FORD returned and he then relieved HOFFMEYER on C/D-Wings. MCELROY stated that two nurses arrived wanting to see DAVIS-BILLS and he opened the cell. MCELROY was sure that DAVIS-BILLS was laying on her right side, her top half was unclothed as if she was just "coming off the toilet." MCELROY thought that the room smelled like feces and there was "wetness" on the floor around DAVIS-BILLS. MCELROY recalled the nurses saying that her blood pressure was somewhat normal, but her breathing was shallow. MCELROY stated that HOFFMEYER and more medical staff arrived and TIMM was at Cell #C-1 briefly. MCELROY stated that the nurses placed DAVIS-BILLS on a blanket and pulled her out in front of the showers. MCELROY stated that there was the usual banter from the other inmates, but nothing specific about DAVIS-BILLS. MCELROY stated that DAVIS-BILLS' cellmate stood or sat on the bed and said nothing. MCELROY stated that, after DAVIS-BILLS was taken out in an ambulance, he and HOFFMEYER remained on C/D-Wings till the end of the shift MCELROY remembered that HOFFMEYER said that DAVIS-BILLS was okay after her hearing, she had heard DAVIS-BILLS and her cellmate talking a couple of times, and she heard DAVIS-BILLS snoring. MCELROY maintained that he looked in Cell #C-1 just the two times and he did not laugh about DAVIS-BILLS. MCELROY stated that he had not talked with TIMM since the incident (Attachment #31).

Correctional Officer MARK SILA recalled that he was at the Health Care Unit waiting to escort an inmate at about 12:40 p.m., on 11/04/03. SILA stated that Nurse MILLER told him that he needed to pick up DAVIS BILLS at Unit #C-12 next, and bring her to the hospital. SILA stated that, that was the first he heard of DAVIS-BILLS. SILA stated that he transported the inmate in Health Care back to the Mental Health Unit and arrived at #C-12 at about 1:05 p.m. SILA stated that he told FORD that he needed Inmate BRANCH and MILLER's requested add-on, DAVIS-BILLS. SILA remembered that FORD said that there was no supervisor in the building and he understood that FORD called the Armory to have TIMM radioed. SILA stated that FORD took a call a few minutes later and said that TIMM was coming. SILA stated that he told HOFFMEYER that he needed DAVIS-BILLS and HOFFMEYER said that she was on the floor and she didn't know if he would be able to bel her up. SILA stated that neither HOFFMEYER nor FORD commented further regarding DAVIS-BILLS. SILA stated that he went to Cell #C-1 at about 1:15 p.m. and had HOFFMEYER open the food slot. SILA saw a black female lying on her side on the floor with her back toward the door and her face away from him. SILA stated that the cellmate was sitting on the top bunk and said nothing. SILA stated that he yelled DAVIS-BILLS name a couple of times, she did not respond, but he saw her breathing, like she was sleeping. SILA stated that DAVIS-BILLS' jumpsuit was on her lower body and she was unclothed from the waist up. SILA stated that he asked HOFFMEYER how long she had been laying there and HOFFMEYER said that she was just talking to her a little while ago. SILA didn't recall HOFFMEYER ever saying how long DAVIS-BILLS had been lying on the floor. SILA stated that he returned to the Dayroom to wait for TIMM. SILA stated that the other inmates acted normal and no one seemed interested in #C-1. SILA stated that Counselor SUTTON was on C-Wing and called into DAVIS-BILLS a couple of times. SILA stated that TIMM arrived at about 1:35 p.m. and opened #C-1's food slot. SILA stated that TIMM yelled to DAVIS-BILLS about ten seconds and then slammed the slot shut and instructed SILA to take the other inmate. SILA stated that TIMM went to the panel and HOFFMEYER helped him get BRANCH from the last cell on C-Wing. SILA stated that before leaving with BRANCH, he asked TIMM what he should tell the nurses, and TIMM said to tell them that she (DAVIS-BILLS) wouldn't get dressed to go to the Health Care Unit. SILA stated that he drove BRANCH to the Infirmary, and when the nurses asked about DAVIS-BILLS, he said he didn't bring her because she was unresponsive, naked from the waist up, and the needed to go to her. SILA stated that it was at about 1:55 p.m. when he telephoned FORD and said that th nurses were coming. SILA stated that Nurse TAYLOR finished with BRANCH at 2:00 p.m. and, as he drove he back to #C-12, he saw MILLER and TAYLOR driving toward #C-12. SILA stated that Superintendent TUCKE came out of #C-12 as he pulled up and asked for a ride. SILA stated that he dropped TUCKER off at the Sal

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

Port and returned with BRANCH to #C-12. SILA stated that TIMM was on C-Wing, HOFFMEYER was nearby and the nurses were treating DAVIS-BILLS in Cell #C-1. SILA stated that the food trays had arrived and he secured BRANCH in her cell on C-Wing. SILA stated that TIMM was on D-Wing when he left the unit at 2:15 p.m. and he hadn't talked to him since. SILA added that, since 11/04/03, HOFFMEYER said that she wished that she had called a medical emergency; however, she thought that DAVIS-BILLS was having a seizure and it was Dwight policy not to call a medical emergency for seizures (Attachment #32).

