


DEFENDANT'S EXHIBIT 1

Rod R. Blagojevich
Governor

Roger E. Walker Jr.
Director

Dwight Correctional Center / Rt. 17 West / P.O. Box 5001 / Dwight, IL 60420-5001 / Telephone: (815) 584-2806 / TDD: (800) 526-0844

## MEMORANDUM

DATE: January 20, 2004

TO: Alyssa B. Williams
    Warden

FROM: Ted Conkling, Assistant Warden - Programs
      Employee Review Officer

SUBJECT: EMPLOYEE REVIEW HEARING – AMENDED SUMMARY
         CORRECTIONAL OFFICER – LARRY FORD

An Employee Review Hearing was held on January 15, 2004 at approximately 6:30 AM in the Video Conference Room with the following in attendance: Major Scott Cranford, Management Representative; C/O Don Phillis, Union Representative; C/O Larry Ford, Reported Employee; and Assistant Warden of Programs, Ted Conkling, Hearing Officer.

### NATURE OF ALLEGATION

Correctional Officer Larry Ford was referred to the Employee Review Officer as a result of External Investigation Case Number 04-DWI-097 for Violation of Department Rules regarding Conduct of Individual regarding Negligence.

On November 4, 2003, from the approximate time of 10:20 AM to the approximate time of 2:00 PM, an inmate lay on the floor of her cell. During this time, no attempt was made by security staff to verify the actual condition of the inmate. The Inmate was pronounced dead on November 6, 2003 with the cause of death listed as Intracerebral Hemorrhage due to Hypertensive Cardiovascular Disease.

### FINDING

The Hearing Officer opened the proceedings by reviewing the report from Assistant Warden of Operations Dottie Culkin which states:

#### Departmental Rule 120 – Rules of Conduct

Section 120.30 – Conduct of Individuals

Individuals shall conduct themselves in a manner which will not reflect unfavorably on the Department and shall not engage in conduct which is unbecoming or impairs the operations of the Department.

Section 120.40 – Compliance with Laws and Regulations

a) Individuals shall obey all federal, State and local laws and applicable court decisions and orders related to the performance of their services to the Department.

Employee Review Hearing
Correctional Officer Larry Ford
Dwight Correctional Center
January 20, 2004

Page 2

      verbal orders issued by Department authorities.

### Section 120.90 – Information to be Reported

a)    Individuals shall immediately report to the Chief Administrative Officer any information indicating a threat to the safety and security of any person.

### Departmental Rule 122 – Internal Investigations

#### Section 112.30 – Reporting of Incidents

a)    Each employee shall completely and accurately document any unusual incident which he observes or which is reported to him.

### Administrative Directive 03.02.108 – Standards of Conduct

I-B    Policy Statement

Employees shall conduct themselves in a professional manner and, whether on-duty or off-duty shall not engage in conduct which is unbecoming of a State employee or which may reflect unfavorably on or impairs operations of the Department.

II-G    Requirements

   1.    Compliance with Laws and Regulations

      a.   Employees shall obey all federal, State and local laws
      b.   Employees shall obey all applicable court decisions and orders related to the performance of their job duties.
      d.   Employees shall comply with departmental rules, written procedures, bulletins and written or verbal orders issued by proper authorities

   7.    Giving False Information

Any employee who knowingly provides false information, including but not limited to false information in statements, incident reports, correspondence, or an interview, shall be subject to disciplinary action, including discharge.

### Institutional Directive 04.03.108 – Response to Medical Emergencies

F:    Requirements

The following procedure has been established for responding to medical emergencies:

   2.    When an employee becomes aware of a medical emergency he/she will immediately call the appropriate code (#3)

### Post Description – Correctional Officer C-12 Panel Segregation/Temporary Confinement Panel/Key Control Officer – All Shifts

12)    Attempts to solve offender problems on an informal basis and communicates offender problems to appropriate staff.

