E-FILED
Thursday, 07 June, 2007  02:55:16 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ALAN TIMM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  05-1276 |
| | ) | |
| THE ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF THE PLAINTIFF, ALAN TIMM, IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

The Plaintiff, Alan Timm ["Timm"], was employed by the Illinois Department of

Corrections ["Department"] as a correctional sergeant at the Dwight Correctional Center.  He

began his employment with the Department on November 4, 1991.  In March of 2004 his

employment with the Department was terminated as a result of the death of an inmate.  The

Department claimed that his conduct on the day of the inmate's death constituted cause for his

termination from employment.

In the wake of his termination, Timm initiated the above captioned proceeding claiming

he was the recipient of discriminatory treatment in employment because of his sex in violation of

42 U.S.C. § 2000e-2(a) in that he was terminated from employment with the Department when

female employees who engaged in similar or more serious conduct than did Timm were not

terminated.

Following discovery, the Department now seeks summary judgment.  It claims that

1

Timm cannot demonstrate the existence of a material disputed fact which would justify a trial. In this respect, it contends that: a) Timm cannot prove a claim of unlawful discrimination under the direct method; b) Timm cannot prove a *prima facie* claim of discrimination under the indirect method since he can establish neither that his performance satisfied the Department's legitimate expectations nor that similarly situated employees were treated more favorably than he; and c) the Department offers a legitimate, non-discriminatory reason for its actions and Timm can produce no evidence that its explanation is pretextual.

For reasons which follow, the Department's motion should be denied.

## II. STATEMENT OF FACTS

### Timm's Response To The Department's Statement Of Material Undisputed Facts

### A. Material Facts Which Are Undisputed For Purposes Of Summary Judgment.

With respect to the material facts claimed to be undisputed by the Department, Timm agrees that the following facts are undisputed and material except as otherwise shown: 1,2,3,4,5, 6,7,8,9,10, 11,12,13,14,15,16,17,18,19,20,21,23,24,25,26,28,29,31,32,33,35,36,37,38,39,40, 41, 42,43,44,45,46,47,48,49,50,51,52,53,54,55,56,57,58,59,60,61,62,63,64,65,66,67,68,69,70,71, 72,73,74,75,76,77 and 78.

### B. Material Facts Claimed To Be Disputed.

With respect to the Department's claim of material facts which are undisputed, Timm disputes: 22 (the Department has mischaracterized the deposition testimony of Timm on this issue. Timm did not instruct Hoffmeyer that inmate Davis-Bills could not see the nurse, but rather, left the decision as to whether the inmate needed to be seen up to the medically trained facility nurse and told the correctional officer to follow the nurse's instructions [Timm Dep.37]),

2

30 (the Department has mischaracterized the observations immediately made by Timm when he was asked to check on inmate Davis-Bills [Timm Dep.42]) and 34 (the Department has mischaracterized the testimony of Timm in his deposition by taking a statement out of context in an attempt to characterize Timm's conduct as negligent. When read in its entirety, Timm's testimony shows that he returned to his normal responsibilities as sergeant overseeing the unit after he was reassured by Davis-Bills and her cellmate that she was "okay").

C.  **Facts Which Timm Claims Are Immaterial.**

Timm asserts that with respect to 27, the Department has taken the statement "known one to cry" out of the context of the depositions either to make it appear that Timm was referencing the deceased inmate or her cellmate, or to inflame this Court against Timm [Timm Dep.41-44]. The arbitration proceeding and the outcome of those proceedings is immaterial to the present cause of action.   This statement is irrelevant to issues raised by this case.  In their statement of undisputed facts, the Department references the arbitration proceedings which preceded Timm's civil rights action.

D.  **Timm's Additional Undisputed Facts.**[1]

1. On November 4, 2003, Timm was working the dayshift from 7:00 a.m. to 3:00 p.m. at the Dwight Correctional Center [Timm Dep.22].  During that shift he was working with Correctional Officer Barbara Hoffmeyer, Correctional Officer Larry Ford and Correctional Officer Stephens [Timm Dep.22].

2. On November 4, 2003 Timm was working as a correctional sergeant in the segregation unit [p.19].  Correctional sergeants are not required to make rounds of the wings

---

[1]See the excerpts of the deposition transcript of Alan Timm attached as Exhibit A.

3

[Timm Dep.101].  Sergeants are primarily responsible for supervising the wing officers [Timm Dep.101].  Sergeants do not have much direct inmate contact [Timm Dep.9].