Correctional Counselor ROSEMARY SUTTON stated that, when she got to #C-12 on 11/04/03, HOFFMEYER told her that DAVIS-BILLS came out of the Adjustment Committee Hearing, went to her room, and "fell out." SUTTON stated that, HOFFMEYER couldn't open the door without a supervisor, so she looked in through the food slot. SUTTON stated that DAVIS-BILLS was lying on the floor on her left side just inside the door. SUTTON stated that DAVIS-BILLS was facing away from the door and she saw her bare shoulder and what seemed to be a blanket over her. SUTTON stated that she called, "KIMBERLY, get up so that you can go to Health Care" and DAVIS-BILLS made a slight gesture with her right hand like she heard her. SUTTON stated that she couldn't see DAVIS-BILLS' face. SUTTON stated that she called "KIMBERLY" a couple more times and the cellmate said, "KIM, Ms. SUTTON is here, get up," but there was no further response. SUTTON added that the cellmate also said that DAVIS-BILLS was faking it. SUTTON stated that HOFFMEYER was concerned but she never said how long DAVIS-BILLS had been there, or if Health Care had been called. SUTTON stated that it wasn't especially loud on C-Wing. SUTTON stated that she did not want to interfere with security staff so she went to D-Wing where she was supposed to be seeing inmates that day. SUTTON recalled MCELROY delivering food trays on D-Wing and she overheard staff saying that they couldn't "open the door without a supervisor." SUTTON stated that she heard HOFFMEYER tell TIMM that DAVIS-BILLS wasn't responding, they needed to call someone, and TIMM responded that she was faking it and one time TIMM said, "Fuck her" regarding DAVIS-BILLS. SUTTON stated that she never saw FORD or the A/B-Wing Officer on the C-Wing side that day. SUTTON stated that, at one point, she saw TIMM open the door of Cell #C-1, he yelled loudly, "Get up, you're faking it" and he shut the door. SUTTON stated that, a little later, Nurse MILLER came on the unit and HOFFMEYER and TIMM pulled DAVIS-BILLS on a blanket into the Dayroom. SUTTON recalled seeing Psychologist PETERSON on the unit after the nurses arrived. SUTTON stated that MILLER and HOFFMEYER were standing over DAVIS-BILLS when she left the unit at 2:19 p.m. (Attachment #33).

SUTTON wrote an Incident Report that stated, substantially, the same information as her interview (Attachment #34).

The A/B-Wings Officer JEREMY STEVENS reported by Incident Report that, at 2:15 p.m., on 11/04/03, he saw medical staff working on someone on the floor on the C/D side (Attachment #35).

Corrections Medical Technician JANICE MILLER stated that, prior to 12:00 p.m., on 11/04/03, she was in the pharmacy, extension 2408, and took a phone call from HOFFMEYER. MILLER recalled that HOFFMEYER said that DAVIS-BILLS was feeling light-headed and dizzy and would MILLER talk to her when MILLER passed medications in #C-12. MILLER told HOFFMEYER that she did not pass medications in #C-12 and she would not be over. MILLER interjected that medications are delivered in the a.m. and p.m. at #C-12. MILLER related further that, later when she was at the nurse's station, extension 2255, HOFFMEYER called again and said that DAVIS-BILLS said that she fell off of the toilet. MILLER stated that she responded with, "Bring her over" and then told SILA, who was nearby, to bring DAVIS-BILLS over next. MILLER stated that at about 2:00 p.m. another extension rang. MILLER stated that SILA answered and said, "She won't get off the floor. Yes, I know DAVIS-BILLS has to come to the hospital next." MILLER continued by relating that she and Nurse TAYLOR went to #C-12 to see about the resident who wouldn't get up off the floor. MILLER stated that FORD and TIMM were in the panel and HOFFMEYER was on C-Wing. MILLER stated that TIMM came on the wing within seconds. MILLER stated that DAVIS-BILLS was lying on her left side, back against the door and head against the wall. MILLER recalled that DAVIS-BILLS' underwear was pulled up on the right and down on the left and

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

just her right arm was in the sleeve of her jumpsuit. MILLER noticed what appeared to be water on the floor around DAVIS-BILLS. MILLER stated that DAVIS-BILLS was breathing, but she did not speak or move. MILLER stated that, when she picked DAVIS-BILLS' right arm up and released it, her arm fell slowly. MILLER recalled saying, "Mrs. BILLS, if this is faking, you're not doing a good job of it." MILLER stated that DAVIS-BILLS' eyelids twitched when she tapped on them. MILLER stated that she and TAYLOR rolled DAVIS-BILLS on her back and began assessment. MILLER stated that her blood pressure was 140/90 and she instructed the officers to get a wheelchair to take DAVIS-BILLS to the Health Care Unit. MILLER admitted that, at that point, she was still unsure if DAVIS-BILLS was faking or not, due to good vital signs. MILLER stated that TAYLOR did a "sternal rub" and a test on DAVIS-BILLS' nipple and she did not respond. MILLER stated that she instructed TAYLOR to get Nurse Practitioner LOUISE TODD and TAYLOR left. MILLER stated that she put DAVIS-BILLS' left arm in the sleeve of her jumpsuit and then she and TIMM rolled DAVIS-BILLS onto a blanket and pulled her out into the Dayroom. MILLER stated that HOFFMEYER held DAVIS-BILLS up as she telephoned for TODD and an ambulance. MILLER stated that, within seconds, TAYLOR returned with TODD. MILLER stated that one of DAVIS-BILLS' eyes opened, she lifted her left arm up, placed it down, and then it went back and stiff. MILLER administered oxygen, per TODD. MILLER stated that DAVIS-BILLS' vital signs were dropping as the ambulance crew arrived and took over. MILLER stated that the only thing she remembered TIMM saying was, "There, she just moved." MILLER added that, when HOFFMEYER called her, she never said that DAVIS-BILLS was not responsive, wouldn't get off the floor and had blood pressure problems. MILLER understood that TAYLOR was in #C-12 that day to see an inmate who had been in an altercation with an officer (Attachment #36).

MILLER wrote an Incident Report on 11/04/03 that began with #C-12 calling at 2:00 p.m. and saying that DAVIS-BILLS had fallen off the toilet a while ago and wouldn't get up to come to the clinic (Attachment #37).