14)    Maintains order and discipline in the living unit. Has read, understands and complies with the

Employee Review Hearing
Correctional Officer Larry Ford
Dwight Correctional Center
January 20, 2004

Page 3

        Inmate Rule Book. Writes disciplinary reports as required in DR 504A and submits Incident Reports when appropriate. Reports immediately to the Shift Commander any serious incidents.

17) Has read, fully understands and complies with the Policy Statement.

23) All unusual occurrences or observations will be submitted at the end of the shift. In addition, the Correctional Officer is responsible for logging in the Living Unit Log Book on a daily shift basis

31) The Panel Officer will be responsible for the living unit log.

### Dwight Correctional Center/Kankakee MSU Policy Statement

**Violation of Policy/Staff Discipline (Page 9)**

8. Unprofessional Conduct

9. Falsifying/altering any records/documents, i.e., logs, reports, travel vouchers, physician statements, etc.

**Staff Duties and Responsibilities (Pages 11 & 14)**

2. Employees shall comply with Departmental Rules, Administrative Directives and Institution Directives, other written procedures, bulletins, and written or verbal orders issued by proper authorities.

42. All employees are responsible for the safety, security, and maintenance of order within the institution. Therefore, regardless of title or function, all staff must report any incidents or information which comes to their attention that might affect the health, safety or welfare of inmates or staff, the good order of the institution, or the custody of inmates. These reports should clearly state facts and label conclusions, hearsay, and interpretations are to be dated, signed by the employee and submitted on a DC 434 to their supervisor.

Correctional Officer Larry Ford is on the 7:00 AM – 3:00 PM shift with Thursdays and Fridays off.

Correctional Officer Larry Ford stated that he read through all of the statements contained in the disciplinary referral packet and didn't see anything that he, Officer Ford, did anything wrong.

Management had no comments other than the written report.

Union Representative, Don Phillis, stated that this hearing officer should look at C/O Ford's work record as he, C/O Ford, is a professional employee who volunteers for overtime. C/O Phillis added that all charges should be dropped and C/O Ford should be made whole.

### RECOMMENDATION

After consideration of the information, documentation and statements presented during the hearing, the Hearing Officer notes that the charges against Correctional Officer Larry Ford are substantiated.

A review of the employee's record revealed no prior infractions of this nature within the past two years.

The External Investigation 04-DWI-097 clearly substantiates Negligence and a failure to follow written guidelines. C/O Larry Ford failed to record any entries in the C-12 Panel logbook from 10:20 AM to 12:35 PM on 11/4/03. This included what time he, C/O Ford, was relieved for lunch. The fact that pertinent entries were not placed in the C-12 Panel logbook on 11/4/03 is extremely serious in light of the incident that took place.

Employee Review Hearing
Correctional Officer Larry Ford
Dwight Correctional Center
January 20, 2004

Page 4

Accordingly, the Hearing Officer recommends a ~~10-day~~ 1 *reduced per grievance # 06-0030-04* suspension for the charges stated above. Additionally, it should be noted that future incidents of this nature may result in more severe discipline.

s/Ted Conkling

Ted Conkling, Assistant Warden – Programs
Employee Review Officer

1-30-04
Date

TC/cjc

✓ Concur

___ Do Not Concur

s/Alyssa B. Williams

Alyssa B. Williams
Warden

1/30/04
Date

Comments: _____
_____
_____
_____
_____
_____

cc:    Correctional Officer Larry Ford
       AW Dottie Culkin, Referring Supervisor
       Union
       Personnel (4)


**DEFENDANT'S EXHIBIT 8**

ILLINOIS DEPARTMENT OF CORRECTIONS

# Disciplinary Action-Suspension Notice

**Name:** Barbara Hoffmeyer    **SSN:** █████

**Address:** █████

**City, State, Zip:** █████

**Suspension:** ~~Suspension Pending Discharge~~
~~15~~ 10 day suspension reduced per grievance #06-0029-04

**Beginning Date:** 2/20/04

**Date of Return:** ~~3/1-04~~ 3/6/04

**Charges:** Violation of Departmental Rules regarding conduct of individuals regarding negligence as a result of an external investigation, Case No. 04-DWI-097. Future acts of this nature may result in further disciplinary action. Hearing held on January 15, 2004.