3.  Hoffmeyer was the wing officer for Dwight Correctional Center in the segregation unit on November 4, 2003 [Timm Dep.98].  In that position she was responsible for overseeing the C and D wings of the prison [Timm Dep.21].  Each wing could potentially hold twenty-five inmates [Timm Dep.98].  Hoffmeyer did not have to have Timm's permission to open the cell door of an inmate if she thought there was a problem or a medical emergency [Timm Dep.92].

4.  A correctional officer does not need the permission of a supervisor to deal with a medical emergency or to contact the infirmary if they think an inmate needs immediate attention [Timm Dep.100].  If a wing officer has reason to believe that an inmate has a healthcare issue, they can contact the medical unit without getting clearance from their sergeant [Timm Dep.99].  Wing officers are responsible for walking the units and making checks on the inmates at twenty minute intervals [Timm Dep.101].

5.  Timm first saw inmate Davis-Bills on November 3, 2003 after the inmate was returned to her cell following recreation time that morning between 9:00 a.m. and 10:00 a.m. [Timm Dep.36-37].  Timm saw inmate Davis-Bills when he was overseeing the return of the inmates to their cells [Timm Dep.35].

6.  Inmate Davis-Bills left her cell for a hearing on a disciplinary ticket between 10:00 a.m. and 10:30 a.m. [Timm Dep.37].

7.  Around 10:30 a.m. on November 4, 2003 Hoffmeyer contacted Timm and told him that inmate Davis-Bills was complaining of dizziness and asking for medication after she was returned to her cell following her hearing.  Timm instructed Hoffmeyer to contact the

correctional facility's nurse about the complaint and to follow her directions.  He also told the correctional officer to make sure the inmate followed the nurse's instructions [Timm Dep.37].  Timm heard Hoffmeyer make that call and speak with Nurse Janice Miller [Timm Dep.41-42].  Miller did not request that the inmate be brought immediately to the infirmary but told Hoffmeyer to instruct the inmate to elevate her feet [Timm Dep.79].

8.  After hearing Hoffmeyer make a call to the nurse's office, Timm left the panel of the prison and walked to the wings [Timm Dep.40].  He stopped in one unit to check on an inmate who was on suicide watch and had a conversation with her [Timm Dep.40].

9.  After touring the wings, Timm went to the C wing and at that time Hoffmeyer informed him that inmate Davis-Bills was laying on the floor of her cell [Timm Dep.42].  He went to the inmate's cell and observed her on the floor [Timm Dep.42].  He assumed she had a seizure [Timm Dep.42].  It was not unusual for inmates to lie down on the floor of their cells to cool off [Timm Dep.47].  He told her that she needed to get up off the floor [Timm Dep.42].  Timm asked Davis-Bills's cellmate if she was okay and the cellmate said "yes" [Timm Dep.42].  He asked inmate Davis-Bills if she was okay and she waived her arm at Timm and said that she was okay [Timm Dep.43].  Timm returned to the panel following the conversation [Timm Dep.45].  The conversation occurred around 12:00 p.m. [Timm Dep. 44].  After Timm went to inmate Davis-Bills's cell the first time, Hoffmeyer told him that inmate Davis-Bills's roommate said that she was faking an illness [Timm Dep.105].

10.  In the afternoon of November 4, 2003, Timm had two meetings away from the segregation unit in the prison's administration building [Timm Dep.102].  One meeting was with the assistant warden of operations and the second meeting was with the shift commander's

5

secretary about donations for a Christmas party [Timm Dep.48-49]. When he was away from the unit, he could be contacted by a wing officer if necessary by radio [Timm Dep.102].

11. While in the administration building, Timm was contacted by phone by Correctional Officer Sila [Timm Dep.50]. Sila was in the segregation unit to take inmates to the healthcare unit [Timm Dep.50]. After he was contacted by Sila, Timm returned to the unit to see what was happening with inmate Davis-Bills [Timm Dep.103-104]. Sila told Timm that he was going to take inmate Davis-Bills to the healthcare facility [Timm Dep.50]. After Sila went to get the inmate, he returned and informed Timm that the inmate was laying on the floor and that she was not dressed or ready to go [Timm Dep.50]. Timm went to check on inmate Davis-Bills and she did not respond when he got there [Timm Dep.50]. He entered the cell and nudged her and checked her for a pulse [Timm Dep.50]. Timm could not find a pulse and before he could call anyone the nurses had already arrived [Timm Dep.50].

12. Janice Miller was the correctional nurse on duty at Dwight Correctional Facility on November 4, 2003 [Timm Dep.94].

13. It was the practice at Dwight Correctional Center for correctional officers to contact the prison nurse with medical issues of the inmates and to follow the directions provided by the nurse in dealing with an inmate who is ill [Timm Dep.94].