Registered Nurse CHRISTINE TAYLOR, the Emergency Response Nurse on 11/05/03, stated that she received no emergency calls that day. TAYLOR thought that Medical Technician MILLER took a call about an inmate in #C-12 who "wouldn't" get up early in the day. TAYLOR stated that she went to a unit to see an inmate who had been in an altercation with an officer; however, no one mentioned an inmate who "wouldn't get up off the floor." TAYLOR interjected that, that did happen; sometimes they wouldn't get up and they would play. TAYLOR continued by relating that between 1:00 p.m. and 1:30 p.m., SILA was in the Health Care Unit and she asked him about the inmate who wouldn't get up and SILA said that he was going to get her next. TAYLOR stated that, a bit later, someone announced to the nurses, in general, that the woman was still lying on the floor. TAYLOR remembered that MILLER jumped up and said, "I'm going to make that woman get up, I'm going with you, I'll make her get up." TAYLOR stated that she and MILLER drove to #C-12 and found a female officer at Cell #C-1, which was open. TAYLOR stated that the cell was very dark, DAVIS-BILLS was in partial fetal position on her side on the floor. TAYLOR stated that DAVIS-BILLS was naked except for her underpants and jumpsuit that were down around her legs. TAYLOR stated that there was a bit of urine on her legs and underwear; but, she had not defecated. TAYLOR stated that there was a puddle of mucous near her face. TAYLOR stated that the cellmate said that she had talked to DAVIS-BILLS when she fell off the toilet. TAYLOR stated that MILLER loudly and repeatedly told DAVIS-BILLS to get up and then tried to pick her up. TAYLOR noted that DAVIS-BILLS' arms were stiff, but her body was flaccid. TAYLOR stated that she raised DAVIS-BILLS' arm over her head and when she let go it fell straight down. TAYLOR stated that DAVIS-BILLS' blood pressure was 140/90, her pulse was 50. TAYLOR described DAVIS-BILLS' breathing as erratic with 10 to 12 breaths, then nothing, and then the breaths again. TAYLOR stated that she firmly twitched DAVIS-BILLS' nipple and DAVIS-BILLS pulled both arms inward. TAYLOR remembered saying that she was "stroking out" and MILLER responded that she couldn't say that in prison. TAYLOR announced that they needed to get her out and MILLER put her on a blanket and pulled her into the hall. TAYLOR had an officer get a flashlight and she checked DAVIS-BILLS' eyes that were fixed and non-responsive. TAYLOR stated that, as she left to get Physician's Assistant TODD who was in the next unit, TODD was already coming. TAYLOR stated that she radioed the Health Care Unit to get an ambulance and she retrieved the oxygen from the car and ran back to

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

DAVIS-BILLS. TAYLOR stated that she suctioned a lot of mucous from her nasal pharyngeal and then down her mouth. TAYLOR stated that seemed to stimulate her breathing and then the paramedics arrived. TAYLOR added that CPR was discussed, but never done, because DAVIS-BILLS was breathing and had a heart beat (Attachment #38).

TAYLOR wrote an Incident Report on 11/04/03 that stated, substantially, the same information as her interview (Attachment #39).

Correctional Sergeant ALAN TIMM stated that he was the 7:00 a.m. to 3:00 p.m. Supervisor of just Unit #C-12 on the 11/04/03. TIMM initially stated that he first became aware of DAVIS-BILLS at about 2:00 p.m. when SILA said she was one of two or three inmates who needed to go to the Health Care Unit. TIMM related that HOFFMEYER and SILA went to C-Wing to get one of the inmates ready, but HOFFMEYER returned to the panel and told him that DAVIS-BILLS wouldn't get up. TIMM stated that he accompanied HOFFMEYER to Cell #C-1, DAVIS-BILLS was unresponsive and he returned to the panel intending to call a nurse, but nurses came in the unit before he could call. When asked if he recalled HOFFMEYER telling him in the morning that DAVIS-BILLS was on the floor and wouldn't get up, TIMM admitted that HOFFMEYER told him that just after MCELROY brought the C/D-Wings in from their 10:00 a.m. to 11:00 a.m. recreation. TIMM stated that he went to Cell #C-1 then, opened the food slot, and saw DAVIS-BILLS laying on her side with a coat over her and her back toward the door. TIMM stated that he asked the cellmate if everything was alright and she responded, "She's faking, we've been talking." TIMM remembered liquid, possibly urine, on the floor around DAVIS-BILLS and he thought that DAVIS-BILLS was having or had a seizure. TIMM emphasized that it was not policy to call a medical emergency for a seizure. TIMM admitted that he lacked medical training regarding seizures; however, based on the many he had seen, the person slept afterwards. TIMM stated that, either just before he looked in the cell at 11:00 a.m. or just after, HOFFMEYER told him that she had called the Health Care Unit and the nurse said to tell DAVIS-BILLS to lie down. TIMM reasoned that DAVIS-BILLS was lying on the floor, instead of the bed, so that she would be taken to the clinic sooner. TIMM recalled that, while he was on break, he was radioed to return to #C-12 because SILA needed to get some inmates out. TIMM believed that, HOFFMEYER and SILA reported that DAVIS-BILLS was on the floor, so he told SILA to take another inmate, who would have been BRANCH. TIMM admitted that he hadn't looked in on DAVIS-BILLS since 11:00 a.m. TIMM stated that, after SILA took BRANCH out, he opened Cell #C-1. TIMM was unaware of any other staff's presence as he nudged DAVIS-BILLS' butt with his hand. TIMM stated that she did not respond, so he felt her neck, she was warm, and she had a pulse. TIMM did not recall if he shut the cell door as he left. TIMM stated that the nurses entered the unit so he didn't have to call for them. TIMM did not know how much time elapsed from SILA's departure and/or his opening the cell and the nurses' arrival. TIMM denied yelling at DAVIS-BILLS through the food slot or the open door to get up, she was faking it. TIMM denied slamming the slot and/or door shut. TIMM denied touching DAVIS-BILLS' butt with his foot. TIMM denied responding to HOFFMEYER's concern throughout the day regarding DAVIS-BILLS with, "Fuck her." TIMM maintained that he thought that DAVIS-BILLS had a seizure or was faking it (Attachment #40).