**Agency Head Approval:**

s/Roger E. Walker Jr.

Roger E. Walker Jr.    Signature    2-12-04
Print Name    Date

**Person Serving Notice:**

s/IDOC Employee

Major Felipe Zavala    Signature    2/19/04
Print Name    Date

Distribution: Personnel    Printed on Recycled Paper    DOC 0105 (Eff. 3/2002)
(Replaces DC 710-6110)

OCT-26-2004 13:09    CENTRAL MANAGEMENT SER    217 524 0836   P.03/03

## RESOLUTION PRIOR TO ARBITRATION

GRIEVANCE NO.: 06-0029-04 (438224) (2004)
06-0030-04 (438225) (2004)

ARBITRATION NO.: 4618

GRIEVANT: Barbara Hoffmeyer
Larry Ford

AGENCY/FACILITY: DOC/Dwight Correctional Center

ISSUE: Discipline (15 day suspension & 10 day suspension)

**RESOLUTION:**

In full, final and complete resolution of this matter, the parties agree as follows:

1. The Union and the Grievants, Barbara Hoffmeyer and Larry Ford, agree to withdraw the above referenced grievances.

2. To avoid arbitration, the Employer will reduce the Grievant Barbara Hoffmeyer's fifteen (15) day suspension to a ten (10) day suspension. The Grievant will receive back wages minus any applicable taxes and deductions for the period March 1, 2004 to March 5, 2004 which shall be paid from the back wage fund administered by the Department of Central Management Services.

3. To avoid arbitration, the Employer will reduce the Grievant Larry Ford's ten (10) day suspension to a one (1) day suspension. The Grievant will receive back wages minus any applicable taxes and deductions for the period February 24, 2004 to March 3, 2004 which shall be paid from the back wage fund administered by the Department of Central Management Services.

4. The Union and the Grievants, Barbara Hoffmeyer and Larry Ford, agree to refrain from initiating or pursuing any grievance, administrative or other judicial proceedings arising out of this suspension action or the circumstances that led to the filing of the charges resulting in the suspensions.

5. This resolution is made without precedent or prejudice to either party and may not be utilized in any subsequent proceedings except for the enforcement of its terms.

s/Carol C. Kirbach                         s/Agent of the Union

For the Employer                           For the Union
DATED: October 18, 2004                    DATED: Oct. 22/2004

xc: Al Mathy/Donna Hoggan
Kathi Hernandez, Personnel
Grievants

DEFENDANT'S EXHIBIT 9

RECEIVED OCT 2 6 2004
Illinois Dept. of Corrections

TOTAL P.03

BEFORE THE ARBITRATOR



In the Matter of the Arbitration
of a Dispute Between

AFSCME, COUNCIL 31, AFL-CIO

and

STATE OF ILLINOIS, CENTRAL MANAGEMENT
SERVICES, DEPARTMENT OF CORRECTIONS,
DWIGHT CORRECTIONAL INSTITUTION

Arbitration No. 4608
Grievance No. 371758
(Alan Timm Grievance)

Appearances:
  Ms. Sue Osthus, Legal Counsel, AFSCME, Council 31, 615 South Second Street, Springfield, Illinois 62705, appearing on behalf of the Union.
  Mr. Steven J. Sturm, Labor Relations Counsel, Central Management Services, 503 Stratton Office Building, 401 South Spring Street, Springfield, Illinois 62706, appearing on behalf of the Employer.

## ARBITRATION AWARD

Pursuant to the provisions of the collective bargaining agreement between the parties, AFSCME, Council 31, AFL-CIO, hereinafter referred to as the Union, and State of Illinois, Central Management Services, Department of Corrections, Dwight Correctional Institution, hereinafter referred to as the Employer, the undersigned was selected to serve as Arbitrator of the Alan Timm grievance. Hearing was held on July 13, 2004, in Dwight, Illinois, at which time the parties presented such testimony, exhibits and other evidence as was relevant to the dispute. The parties made oral arguments in lieu of written briefs.