14. If the nurse on call felt an inmate needed to be seen immediately, the nurse would tell the correctional officer to bring the inmate to the infirmary [Timm Dep.29]. The correctional officers would follow the directions of the nurse [Timm Dep.29].

15. Inmates could not be removed from the segregation unit without being handcuffed [Timm Dep.29-33]. If an inmate refused to be cuffed then a superior officer would be notified

6

[Timm Dep.34].

16.  Timm was not medically trained and did not have the medical expertise to determine how to deal with a sick inmate [Timm Dep.94].

17.  He did complete an incident report about the events that occurred on November 4, 2003 [Timm Dep.53].  He completed his report around 2:00 p.m. [Timm Dep.53].  He was not given an opportunity or permitted to make revisions or addendums to his report after it was filed [Timm Dep.55,58].

18.  Hoffmeyer informed Timm that she was given three or four chances to rewrite her incident report [Timm Dep.56].  Correctional Officer Ford confirmed this [p.56]. Major Edwards would not accept Hoffmeyer's first reports [Timm Dep.57].

19.  Following the arbitration hearing on the Department's disciplinary action toward Timm after the November 4, 2003 incident, Timm had a conversation with Assistant Warden Ted Conklin [Timm Dep.63].  Timm ran into Assistant Warden Conklin at the mall in Bradley one evening.  In the course of that conversation Conklin told Timm that he had been discharged because he was a male working in an all female institution [Timm Dep.64].  At that time Conklin asked what was going on with Timm's case [Timm Dep. 63].  He also asked if he would be personally involved in a lawsuit because of the role he played in the arbitration proceeding [Timm Dep. 63].  Assistant Warden Conklin signed the order to dismiss Timm [Timm Dep. 63, See Ex.5 to the Defendant's motion for summary judgment].

20.  At Dwight Correctional Center the female officers are treated differently than males when it comes to overtime issues.  The female officers do not usually get written up for refusing overtime [Timm Dep.85].  Also at the Dwight Correctional Center, a male officer was locked out

7

after a female officer made an accusation against him and he was fired. The allegations were proven to be untrue, but the female officer was not disciplined [Timm Dep.87].

21.  Following the investigation into the events of November 4, 2003, Correctional Officer Barbara Hoffmeyer received a reduced suspension of ten days pursuant to a resolution prior to arbitration [See Defendant's Ex.9 to the Defendant's motion for summary judgment].

22.  Assistant Warden Ted Conklin signed an order recommending Timm's discharge from employment with IDOC following the investigation into the events of November 4, 2003 [See Defendant's Ex.5 to the Defendant's motion for summary judgment].

### III.  STANDARDS WHICH ARE APPLICABLE IN A SUMMARY JUDGMENT PROCEEDING

Rule 56 of the *Federal Rules of Civil Procedure* provides that a motion for summary judgment shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265 (1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332 (7th Cir.1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir. 1992); *Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.1992); and *McCoy v. WGN Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.1992)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold, Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct. 993 (1962); and *Matsushita Electric*

*Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348 (1986)].

At the summary judgment stage of a case it is not the court's function to weigh the evidence and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial. The role of the court is not to determine whether it thinks the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit.1985); and *Shager v. Upjohn Company*, 913 F.2d 398 (7th Cir.1990)]. If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance, summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir.1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir. 1992)].

Summary judgment is often not appropriate in cases involving claims of discrimination where motive or intent are at issue [See *Stumph v. Thomas Skinner, Inc.*, 770 F.2d 93 (7th Cir. 1985); *Bartman v. Allis-Chalmers Corporation,* 799 F.2d 311 (7th Cir.1986); and *McCoy v. WGN Continental Broadcasting Company* (op.cit.1992)]. In the area of employment discrimination intent and credibility are particularly crucial issues. Accordingly, in those cases the burden which must be satisfied before granting summary judgment is applied with added vigor [see *Sarsha v. Sears, Roebuck & Company*, 3 F.3d 1035, 1038 (7th Cir.1993); *Sample v. Aldi, Inc.*, 61 F.3d 544, 546 (7th Cir.1995); and *Perdomo v. Browner*, 67 F.3d 140 (7th Cir.1995)]. Summary judgment is only to be granted if the record before the court, had it been the record of a complete trial, would have entitled the defendant to a directed verdict [See *Sarsha v. Sears, Roebuck and*

*Company*, 3 F.3d 1035 (7th Cir.1993); *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159 (7th Cir.1994); *CSX Transport, Inc. v. Chicago & North Western Transportation Company, Inc.*, 62 F.3d 185, 188 (7th Cir.1995); and *Illinois Conference of Teamsters v. Steve Gilbert Trucking*, 71 F.3d 1361 (7th Cir.1993)].