TIMM wrote an Incident Report on 11/04/03, that stated only that DAVIS-BILLS was unresponsive when told at 2:00 p.m. to get ready to go to the clinic (Attachment #41).

HOFFMEYER was re-interviewed and stated that she did not recall the times of her calls to the Health Care Unit. HOFFMEYER remembered that MILLER was at the pharmacy, extension #2408, the first time she spoke with her. HOFFMEYER stated that she told MILLER that Inmate DAVIS-BILLS in #C-12, Cell #1 said she's dizzy and didn't feel well. HOFFMEYER seemed to recall DAVIS-BILLS telling her something about her blood pressure and she probably told MILLER about that too. HOFFMEYER stated that MILLER said, "Have her lie down and elevate her legs." HOFFMEYER stated that she did not ask MILLER to come to see DAVIS-BILLS and MILLER said nothing about coming over in that first call. HOFFMEYER stated that, it was after she had done a couple of wing checks, that she discovered DAVIS-BILLS on the floor. HOFFMEYER explained that no

DC 346
IL 426 0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

one called or banged for help, but as was her routine, she periodically looked closely into individual cells. HOFFMEYER stated that it was not unusual to see an inmate lying on the floor and she told DAVIS-BILLS to pull her underwear up and get up. HOFFMEYER stated that DAVIS-BILLS grabbed a bed rail and appeared to try to pull herself up.. HOFFMEYER stated that she had the cellmate produce her order for the bottom bunk. HOFFMEYER emphasized that KAZMIRZAK never yelled, banged or in any way helped DAVIS-BILLS throughout the day. HOFFMEYER continued by stating that she went to the panel and told TIMM and FORD, "DAVIS-BILLS in #C-1 said she fell off her toilet, I didn't see her fall, she's laying on the floor with her jumpsuit and underwear down and she won't get up." HOFFMEYER stated that TIMM responded, "Fuck her." HOFFMEYER stated that, from then on she checked on DAVIS-BILLS every few minutes as she did wing-checks. HOFFMEYER stated that DAVIS-BILLS moaned, grunted, and said yes or no to HOFFMEYER's questions. HOFFMEYER stated that DAVIS-BILLS kept trying to grab the bed and she kept encouraging her. HOFFMEYER stated that, after a while, DAVIS-BILLS, just wasn't getting up, and since TIMM wasn't concerned, she called the Health Care Unit again. HOFFMEYER stated that she told MILLER that DAVIS-BILLS was lying on the floor, she claimed she fell off the toilet, and she wasn't getting up. HOFFMEYER could not recall MILLER's response. HOFFMEYER denied asking MILLER or any Health Care Unit staff to come to the unit. HOFFMEYER interjected, at some point, she heard TIMM at Cell #C-1 tell DAVIS-BILLS to get up. HOFFMEYER stated that SILA was on the unit in the afternoon waiting for TIMM to get an inmate out and she asked him to check on Cell #C-1. HOFFMEYER stated that SILA looked into the cell and said something like, "Oh boy." HOFFMEYER stated that she next saw SILA escort BRANCH out of the unit. HOFFMEYER stated that FORD yelled to her that the nurses were coming. HOFFMEYER stated that she and TIMM were present when the nurses went into the cell. HOFFMEYER stated that she then noticed a liquid, like water, on the floor around DAVIS-BILLS. HOFFMEYER stated that she never smelled urine and/or feces coming from the cell at any time that day. HOFFMEYER added that she did not go over TIMM's head regarding DAVIS-BILLS because she was responsive, she didn't know her medical history, and TIMM was her superior (Attachment #42).

On 11/05/03, Reporting Investigator and Investigator PRONGER observed that nothing happened on the control panels, no buzzer/no light, when call buttons on C/D-Wings of #C-12 were pushed. Staff working in the area could not recall when the call buttons last worked. It was also noted, and confirmed by Assistant Warden CULKIN, that there were no surveillance cameras in #C-12.

The #C-12 Work Order Log documented problems with the control panel lights in 08/02 and 09/02, but nothing since. Work Order #6-149, dated 06/20/03, indicated that there was no power to the control panels in #C-12 (Attachments #43 & #44).

Electrician JEFF MILBAUER, stated in a telephone interview, that he checked out the call button/control panel problem in #C-12 in 06/03. MILBAUER related that the problem was beyond his ability to repair so he returned the work order with a question mark to his supervisor, Chief Engineer BILL ASHCRAFT, and suggested that Thompson Electronics be called. MILBAUER stated that the Business Office indicated that there was no Thompson Electronics be called. MILBAUER added that Thompson Electronics was at money in the budget at that time so no one was called in. MILBAUER added that Thompson Electronics was at the facility since 11/04/03 and they were unable to repair the call buttons/control panel in #C-12 (Attachment #45).

No documentation could be found regarding the definition of "responsive" as it applies to calling a medical emergency.

According to the Dwight Correctional Center/Kankakee Minimum Security Unit 2001 Policy Statement, #42. "All employees are responsible for the safety, security, and maintenance of order within the institution. Therefore, regardless of title or function, all staff must report any incidents or information which comes to their attention that might affect the health, safety or welfare of inmates or staff, the good order of the institution, or the custody of inmates" (Attachment #46).