Now, having considered the evidence, the arguments of the parties, the contract language and the record as a whole, the undersigned makes the following Award.



STIPULATED ISSUE:

The parties stipulated to the following issue:

Was the grievant discharged for just cause?

If not, what is the appropriate remedy?

PERINTENT CONTRACT LANGUAGE:

## ARTICLE IX

### Discipline

A.   The Employer agrees with the tenets of progressive and corrective discipline. Disciplinary action or measures shall include only the following:
   a) Oral reprimand (RC-10 excluded);
   b) Written reprimand;
   c) Suspension (notice to be given in writing); and
   d) Discharge (notice to be given in writing).

Disciplinary action may be imposed upon an employee only for just cause. An employee shall not be demoted for disciplinary reasons. Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter.

In any event, the actual date upon which discipline commences may not exceed forty-five (45) days after the completion of the pre-disciplinary meeting.

FACTS:

Dwight Correctional Institution, hereinafter referred to as DCI or the Employer, is an all female maximum security facility housing approximately 1,000 inmates.

The grievant, Alan Timm, at the time of his discharge, worked at DCI for approximately 13 years. He was a Correctional Sergeant on the 11:00 p.m. – 7:00 a.m. shift.

On November 4, 2003, the grievant worked a double shift, working the 7:00 a.m. – 3:00 p.m. shift on overtime. He worked the overtime shift at C-12 Segregation (SEG) unit where

2

he was the supervisor on duty. C-12 has four wings: A, B, C and D. Working the C and D wing that day was Correctional Officer Barbara Hoffmeyer. The C wing has 13 cells and D wing 12. Hoffmeyer was responsible for monitoring the 25 cells. In the SEG unit, cell doors can only be opened in the presence of a supervisor, except in the case of a medical emergency.[1]

At approximately 10:30 a.m., inmate Kimberly Davis-Bills complained to Hoffmeyer that she did not feel well and was dizzy. At approximately 11:00 a.m., Hoffmeyer called the Health Care Unit and reported inmate Davis-Bills' condition to Janice Miller, a Corrections Medical Technician. Miller advised her to have the inmate lay down and elevate her feet. She testified that she could not remember if she advised Timm of this call. She testified that she told Timm a couple of times about Davis-Bills' condition. Hoffmeyer in her interview statement[2] stated that the second time when she asked for help getting her off the floor, Timm responded "Fuck her."[3]

Correctional Officer Angel Park, Internal Affairs, was present on the panel when Hoffmeyer reported inmate Davis-Bills' condition. She testified that Hoffmeyer told Timm that Davis-Bills was banging and making noise and laying on the floor with her underwear around her knee and refusing to get up. She also heard Hoffmeyer say "this is a game." Parks in her investigation statement said she could not hear Timm's response because someone else in the panel asked her a question. She and Timm then walked to the Administration Building.

Hoffmeyer kept making her routine checks of inmate Davis-Bills. At about 12:30 p.m., she noticed Davis-Bills on the floor with her jumpsuit and underwear below her waist. She called the Health Care Unit and again spoke with Miller. Miller responded that she should be

---

[1] Medical emergency is not defined.

[2] Hoffmeyer testified that her interview statements were accurate. (Joint Exhibits, Attachments 24 and 42)

[3] Timm at first denied saying "fuck her", but, later, admitted same to Warden Alyssa Williams as well as admitting to referring to Davis-Bills as a "retard".

3

brought to the clinic. Miller instructed the SEG Movement Officer Mark Sila that when he took the inmate at the clinic back, he would have another one to bring back from C-12, Davis-Bills. Sila returned with another inmate, not Davis-Bills. Sila told Miller that Davis-Bills would not get off the floor.[4] Miller called C-12 and spoke with someone (she could not remember who) who told her that they could not get Davis-Bills up. This was at 2:00 p.m. She immediately went to C-12 along with nurse Christine Taylor. They went directly to inmate Davis-Bills' cell. The inmate was laying on her left side with her jumpsuit and underwear half off and not moving. She lifted her right arm and when it fell slowly, she said "if this is faking, you're not doing a good job of it." Timm was present. She and Timm rolled her over, put her jumpsuit on, put her on a blanket, and dragged her out to the day room area. She was in a puddle of urine. She sent Nurse Taylor to get a nurse practitioner. Miller tried arousing inmate Davis-Bills. She opened her eyes but could not verbally respond. Miller then called for an ambulance.