In an employment discrimination case maintained through the use of indirect proof, a claimant may defeat a motion for summary judgment by raising a genuine issue of material fact regarding the sincerity of the proffered reason advanced by the defendant for its actions [See *Wohl v. Spectrum Manufacturing, Inc.*, 94 F.3d 353 (7th Cir.1996)].

Summary judgment is proper only if there is no reasonably contestable issue of fact which is potentially outcome determinative. However, Rule 56 was not intended to permit a summary judgment proceeding as a substitute for a trial [*Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396-97 (7th Cir.1997)].

## IV.  ARGUMENT

### A)  Timm's Burden Of Proof.

Summary judgment should not be granted where a genuine dispute exists with respect to any issue of material fact.  Materiality is determined by the substantive law governing a particular claim. Thus, in ruling on a motion for summary judgment, the trial court must view the evidence presented through the prism of the proof burden imposed upon the litigants [See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1985); and *Carson v. Allied News Company*, 529 F.2d 206 (7th Cir.1976)].

The Department's request for summary judgment, therefore, must be considered within the context of Timm's burden of proof.

The Act makes it unlawful for an employer to:

"--- discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex - - " [42 U.S.C. § 2000e-2].

In a disparate treatment claim maintained under the Act, it is the ultimate burden of a plaintiff to prove that he was the victim of an adverse employment action because of his protected status. He need not prove that his protected status was the sole factor motivating the employer's actions, but that it was a "determinative factor" in the sense that he would not have been treated differently "but for" his status [See *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405 (7th Cir.1984); *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111 (7th Cir.1986); and *Brown v. M&M/Mars*, 883 F.2d 505 (7th Cir.1989)]. In other words, it is a plaintiff's ultimate burden to prove that if everything else had been the same other than his membership in the protected group, the claimed conduct would not have occurred [see *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir.1994)].

Timm, in this case, alleges that he was the victim of disparate treatment with respect to the terms and conditions of his employment with the Department because of his gender. Under the Act, a plaintiff can avert summary judgment by either: a) putting forth enough evidence whether direct or circumstantial of a discriminatory motivation to create a triable issue (the direct method); or b) by presenting evidence sufficient under the *McDonnell Douglas* formulation to demonstrate a triable issue of disparate treatment (the indirect method) [see *Sheehan v. Daily Racing Form, Inc.,* 104 F.3d 940 (7th Cir.1997); and *Rudin v. Lincolnland*

*Community College,* 420 F.3d 712, 719 (7th Cir.2005)].[2]

**B)  Timm Can Successfully Resist Summary Judgment Using The Direct Proof Method.**

In attacking Timm's claim of disparate treatment, the Department mistakenly argues that Timm cannot demonstrate discrimination based on his gender using the "direct method".  In making this argument, the Department has ignored the evidence presented in this case of discrimination suitable for maintaining a claim under the direct method.

Under the direct method, Timm may rely upon two different types of evidence: 1) direct evidence; and 2) circumstantial evidence [see *Rudin* at p.720; and *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir.1994)]. Direct evidence is evidence which, if believed by the trier of fact, would prove the particular fact in question without reliance upon inference or presumption [see *Eiland v. Trinity Hospital*, 150 F.3d 747, 751 (7th Cir.1998); and *Rudin* at p. 720]. Direct evidence is a distinct type of evidence that uniquely reveals the mental state of intent to discriminate [see *Rudin* at p.720].

Circumstantial evidence of discrimination on the other hand allows the trier of fact "to infer intentional discrimination by the decisionmaker" [see *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir.2003)]. Circumstantial evidence of intentional discrimination includes: 1) evidence of behavior toward or comments directed at other employees in the protected group and other bits and pieces from which an inference of discriminatory intent might be drawn; or 2) evidence whether or not rigorously statistical that employees similarly situated to Timm other

---

[2]     In a claim of intentional discrimination maintained under § 1983 the same proof standards as those used in claims maintained under the Act (i.e., the direct method and indirect method of proof) are utilized [*Steinhauer v. Degolier*, 359 F.3d 481, 483 (7th Cir.2004)].

12

than for the protected characteristic received systematically better treatment [see *Troupe* at p.736].

In this case Timm has successfully produced plentiful evidence which, for purposes of resisting summary judgment, satisfies his proof burden under the direct method.