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

Copies of the Post Descriptions for Detail Supervisor/Sergeant 1,2; Segregation/C-12, MHU Supervisor; Correctional Officer Living Unit #12 Wings; and Correctional Officer #C-12 Panel Segregation/Temporary Confinement were obtained. Each post requires that "employees assigned shall use good judgment, tact and careful attention to detail in discharging his/her duties where referred in the post description or not" (Attachments #47 through #50).

Conclusion:
Based on the Cook County Medical Examiner's report, Inmate KIMBERLY DAVIS-BILLS' death on 11/05/03 was due to natural causes.

Based on employee and inmate statements and their own admissions, Correctional Sergeant ALAN TIMM, Correctional Officer BARBARA HOFFMEYER and Correctional Officer LARRY FORD violated the Department Rule of Conduct of Individual regarding Negligence.

Attachments:
1. Outlook Message, CULKIN, 11/05/03
2. Outlook Message, CULKIN, 11/05/03
3. Graphics Inquiry, DAVIS-BILLS
4. Certificate of Death, DAVIS-BILLS, 11/06/03
5. ~~Medical Records, DAVIS-BILLS, 07/01/03 through 11/05/03~~    *records omitted from copies MClark 1-11-05*
6. Incident Report, TALL-HAWKINS, 11/04/03
7. Incident Report, FRANKLIN, 11/04/03
8. Unit #C-12 Log Book, 11/04/03
9. Unit #C-12 Wing Checks Log, 11/04/03
10. Unit #C-12 Staff Sign-In Log, 11/04/03
11. Daily Roster, 11/04/03
12. Photo, TIMM
13. Photo, HOFFMEYER
14. Photo, FORD
15. Photo, MCELROY
16. Photo, SILA
17. Interview, KAZMIRZAK, 11/04/03
18. Photo, KAZMIRZAK
19. Re-Interview, KAZMIRZAK, 11/05/03
20. Interview, VANCIL, 11/04/03
21. Re-Interview, VANCIL, 11/05/03
22. Interview, PARK, 11/05/03
23. Incident Report, PARK, 11/05/03
24. Interview, HOFFMEYER, 11/05/03
25. Incident Report, HOFFMEYER, 11/04/03
26. Adjustment Committee Summary, DAVIS-BILLS, 11/04/03
27. Disciplinary Report, DAVIS-BILLS, 10/27/03
28. Interview, HARPER, 11/06/03
29. Unit #C-12 Telephone Records, 11/04/03
30. Interview, FORD, 11/05/03
31. Interview, MCELROY, 11/12/03
32. Interview, SILA, 11/05/03
33. Interview, SUTTON, 11/06/03

DC 346
IL 426 0438

Continued

| Case Number | Subject's Name (Last, first, middle) | Institution Number | Institution |
|---|---|---|---|
| 04-DWI-097 | HOFFMEYER, BARBARA M., (C.O.) | | Dwight C.C. |

34. Incident Report, SUTTON, 11/06/03
35. Incident Report, STEVENS, 11/04/03
36. Interview, MILLER, 11/06/03
37. Incident Report, MILLER, 11/04/03
38. Interview, TAYLOR, 11/12/03
39. Incident Report, TAYLOR, 11/04/03
40. Interview, TIMM, 11/06/03
41. Incident Report, TIMM, 11/04/03
42. Re-Interview, HOFFMEYER, 11/12/03
43. C-12 Work Order Log, 02/11/03 through 11/02/03
44. Work Order, #C-12 Panel, 06/20/03
45. Interview, MILBAUER, 11/21/03
46. Policy Statement 2001
47. Post Description, Detail Supervisor/Sergeant 1,2
48. Post Description, Segregation/C-12, C15, MHU Supervisor
49. Post Description, Correctional Officer-Living Unit 12 Wings
50. Post Description, Correctional Officer #C-12 Panel Segregation AE

Reviewed By:

DC 346
IL 426-0438

EXPIRATION DATE OF 45 DAY LIMIT:

2-28-04





Rod R. Blagojevich
Governor

Illinois
Department of
**Corrections**

Roger E. Walker, Jr.
Director

Dwight Correctional Center / Rt. 17 West / P.O. Box 5001 / Dwight, IL 60420-5001 / Telephone: (815) 584-2806 / TDD: (800) 526-0844

## M E M O R A N D U M

**DATE:**   January 20, 2004

**TO:**    Alyssa B. Williams
       Warden

**FROM:**   Ted Conkling, Assistant Warden - Programs
       Employee Review Officer

**SUBJECT:**  EMPLOYEE REVIEW HEARING
       CORRECTIONAL SERGEANT – ALAN TIMM

An Employee Review Hearing was held on January 15, 2004 at approximately 6:15 AM in the Video Conference Room with the following in attendance: Major Scott Cranford, Management Representative; C/O Don Phillis, Union Representative; Correctional Sergeant Alan Timm, Reported Employee; and Assistant Warden of Programs, Ted Conkling, Hearing Officer.

### NATURE OF ALLEGATION

Correctional Sergeant Timm was referred to the Employee Review Officer as a result of an External Investigation, Case Number 04-DWI-097 and for Violation of Departmental Rules regarding Conduct of Individuals regarding Negligence.

### FINDING

The Hearing Officer opened the proceedings by reviewing the report from Assistant Warden of Operations Dottie Culkin which states:

> I would like to refer Correctional Sergeant Alan Timm as a result of an external investigation, Case No. 04-DWI-097 and for Violation of Departmental Rules regarding Conduct of Individuals regarding Negligence.