Grievant Timm testified that in the morning, Hoffmeyer told him that inmate Davis-Bills was laying on the floor and wanted to go to the clinic. He told her to call the clinic and to tell the inmate what the nurse tells her. Timm testified that Hoffmeyer called and he told her, now go tell Davis-Bills what you were told.

Timm testified that he visited the cell that morning and looked through the chuckhole, but that he did not enter the cell. He asked her roommate where Davis-Bills was. She responded that she was on the floor. He asked her if Davis-Bills was okay. She waved her arm and said she seemed okay. He told Davis-Bills she had to get off the floor and onto the bed. Timm testified that on third shift, his regular shift, it was common for inmates to lay on the floor.

---

[4] Miller testified that it is normal not to bring in an inmate who refuse to get off the floor.

4

Timm testified that Hoffmeyer told him that she told Davis-Bills to lie down and elevate her feet. Timm did not think there was a medical emergency. He thought she was on the floor to get attention and get to the medical center or that she had a seizure.

Timm testified that he took about an hour break around noon time. He received a call on his radio that Movement Officer Sila was there to move inmates.[5] When he returned he told Sila to take another inmate because Davis-Bills would not get off the floor and get dressed.

When inmate Davis-Bills did not get up to get dressed, he opened the cell door and entered. He shut the door and went to call the nurses but on his way he saw the nurses coming so he did not make the call.

After inmate Davis-Bills was removed by the ambulance, at about 3:10 p.m., Correctional Officer Park saw Timm and asked him if the inmate who went out in the ambulance was the same one Hoffmeyer said fell off the toilet that morning. Park testified that he said he didn't know what she was talking about. Park said no code was called. He stated that "we thought she was having a seizure, I'm from the old school, you don't call a code for a seizure, you call the nurses, we called the nurses to come over."

Timm was placed on administrative leave with pay. An Employee Review Hearing was held on January 15, 2004. Discharge was recommended. The Employee Review Hearing findings and recommendations were not formally rebutted by the Union. By letter sent on February 17, 2004, by regular mail, Timm was notified that he was being suspended effective July 23. Timm did not receive the February 17 letter. He was informed of his suspension by certified mail on March 9, 2004. He was discharged effective March 19, 2004. The grievant was discharged for the following reasons:

---

[5]    A supervisor needs to be present to open cell doors.

5

- On November 4, 2003, an inmate of the Department
  pronounced dead with the cause of death lis...
  Hemorrhage due to Hypertensive Cardiovascular Dis...
  was laying on the floor of the cell from the approxima...
  to the approximate time of 2:00 PM. During this time
  was made by security staff to verify the actual condition
  this date, Sergeant Timm was assigned to the un...
  mentioned inmate was housed in as the Sergeant in
  Timm admits that he was made aware of the inmate...
  approximately 11:00 AM and at that time, he went to...
  took no action. Sergeant Timm:

    - failed to notify the Health Care Unit of this s...
    - failed to verify that his subordinates ha...
      Care Unit
    - failed to document the fact that an inm...
      floor of her cell at this time
    - failed to verify the actual condition of the inm...
    - admitted that he failed to return to the i...
      approximately 2:00 PM (approximately t...
      initial check on the inmate.)

    . . .

- Sergeant Timm wrote out and turned in an incident
  that the above-mentioned inmate was unresponsive when
  to get ready to go to the clinic. Mr. Timm admitted tha...
  inmate's cell approximately three hours prior to the 2:0...

    . . .