The evidence shows that, shortly after Timm was terminated from the Department following an arbitration hearing, he ran into Assistant Warden Conklin at the Bradley Mall.  At that time Conklin asked him if he would be named in a lawsuit.  During that conversation Timm was told by Assistant Warden Ted Conklin that he was terminated because he was a male employee [¶19 of Timm's Statement].  Conklin played a role in the proceedings which led to Timm's termination [¶19 of Timm's Statement].   Conklin was the Employee Review Officer who recommended Timm's discharge and signed the order recommending discharge [¶19 of Timm's Statement, see Defendant's Ex.5 to the Defendant's motion for summary judgment].

In *Robinson v. PPG Industries,* 23 F.3d 1159 (7th Cir.1994), a discharged employee brought an age discrimination action against his employer. In that case, this Circuit held that the trial court erred in granting summary judgment in favor of the employer because the court failed to take adequate consideration of the testimony that the plaintiff presented that a supervisor made at least one statement to him that his age was a motivating factor in his discharge [*Id.* at 1165]. Specifically, this court stated:

> "At the same time, we cannot definitively state based on the limited record before us that [the employer's] alleged statements were merely stray remarks that had nothing to do with his termination [citations omitted].
> ****
> Moreover, the breadth of the statements [the employee] has attributed to [the employer] permits the inference that an underlying desire not to retain employees until they reached retirement age had something to do with the decision to discharge [the employee]. As [employee] has recounted the remarks, they were

13

not casual asides that merely reflected a consciousness of his age [citations omitted]. Instead, they could be construed as interpretations of a corporate goal to boot employees out before they retired" [*Id.* at 1165].

In conclusion, in *Robinson*, this Court determined that a dispute of material fact remained as to whether age was a motivating factor in the employee's discharge and the court reversed the trial court's grant of summary judgment for the employer.

In *Shager v. Upjohn Company*, 913 F.2d 398, 400 (7th Cir.1990), this Court determined that a supervisor's remarks that "these older people don't much like or much care for us baby boomers, but there isn't much we can do about it" and "the old guys really know how to get around things" combined with other evidence to raise inference that age may have played a role in plaintiff's discharge. Specifically, that Court noted that, even though the employer's statements could be considered ambiguous with respect to discriminatory animus, "the task of disambiguating ambiguous utterances is for trial, not for summary judgement" [*Id.* at 402].

In the present case, there is no ambiguity to the statements made by the Assistant Warden to Timm about his termination. The Assistant Warden very clearly told Timm that he was discharged because he was a male working in an all female institution. This is direct evidence of discriminatory animus based on gender [¶19 of Timm's Statement].

The Seventh Circuit's decisions in *Robinson* and *Shager* are consistent with decisions outside of this circuit. For example, in *Elliott v. Mongomery Ward & Company*, 967 F.2d 1258, 1262, 1263 (8th Cir.1992), the Eighth Circuit held that a manager's statement to a plaintiff that "company was growing so rapidly that she would not be able to keep up" was sufficient to raise an inference that age may have played a role in her discharge despite inferior evaluations she received. In *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 55 (3rd Cir.1990), the Third Circuit found

14

that the utterance of the old adage "old dogs won't hunt" was evidence of age discrimination." In *Buckley v. Hospital Corp. of America*, 758 F.2d 1525, 1530 (11th Cir.1985) the court held that a hospital administrator's remark that he was surprised at the longevity of the hospital's staff, that the hospital needed "new blood", that he intended to hire younger doctors and nurses, and that plaintiff's "advanced age" of 62 may have been causing her stress, presented a jury question as to whether defendants acted with discriminatory intent.

In the present case, Timm has presented a body of evidence that the Department discharged him based upon his gender to raise an issue of material fact. It is the role of the finder of fact to decide at trial whether the statements had anything to do with Timm's discharge.

### C)  Timm Has Presented Evidence Sufficient To Withstand Summary Judgment Under The Indirect Proof Method.

Under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 36 L.Ed.2d 668 (1973), a plaintiff must establish a *prima facie* claim of race discrimination. Once that burden has been established, a presumption of discrimination arises and the employer must articulate a legitimate, non-discriminatory reason for the employment action in question. If the employer articulates such a reason, then the plaintiff must show by a preponderance of the evidence that the employer's proffered reasons were a pretext [see *Rudin* at p.724; and *Moser v. Indiana Department of Corrections*, 406 F.3d 895, 900 (7th Cir.2005)]. Contrary to the contentions of the Department, Timm has presented a body of evidence utilizing the indirect method which is sufficient to resist summary judgment.