### Departmental Rule 120 – Rules of Conduct

**Section 120.30 – Conduct of Individuals**

Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.

**Section 120.40 – Compliance with Laws and Regulations**

a)   Individuals shall obey all federal, State and local laws and applicable court decisions and orders related to the performance of their services to the Department.

c)   Individuals shall comply with departmental rules, written procedure, bulletins and written or verbal orders issued by Department authorities.

Employee Review Hearing
Correctional Sergeant Alan Timm
Dwight Correctional Center
January 20, 2004

Page 2

### Section 120.90 – Information to be Reported

a)    Individuals shall immediately report to the Chief Administrative Officer any information indicating a threat to the safety and security of any person.

## Departmental Rule 122 – Internal Investigations

### Section 112.30 – Reporting of Incidents

a)    Each employee shall completely and accurately document any unusual incident which he observes or which is reported to him.

## Administrative Directive 03.02.108 – Standards of Conduct

I-B    Policy Statement

Employees shall conduct themselves in a professional manner and, whether on-duty or off-duty shall not engage in conduct which is unbecoming of a State employee or which may reflect unfavorably on or impairs operations of the Department.

II-G    Requirements

1.    Compliance with Laws and Regulations

a.    Employees shall obey all federal, State and local laws
b.    Employees shall obey all applicable court decisions and orders related to the performance of their job duties.
d.    Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities

7.    Giving False Information

Any employee who knowingly provides false information, including but not limited to false information in statements, incident reports, correspondence, or an interview, shall be subject to disciplinary action, including discharge.

## Institutional Directive 04.03.108 – Response to Medical Emergencies

F.    Requirements

The following procedure has been established for responding to medical emergencies:

2.    When an employee becomes aware of a medical emergency he/she will immediately call the appropriate code (#3)

## Post Description – Detail Supervisor/Sergeant 1, 2

4)    Executes all Institutional Directives and Administrative Directives and all existing policies of this institution and has a good working knowledge of same.

13)    Attempts to solve offender problems on an informal basis and communicates offender problems to appropriate staff.

Employee Review Hearing
Correctional Sergeant Alan Timm
Dwight Correctional Center
January 20, 2004
Page 3

14)    Has read, fully understands and complies with the Policy Statement.

## Post Description – Segregation/C-12, C-15, MHU Supervisor

1)    Executes all Institutional Directives and Administrative Directives and all existing policies of this institution and has a good working knowledge of same.

4)    Provides direct supervision to security staff assigned to C-15, C-12 or MHU. Ensure compliance with established procedures for Segregation and general protection.

16)    Attempts to solve offender problems on an informal basis and communicates offender problems to appropriate staff.

17)    Has read, fully understands and complies with the Policy Statement.

23)    Ensures staff assigned completes Incident Reports as required and coordinates distribution after reviewing same and that staff completes Offender Disciplinary Reports as needed.

## Dwight Correctional Center/Kankakee MSU Policy Statement

Violation of Policy/Staff Discipline (Page 9)

8.    Unprofessional Conduct

9.    Falsifying/altering any records/documents, i.e., logs, reports, travel vouchers, physician statements, etc.

Staff Duties and Responsibilities (Pages 11 & 14)

2.    Employees shall comply with Departmental Rules, Administrative Directives and Institution Directives, other written procedures, bulletins, and written or verbal orders issued by proper authorities.

42.    All employees are responsible for the safety, security, and maintenance of order within the institution. Therefore, regardless of title or function, all staff must report any incidents or information which comes to their attention that might affect the health, safety or welfare of inmates or staff, the good order of the institution, or the custody of inmates. These reports should clearly state facts and label conclusions, hearsay, and interpretations are to be dated, signed by the employee and submitted on a DC 434 to their supervisor.

Correctional Sergeant Alan Timm is on the 11:00 PM – 7:00 AM shift with Tuesdays and Wednesdays off."

Sgt. Alan Timm initially referred to an incident dated February 6, 2001 in which he and others were pulled over on a highway by a corrections official. Sgt. Timm attempted to make a distinction between Attachment #2, an outlook message from AW Culkin to Larry Beck, External Investigations, as Mr. Beck allegedly was the Corrections Official who pulled him over.

Sgt. Timm went through each alleged violation of Departmental Rules, Administrative Directives, Institutional Directives, Post Descriptions and Dwight Correctional Center/Kankakee MSU Policy Statement with a standard, "no comment." Sgt. Timm did however, have exceptions to <u>DR 112.30 Reporting of Incidents</u> in which he replied, "paperwork submitted" and <u>DR 120.90, Information to be Reported</u> in which he replied, "Documentation stands."

Union Representative, Don Phillis, stated that the documentation provided does not substantiate any of the charges as specified in the disciplinary referral packet. C/O Phillis stated that the union requests that all charges be dropped, Sgt. Timm be reinstated immediately and be made whole.

Management had no comments other than the written report.

Employee Review Hearing
Correctional Sergeant Alan Timm
Dwight Correctional Center
January 20, 2004

Page 4

## RECOMMENDATION

After consideration of the information, documentation and statements presented during the hearing, the Hearing Officer notes that the charges against Correctional Sergeant Alan Timm are substantiated.

A review of the employee's record revealed no prior infractions of this nature within the past 2 years

The external investigation case number 04-DWI-097 clearly substantiates negligence and a failure to follow written guidelines. Sgt. Timm's failure to accurately report the incident is completely evident in the fact that his incident report dated November 4, 2003 (Attachment 41) recorded only events beginning at 2:00 PM. Sgt. Timm did admit in 04-DWI-097 involvement in relevant events beginning as early as 11:00 AM, on that date. Sgt. Timm additionally admitted in 04-DWI-097 that the offender Davis-Bells, N57280 had suffered a seizure when he checked her at approximately 11:00 AM, yet he never contacted the Health Care Unit before medical staff arrived at 2:00 PM.