Alan Timm's failure to adhere to the Administrative Direct...
Directives, Departmental Rules, and Facility Post Desc...
contributed to the death of an inmate in this Agency's custod...
unacceptable. The Agency recommends Mr. Timm for immedi...

The Union immediately filed a grievance alleging that the grievant's ...

cause.

POSITIONS OF THE PARTIES:

Employer's Position

6

It is the Employer's position that there was a number of reasons to justify the discharge of the grievant. The biggest reason is that he was terribly negligent in his treatment of inmate Davis-Bills. It is argued that the grievant was told by Hoffmeyer that the inmate was lying on the floor yet he made no calls on her behalf and left for one hour. He left knowing that other staff could not enter her cell to move her, because he was the only supervisor on duty. The Employer argues that it is totally unacceptable and negligent to let an inmate on the floor for four hours without checking on her. This, it is argued, was confirmed by Officer Parks in her testimony.

The Employer contends that not only was the grievant negligent in the performance of his duties, but he was also totally indifferent. He testified that when he was being interviewed two days later he was not aware that inmate Davis-Bills had died. The Employer points out that here was a situation where an inmate was hauled off in an ambulance on his watch yet he was not concerned enough to know she passed away.

It is argued that his indifference is also manifested by his refusal to call the medics after being told several times by Hoffmeyer of inmate Davis-Bills' condition. He did nothing. He told Officer Park, as the ambulance left, that he was from the old school and that code is not called for seizures. The Employer contends, however, that no one told him that the inmate was having a seizure. He simply did not pursue the situation; he was irresponsible.

Also, it is argued, both the grievant's insensitivity and lack of credibility is apparent when he responded "fuck her" when told of inmate Davis-Bills' condition and when he referred to her as a "retard." He at first denied making said comments, but admitted same in his unemployment compensation hearing.

7

The Employer argues that the grievant's conduct warranted discharge, especially given his past record of discipline for failure to follow directives and comply with DOC policy.

With respect to the procedural issue raised by the Union that the Employer did not impose discipline within 45 days of the pre-disciplinary meeting, it is the Employer's position that (1) the 45 days begins from the date of the Union's rebuttal which in this case was the Union's grievance filed in March 2004; (2) that in any event it did meet the 45 days because the notice of the grievant's suspension pending discharge was sent February 17, 2004, and effective February 23; and (3) the State Supreme Court has held that in cases of misconduct like in this case, discharges cannot be set aside for procedural reasons.

Union's Position

It is the Union's position that the grievant's discipline and discharge was not timely under Article IX, Section 1 of the contract and therefore must be set aside. The contract requires discipline to commence no later than 45 days after the completion of the pre-disciplinary meeting. The pre-disciplinary meeting was held on January 15 and it was not until March 9 that he received his suspension notice which exceeded the 45-day limit.

With respect to the merits of the grievant's discharge, the Union argues that it is easy to overreact because the situation ended up with an inmate dying. However, the Union avers, all of the circumstances must be considered before making a determination.

In this regard, it is argued, the Arbitrator must take into consideration the fact that it was common practice among the inmates to lie on the floor. Witnesses Hoffmeyer, Miller and Park testified to same. In fact, Hoffmeyer told the grievant that she thought inmate Davis-Bills was

8

faking. Therefore, it is argued, it is understandable and reasonable that the grievant did not conclude there was a problem and that Davis-Bills was in need of medical attention. Further, it is argued, inmate Davis-Bills was responsive until 2:00 p.m. so it was reasonable to assume there was no medical emergency requiring a Code 3.

The Union claims it was not unreasonable, much less negligent, for the grievant not to call the medical unit because he was aware his subordinate, Hoffmeyer, had already done so. He did not call code because from what he was told and observed there was no medical emergency. Neither he nor Hoffmeyer had knowledge of inmate Davis-Bills' medical history.

The Union argues that it was not negligent for the grievant to leave the SEG unit for one hour because the medics had been called, there was some thought that the inmate was faking, and he relied on his wing officer to take charge. It is argued that even CMT Miller upon arrival at 2:00 p.m. at first thought the inmate was faking, so how can the Employer claim that the grievant should have known there was a medical emergency.