### 1)  Timm's *prima facie* claim.

In order to establish a *prima facie* claim of race discrimination, a plaintiff must normally prove that: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate

performance expectations; 3) he suffered an adverse employment action; and 4) he was treated less favorably than similarly situated individuals who are not members of his protected class [see for example *Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir.2005); and *Ballance* at p.617]. It is settled law that an individual who is a member of a group which has not historically been victimized by discriminatory conduct is also entitled to protection against discrimination in employment [see *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 49 L.Ed.2d 493 (1976); *Greenslade v. Chicago Sun Times, Inc.*, 112 F.3d 853, 863 (7th Cir.1997); *Duffy v. Wolle*, 123 F.3d 1026 (8th Cir.1997); and *Ballance* at p.617]. In order to establish a *prima facie* claim in a reverse discrimination case, a plaintiff, in addition to meeting the second, third and fourth prongs set forth above, must also show that "background circumstances" exist creating an inference that the employer has "reason or inclination to discriminate invidiously" against a class, or evidence that "there is something 'fishy' about the facts at hand" [see *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir.2003); *Mills v. Healthcare Service Corporation*, 171 F.3d 450, 455-57 (7th Cir.1999); and *Ballance* at p.617].

In arguing that Timm fails to set forth a *prima facie* claim of discrimination, the Department advances two points. First, it claims that Timm failed to meet his employer's legitimate workplace expectations. Second, it claims that he was not similarly situated to other employees who were treated more favorably. The Department has conceded that Timm was subject to an adverse employment action.[3]

---

[3]The Department has not specifically attacked the ability of Timm to satisfy the "background circumstances" prong which is particularly applicable to a claim of reverse discrimination. Presumably, the Department concedes the presence of background evidence suggesting gender discrimination. Accordingly, Timm will discuss that issue only briefly.

**2)  Timm was similarly situated to the female correctional employees who were not discharged.**

An employee is considered similarly situated to another for purposes of a disparate treatment claim if they are comparable to one another in all material respects. However, being similarly situated in all material respects does not mean that they must be identical [see *Grayson v. O'Neill*, 308 F.3d 808 (7th Cir.2002); and *Patterson v. Avery Dennison Corporation*, 281 F.3d 676 (7th Cir.2002)].

In determining whether two employees are similarly situated, a court must look at all relevant factors which will vary depending upon the context of a particular case [see *Radue v. Kimberly-Clark Corporation*, 219 F.3d 612, 617 (7th Cir.2002)]. In a case in which an employee claims that he was treated less favorably than a similarly situated employee based upon some prohibited reason, he must show that he was similarly situated with respect to performance, qualifications and conduct.  Normally, this requires a showing that two employees dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or their employer's treatment of them [see *Radue* at pp.617-18].

In this case, the Department has mischaracterized the requirement that Timm point to a similarly situated employee as a requirement that he must point to an employee who is identical. In doing so it would appear as though they are ignoring the guidance offered by this Circuit in *Allen v. Muriello*, 217 F.3d 517,522 (7th Cir.2000).  In Allen, the Court held:

> "If the test is to work—and our discrimination laws are to have an effect on more than the most egregious and obvious discrimination—courts should neither narrow *McDonnell Douglas'* application such that no one is similarly situated, nor broaden its application such that no one is disparately treated" [Id.].

17

The Sixth Circuit has also rejected the notion that "similarly situated" means employees must be identical in all respects and has outlined this prong of the *prima facie* case as follows:

> "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated; rather the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in all relevant aspects'…[This court has asserted that in applying the standard [that plaintiff must show that he is treated differently that similarly situated employees from outside the class] courts should not demand exact correlation, but instead should seek relevant similarity [*Clayton v. Metter, Inc.,* 281 F.3d 605, 611 (6th Cir.2002)(internal citations omitted); see also *Ercegovich v. Goodyear Tire and Rubber Company*, 154 F.3d 344, 352 (6th Cir.1998)].

In the present case, the Department argues that because Timm cannot point to someone who held the same classification as he did, he cannot establish this prong of the *prima facie* case. This argument is erroneous. There is no caselaw that holds that an employee must hold the same job classification as another to be comparable [see *Johnson v. Zema Systems Corporation*, 170 F.3d 734, 743-744 (7th Cir.1999)].  Furthermore, whether employees are similarly situated is a question of fact unless there has been presented facts from which no jury could ever conclude that the similarly situated requirement was met [see *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir.2004)].