Accordingly, the Hearing Officer recommends Discharge due to the severity of the incident and the overall failure of Sgt. Alan Timm to complete his supervisory responsibilities.

s/Ted Conkling

Ted Conkling, Assistant Warden – Programs
Employee Review Officer

1-20-04

Date

TC/cjc

s/Alyssa B. Williams

✓ Concur

Alyssa B. Williams
Warden

11/20/04

___ Do Not Concur

Date

Comments: _____

_____

_____

_____

_____

Employee Review Hearing
Correctional Sergeant Alan Timm
Dwight Correctional Center
January 20, 2004

Page 5

cc:    Correctional Sergeant Alan Timm
       AW Dottie Culkin, Referring Supervisor
       Union
       Personnel (4)





**Illinois**
Department of
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

Dwight Correctional Center / Rt. 17 West / P.O. Box 5001 / Dwight, IL 60420-5001 / Telephone: (815) 584-2806 / TDD: (800) 526-0844

M E M O R A N D U M

DATE:       January 20, 2004

TO:         Alyssa B. Williams
            Warden

FROM:       Ted Conkling, Assistant Warden – Programs
            Employee Review Officer

SUBJECT:    EMPLOYEE REVIEW HEARING – AMENDED SUMMARY
            CORRECTIONAL OFFICER – BARBARA HOFFMEYER

An Employee Review Hearing was held on January 15, 2004 at approximately 6:50 AM in the Video
Conference Room with the following in attendance: Major Scott Cranford, Management Representative;
Correctional Officer Don Phillis, Union Representative; Barbara Hoffmeyer (absent), Reported
Employee; and Assistant Warden of Programs, Ted Conkling, Hearing Officer.

NATURE OF ALLEGATION

Correctional Officer Barbara Hoffmeyer was referred to the Employee Review Officer as a result of
External Investigation Case Number 04-DWI-097 for Violation of Department Rules regarding Conduct of
Individual regarding Negligence.

On November 4, 2003, from the approximate time of 10:20 AM to the approximate time of 2:00 PM, an
inmate lay on the floor of her cell. During this time, no attempt was made by security staff to verify the
actual condition of the inmate. The inmate was pronounced dead on November 6, 2003 with the cause of
death listed as Intracerebral Hemorrhage due to Hypertensive Cardiovascular Disease.

FINDING

The Hearing Officer opened the proceedings by reviewing the report from Assistant Warden of
Operations Dottie Culkin which states:

> I would like to refer Correctional Officer Barbara Hoffmeyer as a result of an external
> investigation, Case No. 04-DWI-097 and for Violation of Departmental Rules regarding conduct
> of Individuals regarding negligence.

Departmental Rule 120 – Rules of Conduct

Section 120.30 – Conduct of Individuals

Individuals shall conduct themselves in a manner which will not reflect unfavorably on the
Department and shall not engage in conduct which is unbecoming or impairs the operations of
the Department.

Section 120.40 – Compliance with Laws and Regulations

Employee Review Hearing
Correctional Officer Barbara Hoffmeyer
Dwight Correctional Center
January 20, 2004

Page 2

        orders related to the performance of their services to the Department.

c)     Individuals shall comply with departmental rules, written procedure, bulletins and written or verbal orders issued by Department authorities.

### Section 120.90 – Information to be Reported

a)     Individuals shall immediately report to the Chief Administrative Officer any information indicating a threat to the safety and security of any person.

## Departmental Rule 122 – Internal Investigations

### Section 112.30 – Reporting of Incidents

a)     Each employee shall completely and accurately document any unusual incident which he observes or which is reported to him.

## Administrative Directive 03.02.108 – Standards of Conduct

I-B    Policy Statement

Employees shall conduct themselves in a professional manner and, whether on-duty or off-duty shall not engage in conduct which is unbecoming of a State employee or which may reflect unfavorably on or impairs operations of the Department.

II-G   Requirements

1.    Compliance with Laws and Regulations

    a.    Employees shall obey all federal, State and local laws
    b.    Employees shall obey all applicable court decisions and orders related to the performance of their job duties.
    d.    Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities

7.    Giving False Information

Any employee who knowingly provides false information, including but not limited to false information in statements, incident reports, correspondence, or an interview, shall be subject to disciplinary action, including discharge.

## Institutional Directive 04.03.108 – Response to Medical Emergencies

F.    Requirements

The following procedure has been established for responding to medical emergencies:

2.    When an employee becomes aware of a medical emergency he/she will immediately call the appropriate code (#3)

Employee Review Hearing
Correctional Officer Barbara Hoffmeyer
Dwight Correctional Center
January 20, 2004

Page 3

<u>Post Description: Correctional Officer – Living Unit 12 Wings (A & B and C & D) – All Shifts</u>

11)   Attempts to solve inmate problems on an informal basis and communicates inmate
      problems to appropriate staff.

12)   Conducts routine checks on the living unit at no less than twenty minute intervals and shall
      be documented as it occurs to prevent security breaches, escapes or suicides. Also checks
      noise levels, room restrictions, etc.

13)   Maintains order and discipline in the living unit. Has read, understands and complies with the
      Inmate Rule Book. Writes disciplinary reports as required in DR 504A and submits Incident
      Reports when appropriate. Reports immediately to the Shift Commander any serious
      incidents.

17)   Has read, fully understands and complies with the Policy Statement.

18)   Submits shift reports daily by shift to the Chief of Security, Shift Commander and Zone
      Commander. The shift report should include all unusual occurrences or observations and
      will be submitted at the end of each shift. In addition, the Correctional Officer is responsible
      for ensuring logging same in the Living Unit Log Book on a daily shift basis.