Lastly, the Union argues that the grievant's prior record cannot be a consideration because his discharge was not based on same, and secondly, because he has had no prior discipline for a similar offense of negligence.

Based on the above, it is the Union's position that the grievant's discharge was not for just cause and accordingly he should be reinstated with full back pay.

DISCUSSION:

### Procedural Issue

Article IX, Section 1, provides that "...the actual date upon which discipline commences may not exceed forty-five (45) days after the completion of the pre-disciplinary meeting.

9

The grievant's pre-disciplinary hearing was held on January 15, 2004. He received notice of his suspension on March 9, 2004, nine days past the 45-day limit. As with most procedural timeline issues, timeliness must be determined in context of the facts of each case. Similar to cases where the Union fails to file a grievance timely or appeal a grievance to the next step within the strict time limits of the contract, compliance determinations are made on a case by case basis.

Here, the Arbitrator is convinced from the evidence produced that the State sent the grievant notice of his suspension on February 17, 2004, to commence on February 23. The Employer's action was within the 45-day limit, but it was not received by the grievant. Once the Employer learned of this, it immediately sent the grievant another notice which he received on March 9. The Employer acted in good faith and in a timely manner, but it turned out otherwise. Given what can be considered mitigating circumstances, the Arbitrator finds the Employer substantially complied with the requirement to timely impose discipline once the pre-disciplinary hearing had been completed.

## Merits

The just cause issue in this case is whether the grievant was negligent in the performance of his duties as it relates to inmate Davis-Bills. More specifically, whether he was negligent in attending to Davis-Bills' medical condition.

It is institutional policy that in medical emergency situations, staff is to call a Code 3. Medical emergency is not defined. A clear-cut case of a medical emergency is when an inmate is not responsive. Short of that, staff is required to use their judgment in alerting Code 3. For

instance, in the past, inmates who had seizures, while requiring medical attention, were not considered a Code 3 medical emergency.[6]

Suffice to say, staff must use a considerable amount of judgment in determining if a medical emergency exists or if an inmate is in need of medical attention. This is complicated by the fact that inmates often times fake illness in order to get a trip to the Health Care Unit.

This case is unusual because it involves the death of an inmate. The fact that the inmate in this case died is, of course, tragic. However, the Arbitrator must remain mindful that there is no evidence, or even a claim, that the delay in getting the inmate to the hospital caused her death. Therefore, every effort has been made by the Arbitrator to make sure that the grievant's just cause determination is not prejudiced by the tragedy in this case.

After a thorough review of the record and careful consideration of the evidence produced, the Arbitrator finds the grievant, by his conduct, was clearly negligent.

In this case, an inmate, Davis-Bills, laid on the floor of her SEG unit cell for almost four hours from approximately 10:20 a.m. to 2:00 p.m. While the grievant's initial assessment of Davis-Bills' condition was reasonable, his follow-up was not. He was first made aware of the inmate's situation by Hoffmeyer who said she thought Davis-Bills was faking. At that point, there was no reason for the grievant to think otherwise. His initial feedback was she was faking and it was not uncommon for inmates to lie on the floor and fake illness. That being said, however, it is (1) against the rules for inmates to lie on the floor, and (2) each case must be verified to determine if the inmate is in need of medical attention or faking.

The grievant checked on Davis-Bills shortly after 11:00 a.m., but did not enter the cell. He observed her laying on the floor complaining, but relied on her roommate's assessment that

---

[6]   This is no longer the case.

-11-

Davis-Bills was faking.[7] For the next 2½ - 3 hours he did nothing to check on, inquire, or verify Davis-Bills condition.