The question of whether individual employees are comparable depends upon the facts of each given case. The Seventh Circuit has outlined some parameters:

> "In a *McDonnell* situation, where one's application for an existing vacancy is rejected, the basis for comparability is simply that the employee met the job qualifications. When the universe for comparability broadens to employment decisions such as promotions and discharges, not restricted to particular vacancies, there must, it seems to us, be an objectively identifiable basis for comparability.
>
> One example might be an automatic system for promotion dependent upon time in service and the acquisition of credits based on additional education or training; a

18

plaintiff denied promotion would met the *McDonnell* standard by showing that
others of the opposite sex or race who possess no greater credentials were
promoted, even though jobs involved might be different ones.  <u>Another example
would be where the basis for comparability lies in a policy addressed to or aimed
against the members of a protected class, regardless of the job being done</u>" [see
*Cherry v. American Telephone Company*, 47 F.3d 225, 229 (7th Cir.1995)].
[emphasis added].

In the present case, the Department asserted that Timm was ultimately discharged
because the Department, after conducting an investigation, believed that he negligently handled
the events that occurred with inmate Davis-Bills on November 4, 2003. The facts in this case
show that at least two other employees, who were female, were subject to a review of their
actions under Department policies.  Neither of those employees were discharged from the
Department following the investigation. Therefore, the question becomes whether there were
individuals who allegedly also violated Department policy on that occasion, but were not
disciplined as severely as Timm.   In fact, the recommended discipline for those employees was
significantly lighter than for Timm [¶21, 22 of Timm's Statement].

Applying the foregoing standards, Timm, for purposes of resisting summary judgment,
has presented plentiful evidence demonstrating that he has met similarly situated prong of the
*prima facie* case and summary judgment is not appropriate.

### 3)  Timm has demonstrated background circumstances suggesting that fellow female correctional employees were more favorably treated because of their gender.

The Department does not deny that background circumstances exist in this case
suggesting that the Department inclined to discriminate in favor of female employees at Dwight.
The background circumstances further suggests that the two female employees involved in the
November 4, 2003 incident were treated better than Timm both during and following the

investigation into the death of inmate Davis-Bills.

First, Hoffmeyer was permitted to rewrite and resubmit her incident report about the events surrounding the death of inmate Davis-Bills at least three or four times before it was accepted as a final draft [¶18 of Timm's Statement]. Timm found out that Hoffmeyer had redrafted her report and requested an opportunity to amend his report, but his request was refused [¶17 of Timm's Statement]. It was apparent that Major Edwards would not accept Hoffmeyer's report until it was done as he felt it should be done [¶17 of Timm's Statement]. This suggests that Major Edwards was making certain that Hoffmeyer would write a report that placed her and the facility in better light.

Second, although both Hoffmeyer and Miller were decisionmakers with respect to inmate treatment and had the authority to arrange for treatment of inmate Davis-Bills without the permission of Timm, neither female were subject to disciplinary action as severe as his. In fact, Miller was not subject to any disciplinary action despite the fact that she had been advised of the inmate's symptoms and failed to take action to get the inmate to the infirmary. The only thing Miller did do was to tell Hoffmeyer to have the inmate elevate her feet [¶7 of Timm's Statement]. Hoffmeyer received a disciplinary suspension which was ultimately shortened in time[see Defendant's Ex.9 to the Defendant's motion for summary judgment]. In sharp contrast, Timm was ultimately discharged from the Department following the investigation into the events of November 4, 2003.

Finally, Assistant Warden Ted Conklin told Timm that he was discharged because he was a male working in an all female institution [¶19 of Timm's Statement].

Other actions by the Department with respect to its treatment of its female employees

20

versus its male employees further support Timm's argument that it treated its female employees more favorably that its male employees. At Dwight Correctional Center, the female officers are treated differently than the males when it comes to overtime issues. The females do not usually get written up for refusing overtime [¶20 of Timm's Statement]. Also at Dwight Correctional Center, a male officer was locked out after a female officer made an accusation against him and he was fired. The allegations were proven to be untrue, but the female officer was not disciplined [¶20 of Timm's Statement].

There is a body of evidence in the present case that the Department treated Timm less favorably than his similarly situated female employees.

### 4) The evidence supports the conclusion that Timm was meeting his employer's legitimate employment expectations.

The Department's motion for summary judgment relies heavily on an argument that Timm failed to meet his employer's expectations in dealing with the events which occurred on November 4, 2003. That argument is contrary to the evidence that is available in this case. While it is true that a tragic event occurred at the Dwight Correctional Center on that date, there is a body of evidence contrary to the Department's assertion that Timm failed to follow his employer's protocol in dealing with the sudden illness which struck inmate Davis-Bills.