<u>Dwight Correctional Center/Kankakee MSU Policy Statement</u>

**Violation of Policy/Staff Discipline (Page 9)**

8.    Unprofessional Conduct

9.    Falsifying/altering any records/documents, i.e., logs, reports, travel vouchers, physician
      statements, etc.

**Staff Duties and Responsibilities (Pages 11 & 14)**

2.    Employees shall comply with Departmental Rules, Administrative Directives and Institution
      Directives, other written procedures, bulletins, and written or verbal orders issued by proper
      authorities.

42.   All employees are responsible for the safety, security, and maintenance of order within the
      institution. Therefore, regardless of title or function, all staff must report any incidents or
      information which comes to their attention that might affect the health, safety or welfare of
      inmates or staff, the good order of the institution, or the custody of inmates. These reports
      should clearly state facts and label conclusions, hearsay, and interpretations are to be
      dated, signed by the employee and submitted on a DC 434 to their supervisor.

Correctional Officer Barbara Hoffmeyer is on the 7:00 AM – 3:00 PM shift with Sundays and Mondays off.

Correctional Officer Barabara Hoffmeyer was not present at this hearing. This Hearing Officer notes that
Barbara Hoffmeyer did sign for the disciplinary referral and notice of hearing on January 9, 2004.

Management had no comments other than the written report.

Union Representative, Don Phillis, stated that the documentation provided does not substantiate any of the

Employee Review Hearing
Correctional Officer Barbara Hoffmeyer
Dwight Correctional Center
January 20, 2004

Page 4

charges specified in the disciplinary referral packet. C/O Phillis went on to say that union requests that all charges be dropped and that C/O Barbara Hoffmeyer be made whole.

## RECOMMENDATION

After consideration of the information, documentation and statements presented during the hearing, the Hearing Officer notes that the charges against Correctional Officer Barbara Hoffmeyer are substantiated.

A review of the employee's record revealed no prior infractions of this nature within the past two years.

The External Investigation Case Number 04-DWI-097 clearly substantiates negligence and a failure to follow written guidelines. Additionally, Officer Barbara Hoffmeyer's incident report dated November 4, 2003 (Attachment 25) records events only beginning at 2:00 PM, however, during the investigation interview Officer Hoffmeyer admitted involvement in relevant events beginning as early as 11:00 AM on November 4, 2003. This hearing officer notes that Officer Barbara Hoffmeyer made several trips to C-12, Room C-1 to check on offender Davis-Bells, N57280 noticing little or no change in Offender Davis-Bells condition. Following the visits to Room C-1 Officer Hoffmeyer called nursing staff and advised her supervisor Sgt. Alan Timm. The problem existed that Offender Davis-Bells actions and conditions persisted with no further follow-up from Officer Hoffmeyer. Officer Hoffmeyer should have immediately sought out another supervisor other than Sgt. Alan Timm.

Accordingly, the Hearing Officer recommends Discharge due to the severity of the incident.

s/Ted Conkling

Ted Conkling, Assistant Warden – Programs
Employee Review Officer

1-30-04
Date

TC/cjc

s/Alyssa B. Williams

✓ Concur

Alyssa B. Williams
Warden

1/30/04
Date

___ Do Not Concur

Comments: _____

_____

_____

Employee Review Hearing
Correctional Officer Barbara Hoffmeyer
Dwight Correctional Center
January 20, 2004

Page 5

_____

cc:    Correctional Officer Barbara Hoffmeyer
       AW Dottie Culkin, Referring Supervisor
       Union
       Personnel (4)

EXPIRATION DATE OF 45 DAY LIMIT:

2-28-04



Illinois
Department of
**Corrections**

Rod R. Blagojevich
Governor

Roger E. Walker, Jr.
Director

Dwight Correctional Center / Rt. 17 West / P.O. Box 5001 / Dwight, IL 60420-5001 / Telephone: (815) 584-2806 / TDD: (800) 526-0844

M E M O R A N D U M

DATE:       January 20, 2004

TO:         Alyssa B. Williams
            Warden

FROM:       Ted Conkling, Assistant Warden – Programs
            Employee Review Officer

SUBJECT:    **EMPLOYEE REVIEW HEARING
            CORRECTIONAL OFFICER – BARBARA HOFFMEYER**

An Employee Review Hearing was held on January 15, 2004 at approximately 6:50 AM in the Video Conference Room with the following in attendance: Major Scott Cranford, Management Representative; Correctional Officer Don Phillis, Union Representative; Barbara Hoffmeyer (absent), Reported Employee; and Assistant Warden of Programs, Ted Conkling, Hearing Officer.

<u>NATURE OF ALLEGATION</u>

Correctional Officer Barbara Hoffmeyer was referred to the Employee Review Officer as a result of External Investigation Case Number 04-DWI-097 for Violation of Department Rules regarding Conduct of Individual regarding Negligence.

<u>FINDING</u>

The Hearing Officer opened the proceedings by reviewing the report from Assistant Warden of Operations Dottie Culkin which states:

  I would like to refer Correctional Officer Barbara Hoffmeyer as a result of an external investigation, Case No. 04-DWI-097 and for Violation of Departmental Rules regarding conduct of Individuals regarding negligence.

<u>Departmental Rule 120 – Rules of Conduct</u>

  **Section 120.30 – Conduct of Individuals**

  Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.

  **Section 120.40 – Compliance with Laws and Regulations**

  a)    Individuals shall obey all federal, State and local laws and applicable court decisions and orders related to the performance of their services to the Department.

  c)    Individuals shall comply with departmental rules, written procedure, bulletins and written or verbal orders issued by Department authorities.