The grievant, in defense of his conduct, claims that he relied on Hoffmeyer calling the nurse. Yet, when she told him a second time of the inmate's condition and asked for help to get Davis-Bills off the floor, his response was "fuck her."[8] His response was not based on any personal knowledge that she was faking. Apparently, he was still relying on Davis-Bills' roommate's assessment, or simply assuming that she was faking in order to get a visit to HCU. Meanwhile, he knew Inmate Davis-Bills was claiming that she fell off the toilet and could not get up. The grievant was the only one who could make a reasonable assessment and verify Davis-Bills' condition. This is so because he was the only one who could open the cell door. So either he had to enter the cell or be there to allow Hoffmeyer to enter. However, his response to Hoffmeyer ("fuck her") when asked to help with Davis-Bills, left Hoffmeyer unable to enter Davis-Bills' cell to verify her condition because she needed the presence of a supervisor to do so. Hoffmeyer was left with the impression that the grievant was not concerned and there was no use in contacting him about the situation anymore.[9]

The grievant in his investigation interview, stated that he thought that Davis-Bills was faking or having, or had, a seizure.[10] Why he thought someone having a seizure was not in need of medical attention is incredible. It is understandable he did not call a Code 3 since, apparently,

---

[7] The roommate in her interview claimed that the grievant opened the chuckhole and told Davis-Bills to "get up or you are going to lay there all fucking day till the next shift comes." However, since the roommate did not testify, the grievant's testimony on this point is credited.

[8] See Joint Exhibit 10, Attachments 24 and 42, her investigation statements. Hoffmeyer testified that her statements were accurate.

[9] In her investigation interview, Joint Exhibit 10, attachment 24, she stated that she did not believe Timm cared that there was an inmate lying on the floor.

[10] He stated that he observed Davis-Bills laying on her side with her back to the door with her jumpsuit and underwear around her knees, He asked the roommate if everything was all

12

seizures were not considered a medical emergency at the time, but to not call a nurse or send the inmate to the Health Care Unit was simply negligent. He was negligent not for not calling a Code 3, but for not doing anything at all, when admittedly, he thought she might be having a seizure. He explained in his investigation interview that he did not have medical training regarding seizures, but that some seizure victims he saw in the past, slept afterwards. He should have either confirmed she was having, or had, a seizure or was faking. He did neither.

Furthermore, when he returned to the unit at about 1:30 p.m., he still proceeded on the basis that Davis-Bills was not in need of immediate medical attention; again without first verifying her condition. Officer Sila was there to move Davis-Bills to the Health Care Unit, but was told by the grievant to take someone else because Davis-Bills was undressed. So after 2½ - 3 hours and the grievant still on the floor in about the same location and position and still complaining, the grievant did not enter Davis-Bills' cell to verify her medical condition before sending Sila off with another inmate. Davis-Bills by this time was in serious condition requiring a Code 3 call. Finally, he left to call the HCU, but by this time two nurses were on their way and approaching the unit.

All in all, the grievant, as the supervisor in charge, was negligent in his handling of the Davis-Bills' situation. This is a situation in which inmate Davis-Bills did nothing to indicate that her call for help was anything but real. She laid on the floor for nearly four hours in basically the same location and position seeking help without anyone verifying her need for medical attention. The grievant believed she was either faking or had a seizure, but he did not follow up on either. Ignoring an inmate who was having, or had, a seizure was in itself negligent. Further, while he relied on Hoffmeyer to take charge of the situation, he knew she could not enter Davis-Bills' cell

---

right. According to the grievant, she waived her hand and said she was faking. The grievant stated that he saw liquid on the floor and thought she had a seizure.

13

to verify her condition without his presence. Yet, he discouraged her from contacting him about Davis-Bills, because the last time she did his response was "fuck her". Hoffmeyer was left with the impression that he was not interested enough to be bothered.

The grievant was responsible for the safety and well being of not only staff but the inmates as well. Under the circumstances, the grievant failed to meet his responsibility and was negligent in the performance of his duties as it related to inmate Davis-Bills. His discharge was for just cause.

Based on the above facts and discussion thereon, the Arbitrator renders the following

## AWARD

1. That the grievant's discipline was timely imposed.
2. That the grievant's discharge was for just cause.

Dated at Madison, Wisconsin, this 12th day of August, 2004.

s/Herman Torosian

Herman Torosian, Arbitrator

14