The evidence in this case shows that Timm followed procedures adopted by the Department in dealing with a sick inmate. Timm had no medical training which would allow him to diagnose or treat inmates in the correctional facility [¶16 of Timm's Statement]. If there were medical issues on a unit, it was the practice at the facility to contact the trained medical staff for assessment and treatment of the sick inmate [¶13 of Timm's Statement]. If the nurse working that shift felt an inmate needed to be seen for immediate treatment, the nurse would

request that the inmate be brought to the infirmary [¶14 of Timm's Statement].

As a correctional sergeant at the Dwight facility, Timm's job duties did not include making rounds of the wings of the prison. As a result, he had very little direct inmate contact [¶2 of Timm's Statement].

At the Dwight facility, correctional sergeants are primarily responsible for supervising the wing officers [¶2 of Timm's Statement]. In the role as supervisor, correctional sergeants rely on the observations of the wing officers with respect to what is going on in the wings during a shift. It is the responsibility of the correctional officers to make rounds of the units every twenty minutes to check on the inmates [¶4 of Timm's Statement]. Correctional officers do not need the permission of a sergeant to deal with a medical emergency on the wing [¶3 of Timm's Statement]. If a wing officer has reason to believe that an inmate has an immediate healthcare issue, they should contact the healthcare unit and follow the directions of the facility's nurse [¶4 of Timm's Statement].

On November 4, 2003, Timm only saw inmate Davis-Bills on three occasions. The first time, when she was returned to her cell following recreation time in the morning at around 10:00 a.m. [¶4 of Timm's Statement]. The second time, when Hoffmeyer told Timm that inmate Davis-Bills was lying on the floor and had complained of dizziness [¶7 of Timm's Statement]. At that time, Timm did go to check on inmate Davis-Bills, and both the inmate and her cellmate told him that she was "o.k." [¶9 of Timm's Statement]. Timm did not have any medical training which would have alerted him to the fact that those statements were not accurate [¶16 of Timm's Statement]. Instead, he relied upon his knowledge that the certified nurse at the facility had been contacted about the situation and that she advised Hoffmeyer about what should be done. Timm

did not have any medical training which would have given him the knowledge to question the treatment recommended by the facility's certified nurse [¶16 of Timm's Statement].

The third and final time Timm saw inmate Davis-Bills was November 4, 2003.  He had been called down to her cell by a co-worker who said the inmate was not "dressed" to leave her cell to go to the infirmary [¶11 of Timm's Statement].  At that time, he went in to the inmate's cell to check on her.  By the time he determined that inmate Davis-Bills was seriously ill, the medical staff arrived to handle the situation [¶11 of Timm's Statement].

The evidence in this case is contrary to the Department's assertion that Timm did not meet its legitimate employment expectations.  In fact, the evidence supports a conclusion to the contrary that Timm followed the protocol established by the Department of following the instructions of the certified nurse on call at the time the inmate became ill.   Firing an employee for failing to meet expectations that the employer never actually had is firing for a phony reason [*Coco v. Elmwood Care, Inc.*, 128 F.3d 1177 (7th Cir.1997)].  The Department's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge [*Id.*].  If the non-invidious reason offered by the Department is not credible, the factfinder can reasonably, though he need not, infer that the real reason was a discriminatory one [see *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)].

In this case, Timm's position that the Department's proffered reason for his discharge that he was not meeting employment expectations is a "phony" one is well supported by the evidence that he followed Department protocol on November 4, 2003.  This raises a question of fact that must be presented to a trier of fact.

## V.  CONCLUSION

For the foregoing reasons, the Plaintiff, Alan Timm, respectfully requests that the

Department's motion for summary judgment be denied.


ALAN TIMM, Plaintiff

By:___s/ James P. Baker_____
        James P. Baker
        Bar Number: 0097802
        Baker, Baker & Krajewski, LLC
        415 South Seventh Street
        Springfield, Illinois 62701
        Telephone: (217) 522-3445
        Facsimile: (217) 522-8234
        E-mail: brendabakerlaw@sbcglobal.net
        (Memorandum/timmalanmsjopposition 060407)

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

David M. Walter
Office of the Attorney General
500 South Second Street
Springfield,  Illinois   62701

By:___s/ James P. Baker_____
        James P. Baker
        Baker, Baker & Krajewski, LLC
        415 South Seventh Street
        Springfield, Illinois 62701
        Telephone: (217) 522-3445
        Facsimile: (217) 522-8234
        E-mail: brendabakerlaw@sbcglobal.net

25