E-FILED
Thursday, 07 June, 2007 12:56:13 PM
Clerk, U.S. District Court, ILCD

1

UNITED STATES DISTRICT COURT    MAR 0 5 2007
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

```
ALAN TIMM,                         )
                                   )
           Plaintiff,              )
                                   )
   Vs.                             )   No. 05-1276
                                   )
ILLINOIS DEPARTMENT OF             )
CORRECTIONS,                       )
                                   )
           Defendant.              )
```

Discovery deposition of ALAN TIMM, taken

before Tammy S. Wagahoff, CSR, at the instance of the

Defendant, on the 12th day of February, 2007, at the

hour of 1:00 P.M., at the Law Offices of Baker, Baker

& Krajewski, 415 South Seventh Street, Springfield,

Illinois, pursuant to attached stipulation.


ASSOCIATED COURT REPORTERS
1-800-252-9915
P.O. Box 684
Taylorville, Illinois 62568

9

1     A.  No.

2     Q.  Are you claiming you were treated less

3  favorably because of your national origin?

4     A.  No.

5     Q.  Is it fair to say then that the allegations

6  in your complaint concern discrimination because of

7  sex?

8     A.  Yes.

9     Q.  Now why do you believe you were treated less

10  favorably than the female nurse that you reference?

11     A.  I, umm, wasn't required to be on the unit

12  the whole time that I was there.  If I wanted to walk

13  off the unit, I could without being properly relieved

14  or somebody else taking my place.  I was not in direct

15  contact with the inmates.

16     Q.  Let's back up a little bit if you would.

17  Who is the female nurse that you reference?

18     A.  Janice Miller.

19     Q.  Do you know what type of training she had?

20     A.  She is a correctional --

21     Q.  Correctional med tech, is that right?

22     A.  I don't want to say med tech.

23  Correctional -- on the street she would be an LPN.  So

24  a CNT, she might be a correctional nurse technician.

10

1     Q.  Okay.  But your understanding is she was a

2  licensed practical nurse?

3     A.  Correct, yes.

4     Q.  Now is that the only nurse that you believe

5  was treated more favorably than you as it relates to

6  this case?

7     A.  She was, yes.

8     Q.  Now you also reference a female correctional

9  officer in your complaint, correct?

10     A.  Yes.

11     Q.  And who is that female correctional officer?

12     A.  Barbara Hoffmeyer.

13     Q.  And she's another person who you state in

14  your complaint was treated more favorably than you

15  were, correct?

16     A.  Yes.

17     Q.  Are there any other correctional staff that

18  you're claiming were treated more favorably than you

19  were with respect to this incident?

20     A.  No.

21     Q.  Okay.  Now Barbara Hoffmeyer was a

22  correctional officer, is that correct?

23     A.  Yes.

24     Q.  Do you know when she started with the

11

1  department?

2     A.  I would say middle 80's roughly, not for

3  sure.

4     Q.  Okay.  Do you know if she held any rank

5  other than correctional officer during the time she

6  was with DOC?

7     A.  No.

8     Q.  Let's go to the actual date of the incident

9  alleged in your complaint.

10         There was an incident involving an

11  inmate at Dwight Correctional Center, correct?

12     A.  Yes.

13     Q.  Do you recall what the date was when that

14  incident occurred?

15     A.  November 4th, 2003.

16     Q.  Okay.  And what was your rank on November

17  the 4th of 2003?

18     A.  Correctional sergeant.

19     Q.  Just generally what were your

20  responsibilities as a correctional sergeant working at

21  Dwight Correctional Center?

22         MR. BAKER:  Generally or on

23  that date?

24         MR. WALTER:  Generally, not

12

1  just restricted to that date.  We'll cover that date

2  next.

3         THE WITNESS:  Basically the

4  gate house supervisor, sally port operator.  Sergeant

5  maintained any visual, or not visual, but any gate

6  opening to the facility, let's see, gate house, and

7  the seg units supervisor.

8     Q.  Okay.  Now when you say gate house, are you

9  referring to the gate house as you enter Dwight

10  Correctional Center?

11     A.  Yes, the main entrance for employees and

12  visitors.

13     Q.  Okay.  So on some days you would man the

14  gate house?

15     A.  Yes.

16     Q.  And would you have correctional staff

17  working with you at the gate house?

18     A.  At some point, yes.

19     Q.  And did you supervise those individuals?

20     A.  Worked along with them, yes.

21     Q.  Did you have any sort of supervisory

22  responsibility over the individuals when you worked

23  the gate house?

24     A.  No, no.

21

```
1      A.  C wing.
2      Q.  And who was the gallery officer -- is that
3  the wrong term?  You guys didn't use gallery.  Wing
   officer?
5      A.  It's different.  I understand it when you're
6  used to talking about male institutions, that's what
7  they call them, galleries.  But wing was Hoffmeyer,
8  wing officer was Hoffmeyer.
9      Q.  And which wings did she have?
10     A.  She had the C and D.
11     Q.  Then who had A and B?
12     A.  Stephens, I think his name was.
13     Q.  And then who was the panel officer?
14     A.  Ford.
15     Q.  What's Stephens first name, do you know?
16     A.  No, I don't.
17     Q.  Was he also a correctional officer?
18     A.  Yes.
19     Q.  Male?
20     A.  Male.
21     Q.  And what about Ford?
22     A.  Male.
23     Q.  And do you know his first name?
       A.  Larry.
```

22

```
1      Q.  Now other than you, Correctional Officer
2  Stephens, Correctional Officer Ford and Correctional
3  Officer Hoffmeyer, was there anyone else who was
4  assigned to that particular unit, C12, on that date,
5  November 4th, 2003?
6      A.  For the day?
7      Q.  Right.
8      A.  Officer Jim DeMattia was assigned at first
9  from 7:00 o'clock until 8:15 or 8:00 o'clock.  And I
10 had to call and say I need a female on the unit.  And
11 that's when they sent Hoffmeyer over.  They switched
12 Hoffmeyer and DeMattia.
13     Q.  Okay.  And he was working from 7:00 a.m. to
14 8:15 p.m.?
15     A.  A.M., 8:00 A.M. or 7:00 A.M.
16     Q.  And what shift were your working on that
17 date?
18     A.  Working day shift.
19     Q.  So 7:00 A.M. to 3:00?
       A.  Correct.
21     Q.  And is that also the shift that Officer
22 Stephens, Ford and Hoffmeyer were working if you
23 recall?
24     A.  Yes.  We were all on overtime.
```

23

```
1      Q.  What do you mean you were all on overtime?
2      A.  Yes, Ford and myself, we worked the midnight
3  shift, 11:00 to 7:00, 11:00 P to 7:00 A.  We worked
4  the previous night and stayed over for the day shift
5  on the 4th.
6          And Stephens is a 3:00 to 11:00
7  officer, and he was working overtime also.  And
8  Hoffmeyer was the regular, the only day person.
9      Q.  What was your -- in 2003, what was your
10 customary shift?  What shift did you typically work?
11     A.  Midnights, 11:00 to 7:00, 11:00 P to 7:00 A.
12     Q.  And you started with the Department of
13 Corrections in the 1990's, is that correct?
14     A.  '91.
15     Q.  Had you ever worked day shift before?
16     A.  Yes.
17     Q.  When did you work day shift if you recall?
18     A.  You mean in an overtime period or as
19 assigned?
20     Q.  Assigned shift.
21     A.  Assigned to day shift, that would be, that
22 would be probably middle 90's probably a two year
23 stretch or something like that, two or three year
24 stretch maybe.
```

24

```
1      Q.  And that was at Dwight, correct?
2      A.  Correct.
3      Q.  And did you ever work the segregation unit
4  during that two year stretch?
5      A.  I don't -- you mean the whole time period or
6  from '91 on or --
7      Q.  During that two year time you were working
8  days, were you ever assigned to the segregation unit?
9      A.  I mean, we were assigned everywhere.  I
10 mean, there's no particular place that we worked.
11     Q.  So you may have been?
12     A.  Could have been, yeah.  One day we could
13 have been, and the next day we were someplace else.
14     Q.  You don't recall if you worked there or not?
15     A.  No.
16     Q.  Now going back to November the 4th of 2003,
17 were there any lieutenants working on that day,
18 November 4th, 2003?
19     A.  Lieutenant Kuhse.
20     Q.  How do you spell that last name?
21     A.  K-u-h-s-e.
22     Q.  And where was he assigned on that day?
23     A.  She's a female.
24     Q.  She.
```

## 29

1    A.  We would call -- uhm, you would just -- as
2    the correctional sergeant, you would just make sure
3    that the inmate was, if she was taken over to the
4    clinic.  I mean, there was no particular, anything in
5    particular that you had to do as a sergeant to get her
6    over there.  The officers would make the phone call
7    and then listen.  I mean, not listen, but let the
8    nurse know what's going on.  And they, the nurse,
9    would say, okay, get her over here.  And I guess
10   either the panel officer or the sergeant could call
11   base, control center, and tell them that we had an
12   inmate to go to the clinic right away.  And you'd say
13   per the nurse.  And as long as you said per the nurse,
14   you know, no questions were asked.
15       Q.  Okay.  How do you get the inmate -- I'm
16   sorry, I want to know the procedure.  How did you get
17   the inmate out of the cell in a medical emergency
18   situation?
19       A.  You don't cuff pregnant inmates.  You let
20   her walk out.  I mean, there again, you're asking a
21   broad statement for segregation units or for general
22   population.
23       Q.  Let's talk about the segregation unit.  If
24   you have an emergency situation such as a pregnant

## 30

1    woman bleeding or someone having heart trouble, how
2    would you physically get them out of the cell and get
3    them to the health unit?  I want you to describe for
4    me if you would the process.
5        A.  A pregnant inmate you wouldn't cuff them
6    because you would have a chain, a waist chain to where
7    they couldn't use their hands in case they fell, so
8    you wouldn't cuff a pregnant lady.  And --
9        Q.  Are their arms secured to the waist chain?
10       A.  Right.  Well, no, they're different than the
11   male institutions.  I mean, I'm sure you've seen the
12   male institutions.  But what the women have are a set
13   of handcuffs.  And then on the chain there's a piece
14   where it loops through, and it just holds them to
15   their waist.
16       Q.  Okay.
17       A.  So the pregnant one wouldn't get cuffed.
18   But if she was bleeding or something and you would
19   just ask, I mean you would just cuff her with the
20   waist chain.  You also had to leave the unit in the
21   waist chain.
22       Q.  And what about someone with heart trouble,
23   what's the procedure there, again, in the segregation
24   unit?

## 31

1        A.  Never had one in the segregation unit.  Had
2    some out in general pop, but not in the segregation
3    unit.
4        Q.  Did you ever have anything that you
5    considered to be an emergency medical situation while
6    you were working in the segregation unit?
7        A.  Once on a mental health unit had an inmate
8    who looked like she had a broken foot, broken ankle.
9    And the assistant warden who was, at that time it was
10   Matriana.  He said under no circumstances do you open
11   that door unless she's handcuffed.  He goes I don't
12   care what she does, but you do not open that door
13   unless she's handcuffed.
14       Q.  I don't think that answers my question.
15   What was the procedure that you used in that instance?
16            MR. BAKER:  In that specific
17   situation?
18            MR. WALTER:  Sure.  What
19   procedure did you use?
20            THE WITNESS:  She didn't get
21   out unless she got handcuffed.  And she knew with him
22   standing there, she was not going to get the door open
23   unless she backed up to the door and got handcuffed.
24       Q.  So what did you do in that situation?

## 32

1        A.  What did she do?
2        Q.  Right.
3        A.  She -- I don't know if she backed up at that
4    time, but I know she didn't go to the clinic right
5    away because she wouldn't cuff up.
6        Q.  Was she taken to the health care unit?
7        A.  Eventually she did back up and got cuffed.
8        Q.  Okay.  Now you also mentioned an incident
9    whenever a person was having heart trouble.  How did
10   you get the inmate out of the cell in that particular
11   incident?
12       A.  In segregation I don't remember having any
13   inmates with heart trouble.
14       Q.  I'm not asking about segregation.  You had
15   another incident.  Was that in segregation?
16       A.  No.  I don't remember.
17       Q.  The inmate was in a cell, correct?
18       A.  Right.  They're all in cells.
19       Q.  How did you get them out of the cell?
20       A.  If it's general population, you just open
21   the door, and you let them go.  I mean, you can let
22   them walk to the clinic.  Or if it's like a heart
23   trouble, you would give them a ride to the clinic and
24   keep an eye on them.

33

1    Q. Have you ever had an inmate when you were
2  working in the segregation unit who refused to cuff
3  up?
     A. Oh, yes.
5    Q. And what was your procedure when you had an
6  inmate who refused to cuff up?
7    A. You just give them a direct order, tell them
8  to cuff up or they're not coming out of their cell.
9    Q. If you have an inmate who you want to come
10 out of the cell and you give them a direct order to
11 cuff up and they refuse, what do you --
12   A. Leave them there. Write them a ticket and
13 leave them there, refusing a direct order.
14   Q. In your experience working at Dwight
15 Correctional Center both as a correctional officer and
16 as correctional sergeant from 1991 through 2004, was
17 there ever an incident where an inmate was removed
18 from a cell even though they did not cuff up?
19   A. I'm sure there was. There's probably a
20 couple -- I mean no, offhand, no.
21        But I know with the mental health there
22 were always with the, you know, the segs over there
23 always acting up. And I know that a couple times a
24 lieutenant emptied pepper spray on them, you know,

34

1  then they probably cuffed them after that. They
2  refused to cuff up; and then, you know, they would
3  spray them to get them to cuff up. And then they
4  would cuff them and then take them out.
5    Q. How would the lieutenant become aware of the
6  fact that an inmate was refusing to cuff up?
7    A. You would -- if you get a refusal to cuff
8  up, you would notify your superior and then let them
9  take it from there.
10   Q. Okay. Let's go back to November the 4th of
11 2003. You started at -- actually, you worked another
12 shift earlier than that?
13   A. Correct.
14   Q. But we'll start at the day shift, the 7 A.M.
15 to 3:00 P.M. shift. What happened that day? You
16 started your shift. Tell me what you did.
17   A. Uhm, roughly between 8:00 and 9:00 o'clock,
18 took out the A and B side for rec. They go outside
19 for an hour.
20   Q. You went out with them?
21   A. I escorted them with an officer out to the
22 rec yard. And then once they got in the rec yard and
23 all the cuffs were taken off, then I came back in to
24 the unit.

35

1    Q. What did you do next?
2    A. About 10:00 o'clock or roughly right around
3  10:00 o'clock, LTS, leisure time service, Harper came
4  on the unit to hear tickets and got inmates out to
5  hear tickets.
6    Q. You said tickets, you're talking about
7  disciplinary tickets?
8    A. Yes, disciplinary tickets. Inmates had
9  gotten out one at a time to hear their tickets.
10   Q. And where were those being heard?
11   A. Right out in the day room.
12   Q. And where was the day room located in this K
13 shape? Is there a day room on each of the legs of the
14 K?
15   A. C and D have one day room. A and B have a
16 day room.
17   Q. Can someone in the A wing walk over, an
18 inmate -- I guess they're locked up, so they can't
19 walk out. But I guess the question is to go from the
20 A wing to the B wing, do you have to go through any
21 secure doors?
22   A. Each wing has a gate that's secured at all
23 times if the officer is not down the wing.
24   Q. And so the day room is in between the two

36

1  wings, is that roughly correct?
2    A. Yes, yes.
3    Q. All right. So the LTS individual came in.
4  You said his name was Harper?
5    A. Correct.
6    Q. Came in and was hearing tickets. What did
7  you then do at that point?
8    A. Got, watched the officer get the inmates out
9  one at a time to hear the tickets and then probably
10 was in the panel.
11   Q. Okay. And which wing or which wings were
12 having their tickets heard?
13   A. C and D side.
14   Q. So who was the officer assisting with the
15 hearing of tickets?
16   A. Hoffmeyer.
17   Q. Okay. And at what point approximately did
18 the hearing of tickets cease and Mr. Harper or
19 Mrs. Harper, whichever it is, leave?
20   A. He was probably gone -- he was probably
21 there no longer than an hour.
22   Q. So he would have been gone by about what
23 time?
24   A. I'd say 11:00 o'clock.

1:05-cv-01276-MMM-JAG    # 17-2    Page 6 of 19

### 37

1    Q.  Okay.  What happened next?

2    A.  And in the meantime, probably around 10:00

3  o'clock also, we took the C and D side out to the rec

4  yard.  And a little after 11:00 brought them back in.

5    Q.  What happened next?

6    A.  Let's see, in between when, well,

7  Bills-Davis came out to hear a ticket about 10:30,

8  10:15, 10:30, in that time.  And she went back to her

9  cell.  Hoffmeyer put her back in her room.  And then,

10  let's see.

11       Hoffmeyer made a statement that

12  Bills-Davis wanted some medication or was feeling

13  dizzy.  I told her, I said, well, call the nurse and

14  see what the nurse says.  So she called and talked to

15  Janice.  And I told her, I said, well, whatever she

16  told you to do, go tell Davis to do it.  And so she

17  went down to tell Davis what happened or not what

18  happened but what the nurse said.  And that was the

19  last I heard of it for, that instance for, oh,

20  probably an hour or so.

21    Q.  And then what happened?

22    A.  Uhm, --

23       MR. BAKER:  What happened

24  generally or what happened with Bills-Davis?

### 38

1       MR. WALTER:  What happened

2  next.  He said Hoffmeyer went back to tell

3  Bills-Davis.  I want to know what he was doing that

4  day.

5       MR. BAKER:  You don't want

6  specifically with respect to the Bills-Davis incident?

7  You want to know everything else?

8       MR. WALTER:  Everything he was

9  doing.

10       MR. BAKER:  Do you understand

11  the question?

12       THE WITNESS:  Yes.  I was in

13  the panel.  Hoffmeyer was in the panel because she

14  came in to use the phone.  And I told her to call the

15  nurse and whatever you find out, go back and tell her.

16  And I remember her going down and telling her.  And

17  then we brought, went down and brought the rec line

18  in, which would have been after 11:00 o'clock.

19    Q.  So that's the C and D?

20    A.  Right, C and D side came in.

21    Q.  About what time is that?

22    A.  11:00, 11:30, somewhere in there.

23    Q.  Okay.  Then what happened?

24    A.  Uhm, then we sat down, I mean not sat down;

### 39

1  but the day got a little relaxed, a little relaxing

2  because the, we had the showers done, we had rec lines

3  done, and we were waiting for the mental health

4  counselors to come over and see the two inmates that

5  were on suicide watch on the unit.

6    Q.  And where would you have been at this point,

7  11:00, 11:30?

8    A.  In the panel.

9    Q.  Okay.  And then what do you recall happening

10  at that point?  Showers are done, the lines, rec lines

11  are done.  What happens next?

12    A.  We were waiting for the food to arrive, and

13  we knew it was going to be late because it was chicken

14  day, and chicken is always late.

15       So then we -- let me see, I don't know

16  what time.  I knew there was two phone calls that

17  Hoffmeyer made to the clinic about Bills-Davis.

18    Q.  Would she have made those calls from the

19  panel?

20    A.  Yes.

21    Q.  And were you present when she made those

22  calls?  Were you present in the panel?

23    A.  I was there for the first one or, yeah, the

24  first one because I remember her saying something

### 40

1  about she wanted to see the nurse.  I said, well, you

2  know, she can't go see the nurse.  Call the nurse and

3  see what she says and go back and tell the nurse or go

4  back and tell Davis what the nurse says.

5    Q.  So I believe your testimony was you recall

6  two phone calls that Hoffmeyer made to the clinic.

7  What happened after the second phone call?

8    A.  I don't remember what time the second phone

9  call was, but I remember going down the wings.  I walk

10  down the wing, you know, maybe once or twice, and

11  talking to the one inmate on the B, in B5, which was

12  the pink room, that she was on a suicide watch.  And

13  she wanted to see the mental health people because

14  they had to see them in order to come off suicide

15  watch.  And then there was another one on the D wing

16  that was on suicide watch.  And she started acting up

17  a little bit.  And I told her, I says, you know, keep

18  acting up, I said they're going to keep you on watch.

19  They won't take you off.  And so she quieted down.

20    Q.  Okay.  How many times did you tour the wings

21  on that day?

22    A.  Maybe twice, three times.  I don't know.  I

23  don't recall.

24    Q.  Would you have gone down all four wings two

41

1  or three times?

2      A.  Not necessarily.  I mean, you weren't

3  required to go down the wings.

4      Q.  Okay.  After you described meeting with an

5  inmate in the pink room and meeting with another

6  inmate on the D wing who was also on suicide watch,

7  what happened next?

8      A.  I know, if I'm not mistaken, I think I

9  called mental health and told them that or told Larry

10  to call mental health.

11      Q.  By Larry, you mean Larry Ford?

12      A.  Yeah, the panel officer, to call and see

13  when mental health was coming over to talk to them

14  because, you know, they wanted to get off their

15  watches and stuff because it was additional duties

16  that the officers had to, you know, I don't recall if

17  they were on ten minute watches, thirty minute watches

18  or what kind of watch they were on.  But if they were

19  coming off of a watch, they had to be on thirty

20  minute, if I'm not mistaken, at that time they had to

21  be upgraded to a thirty minute watch to come off.

22  Because I know Jones, I remember her making a

23  commotion.  And we just said, you know, you got to

24  wait for mental health to get here.

42

1      Q.  Jones is the inmate?

2      A.  Yeah, she was the one in B5.  I said she's a

3  known one to cry, I mean not cry, but complain and to

4  go on watches because she don't like her roommate or

5  something.

6      Q.  And what did you do then after touring the

7  wings and talking to those individuals on suicide

8  watch?

9      A.  I remember going down the C wing, and

10  Hoffmeyer told me that Davis was laying on the floor.

11  And I told her, went and told Davis -- well, I looked

12  in her little window.  And I told her, I said, you

13  know, you need to get up off the floor, you can't lay

14  on the floor.  And I opened up the food chuck, food

15  slot, and was talking to her.  And she just laid

16  there.  And I asked her inmate, I said what's going

17  on?  And she says nothing, we're just talking.  And I

18  says is everything okay?  And her roommate said yes.

19  So I shut the food slot, and I left.

20      Q.  What did you observe about Inmate Davis?

21  Describe her for me.

22      A.  She was laying on the floor on her side like

23  she had a seizure.  And that's what we assumed that

24  she had, she had a seizure, because that's usually

43

1  what the inmates would do is if their cellmate had a

2  seizure, the other one would roll them up on their

3  side, you know, and put a pillow underneath their head

4  so they wouldn't hit their head.

5      Q.  Did she have a pillow under her head?

6      A.  I don't recall that.

7      Q.  Okay.  What else do you recall observing

8  with respect to her other than her laying on her side?

9      A.  Her roommate put her red maroon winter

10  jacket that they issued, the state issued the inmates,

11  that she laid that over her like for a blanket.

12      Q.  Anything else that you recall observing with

13  respect to Inmate Davis?

14      A.  Everything else was nice and calm in there.

15  Nothing was out of place or anything.

16      Q.  Did the inmate ever say anything to you, the

17  Inmate Davis, I'm sorry.

18      A.  Davis, yeah.  I asked her, I said are you

19  all right?  And she says yeah, and she waved her arm.

20  And I said okay, you need to get up off the floor.

21  And that's the way I left it.

22      Q.  So Inmate Davis told you that she was okay?

23      A.  Yeah.

24      Q.  Okay.  About what time was it that you went

44

1  down and spoke with Inmate Davis?

2      A.  Oh, I don't really remember what time.

3      Q.  Okay.  It was after you had finished the

4  lines, is that right?

5      A.  Yeah, rec lines, yes.

6      Q.  Okay.  And what time was that done?

7      A.  11:00, 11:30.

8      Q.  And do you recall how long after you

9  finished the rec lines that you went down?

10      A.  No.

11      Q.  Was it two hours later?

12      A.  No, because two hours later I was off the

13  unit.

14      Q.  Okay.  Was it one hour later?

15      A.  To put an exact time on it, I couldn't do

16  it.

17      Q.  You think it was less than one hour or more

18  than one hour?

19      A.  Let's see, it would be noon.  I'd say it

20  would be within an hour after the rec line came back.

21      Q.  So approximately between 11:00 o'clock and

22  noon?

23      A.  Yeah, somewhere in that time.

24      Q.  Okay.  So you spoke with Ms. Davis, and she

45

1  told that you she was okay.  And then what did you do?

2      A.  I shut the slot; and then I left, left the

3  wing, closed the wing gate and went back in the panel.

4      Q.  Who all heard, who all was present that

5  could hear Ms. Davis tell you that she was okay?

6      A.  Her roommate.

7      Q.  And what was that offender's name?

8      A.  Oh, I'd have to look in the report for that.

9      Q.  Actually, I have a copy of your initial

10 report here that I received today.  Why don't you look

11 at that and see if it refreshes your recollection as

12 to the name of the inmate.

13     A.  Christine Kazmirzak.

14     Q.  Can you just spell that for the Court

15 Reporter?

16     A.  K-a-z-m-i-r-z-a-k.

17     Q.  Okay.  Now other than that offender, and I'm

18 not going to try to pronounce the name.

19         MR. BAKER:  Kazmirzak.

20         MR. WALTER:  Kazmirzak.  Was

21 there anyone else who was able to hear when Ms. Davis

22 said to you that she was okay?

23         THE WITNESS:  No, because you

24 wouldn't -- not unless you're hollering you can't hear

46

1  outside the rooms.

2      Q.  So there would be cells on either side of

3  Ms. Davis?

4      A.  Right, right.

5      Q.  And Ms. Kazmirzak's cell.  But they would

6  not be able to hear what you said or what she said?

7      A.  No, I kind of doubt it.

8      Q.  And were there any other correctional staff

9  present whenever she said this to you?

10     A.  Hoffmeyer could have been there.  I'm not

11 sure if she was down the wing with me.

12     Q.  You don't recall one way or the other?

13     A.  No.

14     Q.  Is there anything that would refresh your

15 recollection as to whether or not she was there?

16     A.  No, because it was -- I mean because

17 sometimes we'd walk down and sometimes we wouldn't go

18 down the wing together.  I mean, it wasn't, you didn't

19 have to go down there with, you know, the coworker or

20 the wing officer every time you went down the wing.

21 Anybody could just go down the wing and come back.

22     Q.  Now I believe you told me that you told her

23 to get off the floor, is that correct?

24     A.  Yes.

47

1      Q.  Okay.  And she didn't get off the floor?

2      A.  No.

3      Q.  Did you write any sort of incident report

4  about that?

5      A.  No.  It wasn't unusual for the females to

6  lay on the floor because at that time they turned the

7  heat on.  And when they turned the heat on, it gets

8  hot in the rooms.  And sometimes it's cooler on the

9  floor than it is -- because the heat comes out of the

10 vent on top of the room.  And she was assigned to a

11 top bunk.  And that's where her bunk was.  So I

12 figured she was on the floor because it was cooler on

13 the floor.

14     Q.  What happened then after you shut the

15 chuckhole and left?

16     A.  Just went probably into the panel and sat

17 down and waited for the noon food to show up.

18     Q.  Okay.  And did it show up?

19     A.  At 12:45 or something like that.

20     Q.  Okay.  Was it chicken?

21     A.  Yep.

22     Q.  Okay.  So the inmates were then fed, is that

23 right?

24     A.  Yes.  I wasn't -- I wasn't on the unit when

48

1  the food arrived.

2      Q.  Okay.  Where were you at?

3      A.  I was up in the administration building.

4      Q.  What were you doing there?

5      A.  Talking to the assistant warden of

6  operations.

7      Q.  And who was that at the time?

8      A.  Dottie Culkin.

9      Q.  What were you talking to her about?

10     A.  Security issue.  Being I worked the midnight

11 shift, there was some things about that.  And she was

12 the warden of operations, so she would be the one that

13 we'd take security concerns to.  And that's -- I went

14 up and had a few minutes to go up and talk to her, so

15 I was talking to her.

16     Q.  Anything unusual about that conversation?

17     A.  Unusual?

18     Q.  Yeah.

19     A.  No.

20     Q.  So you told her what you wanted to tell her,

21 is that right?

22     A.  We talked for maybe fifteen, twenty minutes

23 and then got a phone call that Lissa Black wanted to

24 talk to me, who was the shift commander's, I don't

1:05-cv-01276-MMM-JAG    # 17-2    Page 9 of 19

## 49

1  want to call her a secretary, but office girl.  And
2  she worked in the shift commander's office.  And I
3  went over and talked to her.

       I was a union vice-president and she
5  wanted, she was the EBF, employee benefit committee,
6  EBF, I don't know what the F stands for, but it's
7  employee benefit program.
8       Q.  That's good enough.
9       A.  And she wanted -- every year they try to
10  get, they ask the union to donate for the Christmas
11  party, the Dwight Christmas party.  And being I was
12  vice-president, she was asking me questions to take,
13  you know, to the president or to the executive board.
14  And then we were talking ten, fifteen minutes.  And
15  then I got a phone call that they wanted, Sila was on
16  the unit to get --
17       Q.  Can you spell that name?
18       A.  Sila, S-I-L-A.  And he wanted --
19       Q.  And what rank was Sila?
20       A.  Officer.
21       Q.  Okay.
22       A.  He wanted, he was on the unit to get segs
23  out to take to health care unit.
24       Q.  Okay.  Approximately what time was it that

## 50

1  you received that phone call?
2       A.  12:00, not 12:00, 1:30, somewhere in there,
3  1:30, 2:00 o'clock, somewhere in there, I think.
4       Q.  And then what happened?
5       A.  Uhm, I get on the unit.  He says he's got
6  to take Bills-Davis.  I said, okay, you can go get
7  her.  So he goes down to get her.  And he says she's
8  laying on the floor.  I says, well, you know, you
9  can't take them out of the unit, you can't take them
10  out unless they're dressed.  He said she's not
11  dressed, she's not ready to go.  I said, well, go take
12  somebody else.
13       So I went down and checked on her.
14  And she didn't move, she didn't do anything.  She
15  didn't respond like she responded before.  And then
16  I opened the door.  I checked, I nudged her.  She
17  didn't flinch or anything.  So then I went and checked
18  her, you know, checked her pulse in her neck and
19  didn't get no pulse.  So then I don't know if I left
20  the door open or if I shut the door.  And I went in to
21  the panel to call the nurses.  And when I looked out
22  the window, the nurses were already coming in the
23  door.  And I don't know if Sila told them or how they
24  got informed.  But the next thing I knew, they were on

## 51

1  the unit.  That was about 2:00 o'clock.
2       Q.  You mentioned something about Offender Davis
3  not being dressed.  Do you recall that?
4       A.  Uhm, yes, because when we took the coat off,
5  she wasn't, the coat was covering her body.  And her
6  jump suit was down to her knees.  But her coat was
7  covering that up.  You couldn't tell that looking in
8  through the food slot.
9       Q.  Okay.  So when you observed her some time
10  between 11:00 and 12:00 o'clock, did she appear to be
11  dressed to you at that point?
12       A.  The roommate had her covered with the coat.
13       Q.  So you couldn't see?
14       A.  No.
15       Q.  Okay.  And what about whenever you went to
16  the cell after Sila had called you, did you look in
17  the cell when you got to the cell?
18       A.  I opened the food slot, and I asked her, I
19  said you want to go to the clinic, I said you got to
20  get up and you got to get dressed.  And she didn't
21  respond.  Roommate just sat there.  And she -- I said
22  again, I said if you want to go to the clinic, I said
23  you've got to get up.
24       Q.  Could you observe her at that point?

## 52

1       A.  Probably not the first time.  But the second
2  time I went back down and told her you got to get up,
3  I opened the door.  After she didn't move or anything,
4  that's when I opened the door and checked her.  And
5  that's when the whole day unraveled.
6       Q.  Prior to the coat being removed from her,
7  could you determine that she was undressed?
8       A.  No.
9       Q.  Okay.  Had anyone told you prior to the coat
10  being removed from her that Ms. Davis was undressed?
11       A.  I don't think so.  I don't recall.
12       Q.  Is it possible that someone did tell you
13  that, but you had forgotten?
14       A.  Could be.
15       Q.  Okay.  Is there anything that would refresh
16  your recollection?
17       A.  Uhm, I'd have to just check my report.  I
18  mean, that's all.
19       Q.  Your incident report?
20       A.  My incident report.
21       Q.  434?
22       A.  Yes.  I know -- well, you're not going to
23  find anything on mine, I'll guarantee you that one.
24       Q.  I'm going to show you what's been marked for

**53**

1 identification purposes as Defendant's Exhibit Four.
2 Do you recognize that document?
3      A. Yes.
   Q. And how do you recognize it?
5      A. My signature.
6      Q. Okay. And that's your signature that
7 appears on the, towards the bottom on the left hand
8 side?
9      A. Yes.
10     Q. Okay. And what is this?
11     A. What do you mean what is it?
12     Q. Yeah, what is this document? What type of
13 document is this?
14     A. An incident report.
15     Q. And what are incident reports used for
16 within the Illinois Department of Corrections?
17     A. Unusual incidents.
18     Q. Okay. And was this report prepared on
19 November the 4th, 2003?
20     A. Yes.
21     Q. At approximately 2:00 P.M.?
22     A. That was the day of the incident, at the
23 time of the incident.
24     Q. When was it actually prepared, do you know?

**54**

1      A. I turned it in at 3:10 on November 4th.
2      Q. Now on the right hand side there's something
3 written that I can't read. Can you read that?
4      A. On the right?
5      Q. You see it, right hand side on the bottom?
6      A. Do you mean --
7           MR. BAKER: Right above the
8 signature.
9           THE WITNESS: It looks like
10 it's the major signed.
11          MR. WALTER: Major Rebecca
12 Edwards, offender departed, I would probably say
13 institution, via ambulance at 3:05 en route to Morris
14 hospital.
15     Q. Okay. Now that handwriting appears to be a
16 little different than the handwriting up in the body
17 of the report. Is that your handwriting?
18     A. No.
19     Q. Okay. Now above that it says statement of
20 facts, and there's a statement. Is that your
21 handwriting there?
22     A. Oh, yes.
23     Q. Okay. It begins on the above date?
24     A. Right, correct.

**55**

1      Q. And then it ends notified Lieutenant Kuhse
2 of incident?
3      A. Correct.
4      Q. Okay. And is that the report that you
5 prepared on November 4th, 2003 about the incident
6 regarding Inmate Bills-Davis?
7      A. Yes.
8      Q. Did you prepare any other incident reports
9 regarding the events involving Davis-Bills on November
10 the 4th, 2003?
11     A. They wouldn't let me.
12     Q. They wouldn't let you. Who would not let
13 you?
14     A. Administration.
15     Q. Okay. And who specifically in
16 administration would not let you write an incident
17 report?
18     A. The investigators, the state investigators.
19     Q. Okay. And who were those state
20 investigators?
21     A. One of them was Emerick and the other one I
22 think was Pronger, Proeger, Pronger, something. I
23 think that was their name. One male and female.
24     Q. And do you recall which one was male and

**56**

1 which one was female?
2      A. No. I think -- well, no.
3      Q. And did you ask them about writing an
4 incident report?
5      A. Well, I asked them, I heard a rumor that
6 Officer Hoffmeyer was given three chances, was told to
7 rewrite her incident report, three, four times because
8 I turned in Hoffmeyer's initial incident report that
9 was never to be found. And before she left the
10 institution that night, she was told that she had to
11 write it, another one. And she was told to rewrite it
12 three or four times until Major Edwards got what she
13 wanted in the report.
14     Q. And who told you that?
15     A. Other officers, Ford told me and Hoffmeyer
16 told me.
17     Q. So Hoffmeyer told you that she was
18 instructed to rewrite her report three or four times?
19     A. Yes.
20     Q. And what did Ford tell you?
21     A. The same thing, that they would not accept,
22 they would not accept her initial incident report.
23     Q. And it's your understanding that they who
24 would not accept the incident report was this Major

57

1  Edwards?
2      A. I would presume so.
3      Q. Well, I want to know what they told you.
4      A. Well, I mean, after we turn them in, I have
5  no idea who -- I mean, she was the person that we give
6  it to. And she's the one that signs it; and then it
7  goes up to administration.
8      Q. But you spoke with Correctional Officer
9  Ford, correct?
10     A. Right, after.
11     Q. And who did he tell you had told Hoffmeyer
12  to resubmit that report?
13     A. He didn't say. He just told me that they
14  wouldn't accept her report. Because I know her
15  incident report was maybe only three, four lines.
16  Hers was shorter than what mine was.
17     Q. Now on Hoffmeyer, you also spoke with her,
18  and she told you that someone had told her to resubmit
19  her incident report, is that correct?
20     A. Yes.
21     Q. Who did she tell you had instructed her to
22  do that?
23     A. She just said they wouldn't let me, Major
24  Edwards wouldn't accept it, that she had to write more

58

1  detail.
2      Q. Okay. Now at some point you wanted to add
3  detail to yours, is that correct?
4      A. Yes. After I saw, in the write up I saw
5  Hoffmeyer's incident report. And I asked them, I
6  said this isn't what she turned in. And they go,
7  well, that's what we got. And I says can I change
8  mine? And they said no.
9      Q. In the write up, what do you mean by the
10  write up?
11     A. In the ERO packet.
12     Q. Okay. And so when would this conversation
13  have taken place when you asked to rewrite yours?
14     A. It would have been November 6th is when they
15  came in and did the investigation.
16     Q. So a couple days after the incident?
17     A. Correct.
18     Q. On November the 4th of 2003, did you write
19  anything in addition to what is on Timm Exhibit Four?
20     A. No.
21     Q. Okay. And did you attempt to write anything
22  in addition to what's on Timm Exhibit Four?
23     A. No.
24     Q. Did you keep any personal notes regarding

59

1  the events that took place on November 4th of '03?
2      A. Yes.
3      Q. And have you turned those over to your
4  counsel?
5      A. No.
6      Q. Okay. I would ask that you do that; and,
7  counsel, that those be provided to us.
8         I'm sorry, it's going to take me a
9  minute here.
10        (Recess Taken.)
11        MR. WALTER: I'm going to show
12  you what's been marked for identification purposes as
13  exhibit, Timm Exhibit Six, and ask you if you
14  recognize that document.
15        THE WITNESS: Yes.
16     Q. How do you recognize it? What is it?
17     A. Uhm, notes that I wrote three weeks after or
18  roughly a month after the incident.
19     Q. Okay. And did those describe what you
20  recalled at that time with respect to the incident on
21  November the 4th, 2003?
22     A. Yes, yes.
23     Q. Is this your handwriting?
24     A. Yes.

60

1      Q. How many pages total are there?
2      A. First one is eleven, and the second one I
3  think is three. So there would be a total of fourteen
4  pages.
5      Q. What's the second one about?
6      A. Uhm, basically what I did, I kept calling
7  and asking what was going on with my status. And what
8  happened on November 6th, I wrote down what took place
9  that day with Conkling telling me I couldn't leave the
10  institution.
11     Q. Okay. Now I want to draw your attention to
12  the top of the page on the second one where it starts
13  I kept calling and talking to AWO. I'm assuming
14  that's Assistant Warden of Operations Conkling?
15     A. Correct.
16     Q. What's the date on the top of that page?
17     A. 12/4/03.
18     Q. And then turning to the next page, what's
19  the date on that page?
20     A. 12/4/03.
21     Q. And the last page, what's the date on that?
22     A. 12/4/03.
23     Q. What's the significance of 12/4/03?
24     A. That was the date that I wrote them.

61

1    Q.  So that's the date that you wrote these
2  three pages?
3    A.  Yes.
4    Q.  Okay.  Now drawing your attention to the
5  first page of Exhibit Six, there's a date at the top
6  of it.  What's the significance of that date?
7    A.  That's the date I wrote the first eleven
8  pages.
9    Q.  Okay.  And what date appears there?
10   A.  12/1 of '03.
11   Q.  Is it possible that you wrote these pages on
12 dates other than December the 1st, 2003 and December
13 the 4th of 2003 and have simply forgotten?
14   A.  No.
15   Q.  Okay.  So you wrote the first eleven pages
16 on December the 1st of 2003, correct?
17   A.  Yes.
18   Q.  And you wrote the last three pages on
19 December 4th, 2003?
20   A.  Yes.
21   Q.  And it's not possible you wrote them on
22 different days?
23   A.  No.
24   Q.  I don't have an exhibit number for this,

62

1  these are your Rule 26 disclosures, and there's just
2  some names on there.  And if you would, if you can
3  turn it so I can look with you?
4        MR. BAKER:  Here.
5        MR. WALTER:  That would be
6  great.  Thanks.  Go ahead and look at that.  I want to
7  go through here and have you briefly tell me what this
8  person knows with respect to your case and different
9  individuals who have discoverable information.
10       Warden Alyssa Williams.  What does she
11 know with respect to this case just generally?
12       THE WITNESS:  She was the
13 warden at the time of the incident.
14   Q.  Okay.  And did you have any discussions with
15 her?
16   A.  No.
17   Q.  Okay.  Did she make any statements that
18 you're aware of that led you to believe that you were
19 being discriminated against because of your sex?
20   A.  Not that I can recall, no.
21   Q.  Is there anything that would refresh your
22 recollection?
23   A.  Not that I have.
24   Q.  Okay.  Is there anything within DOC that

63

1  you're aware of that would refresh your recollection
2  as to whether or not she made any statements?
3    A.  That would be in the arbitration hearing
4  notes.
5    Q.  Okay.  So other than that, you're not aware
6  of any statements that she made?
7    A.  No, no.
8    Q.  And what about Assistant Warden Ted
9  Conkling?  What discoverable information do you
10 believe that he has with respect to this case?
11   A.  This is -- I ran into him at the mall in
12 Bradley one day, one evening.  And he asked me what
13 was going on with my case or what I was doing.  And I
14 told him, I asked him why?  And he goes, well, he goes
15 because my name is on the packet.  He goes I just want
16 to know if my name is going to be involved in a
17 lawsuit.
18       And I says, well, I says why would I go
19 after you?  He said, well, because my name is on it,
20 the signature on it.  And I says oh.  I said, no, it's
21 not you, I said it's the department.  And he goes oh,
22 okay.  And I says why?  And he says, well, he says you
23 know why they got rid of you?  And I says, I said why,
24 because I can't keep my mouth shut?  I voice my

64

1  opinion?  And he goes no.  He goes it's because you're
2  a male.  And I says what do you mean because I'm a
3  male?  And he goes because you're a male, and he says
4  you're in a female institution.  And I says, well,
5  what does that have anything to do with anything?  And
6  he says you're a male at a female institution.  He
7  says I'll leave it at that.  And that's all he said.
8        And I didn't ask him anything else
9  because, you know, I wasn't going to pump him any more
10 than what he already told me.  And that's basically
11 what we talked about.  And then I can't remember if
12 his wife was standing there with me, with us when we
13 were talking or if she just walked out and then he
14 says, well, we got to go.
15   Q.  So it would have been -- you believe his
16 wife may have been present during the conversation?
17   A.  Yes.  I mean, I know she was around; but I'm
18 not sure if she just walked up or if she was, you
19 know, how much of it she heard.
20   Q.  And this was at the mall in Bradley?
21   A.  Yes.
22   Q.  And where at in the mall in Bradley?
23   A.  The south court, south court.
24   Q.  In front of any particular store?

1  remember.

2      Q.  Okay.  Is there anything that would refresh

3  your recollection?

       A.  No, nothing in writing anywhere that I have.

5      Q.  Is there anything that's not in writing that

6  would refresh your recollection?

7      A.  Just if somebody would have told me, I mean.

8      Q.  But as you sit here today, you don't recall

9  anyone ever saying, other than Ted Conkling, that you

10  were discharged because you were male?

11     A.  No.

12     Q.  Okay.  And then I'll ask the same question

13  this time with respect to prison officials just to

14  distinguish basically between correctional staff and

15  directors, assistant wardens and so forth to make it

16  clear.

17             MR. BAKER:  And that's your

18  definition of prison officials, directors --

19             MR. WALTER:  For purposes of

20  this question only.

21             MR. BAKER:  Okay.

22             MR. WALTER:  Are you aware of

23  any prison officials, wardens, assistant wardens, so

24  forth, anyone along those lines making any statements

1  that your discharge was because of you being a male

2  other than again Ted Conkling?

3             THE WITNESS:  No, not other

4  than Ted.

5             MR. WALTER:  Okay.  So the only

6  statement by any prison official or employee that

7  you're aware of that your discharge was based on your

8  sex, you being a male, was from Ted Conkling?

9             MR. BAKER:  Objection, asked

10  and answered.  Go ahead and answer.

11             THE WITNESS:  Not unless in my

12  conversation with Dottie or Major Quinley something

13  like that came up.

14     Q.  This case has been pretty important to you?

15     A.  Yes.

16     Q.  In fact, you've made notes about the events

17  that have transpired?

18     A.  Yes.

19     Q.  In any of your notes do you have anything

20  that indicates that Major Quinley or Dottie Culkin

21  indicated that your discharge was based on you being a

22  male?

23     A.  No.

24     Q.  Have you received any written communications

1  from any DOC employees or officials indicating that

2  your discharge was based on you being a male?

3      A.  No.

4      Q.  Okay.  Now I want to draw your attention to

5  your answer to interrogatory number nine.  And if you

6  look at Page 4 of 7, the third line, actually it

7  begins on the second line down, the first full

8  sentence, the Plaintiff followed the direction of the

9  nursing staff by Correctional Officer Hoffmeyer and

10  relied upon information provided to him.  What

11  information was provided to you that you were relying

12  upon?

13     A.  Repeat the question.

14     Q.  Sure.  In your answer, the first full

15  sentence that begins on Line Two on Page 4 of 7, the

16  Plaintiff followed the direction of the nursing staff

17  by Correctional Officer Hoffmeyer and relied upon

18  information provided to him.  What information were

19  you relying upon that was provided to you?

20     A.  What Officer Hoffmeyer told me what the

21  nurse had said.  And I told her to just pass that on

22  to the inmate.

23     Q.  Okay.  And what was it that Hoffmeyer told

24  you that the nurse said?

1      A.  That the nurse told her to have her lay down

2  and elevate her legs.

3      Q.  Now was this before or after you went down

4  to Ms. Davis's cell and spoke with her and Ms. Davis

5  told that you she was okay?

6      A.  That would have been the time of the first

7  phone call.

8      Q.  Okay.  But when did that phone call occur?

9  Was it before or after you went down to Ms. Davis's

10  cell and talked with her and she told you she was

11  okay?

12     A.  It would have been before.

13     Q.  Now I want to draw your attention to --

14  actually, let's back up.

15             Is there any other information that

16  Correctional Officer Hoffmeyer provided to you that

17  you relied upon?

18     A.  Just that she was, that she was calling the

19  nurses and following, and telling her what to do.

20  What the nurse told her is what she told the inmate.

21     Q.  Okay.  Is there any other information that

22  Correctional Officer Hoffmeyer provided to you that

23  you were relying upon besides what the nurse told?

24     A.  No, that's all we had to go on.

85

1  it's -- there hasn't been but one other inmate that I
2  know that has died on the institutional grounds since
3  I've been there.
4        Q.  No, I'm sorry, let me explain to you what
5  I'm looking for.  The allegation is that if there's
6  a male and a female who have the same type of
7  misconduct --
8        A.  Oh, okay.
9        Q.  The female is going to be treated more
10 favorably than the male.  That's what you've claimed
11 in your complaint.
12           Are you aware of any facts or
13 information to support your claim that there's a
14 practice at Dwight Correctional Center to favor the
15 females over the males?
16       A.  When it comes to overtime issues, some of
17 the females don't get wrote up.  The male officer will
18 get wrote up.
19       Q.  And who does that?
20       A.  Who writes them up?
21       Q.  Right.
22       A.  The shift commander who is running the
23 shift, which would be --
24       Q.  All shift commanders or just one shift

86

1  commander?
2        A.  Whoever is running the shift that day.  The
3  shift commander is responsible for the shift, for
4  running the shift.  Even though you may have two,
5  three majors out there on shift, but the main shift
6  commander runs the shift and is responsible for the
7  write-ups.
8        Q.  Okay.  And are all the shift commanders at
9  Dwight favorable to females as opposed to males?
10       A.  Are all of them favorable to females as
11 opposed to males?
12       Q.  Sure.  That's what you're claiming.  You're
13 claiming they have a practice in which female
14 employees receive less severe forms of discipline than
15 male employees.  Now is that true of all shift
16 commanders, do all shift commanders --
17       A.  No, I can't say that all of them act the
18 same way.  I mean, there are certain --
19       Q.  Which shift commanders engage in this
20 practice?
21       A.  Well, I know Major Cranford, the last year
22 he wouldn't write females up on the midnight shift
23 because they refused overtime; but he'd write the
24 males up.

87

1        Q.  Okay.  Any other shift commanders that
2  you're aware of who were discriminatory against males?
3              MR. BAKER:  Still talking about
4  overtime or anything?
5              MR. WALTER:  Anything.
6              THE WITNESS:  Not that I can
7  recall, I mean.
8        Q.  Okay.  Now we've talked about the overtime
9  issue.
10       A.  Okay.
11       Q.  We've talked about Ted Conkling's statements
12 to you at the mall in Bradley.  Is there any other
13 facts or information that you have to suggest that at
14 Dwight Correctional Center female employees receive
15 less severe forms of discipline than male employees
16 for similar misconduct?
17       A.  An incident with, let's see, at the time it
18 was Lieutenant Johnson got locked out because a female
19 officer made an accusation.  He got fired.  And the
20 courts proved that there was no allegation to it.  And
21 she received nothing for making the allegations.  That
22 case was just solved in '06.
23       Q.  Okay.  And other than the Lieutenant Johnson
24 incident, Ted Conkling speaking with you, the overtime

88

1  issue, are there any other facts upon which you base
2  your statement that Dwight Correctional Center has a
3  practice in which female employees receive less severe
4  forms of discipline than male employees for similar
5  types of misconduct?
6        A.  Not right now, no.
7        Q.  Is there anything that would refresh your
8  recollection?
9        A.  Not that I have, no.
10       Q.  Okay.  Is there anything that you're aware
11 of, not necessarily that you have, that you could go
12 look at that would refresh your recollection?
13       A.  Not that I have, no.
14       Q.  Is there anything that DOC has that you're
15 aware of?
16       A.  Now you're opening up a whole new can of
17 worms.  I don't know.
18       Q.  So as you sit here today, there's nothing
19 that you're aware of that would refresh your
20 recollection?
21       A.  No.
22       Q.  Now I want to draw your attention to your
23 answer to interrogatory number fourteen, which states
24 after the Plaintiff was terminated in the spring of

89

1  2004, he was placed on medication because he was
2  suffering from high blood pressure. When were you
3  first diagnosed as having high blood pressure?
4      A. It was in the late fall or early winter of
5  '03.
6      Q. Okay. And had you seen a doctor prior to
7  that diagnosis?
8      A. Yes.
9      Q. And what had your blood pressure been prior
10 to the late fall of '03?
11     A. Prior to that, he said everything was
12 normal, you know, pretty good for a guy my size and
13 the job that I do.
14         And then after, it just, you know, I
15 can't say it skyrocketed; but then the medication
16 started.
17     Q. So in the fall of '03 you were diagnosed
18 with high blood pressure, correct?
19     A. Right.
20     Q. Was that prior to or after November 4th of
21 '03?
22     A. I'm not sure.
23     Q. Okay. And who is your doctor that diagnosed
24 you with high blood pressure?

90

1      A. Doctor Villegas.
2      Q. How do you spell that?
3      A. V-i-l-l-e-g-a-s.
4      Q. And are you currently taking any medication
5  for high blood pressure?
6      A. Yes.
7      Q. What are you taking?
8      A. Toprol, I think it's 50 milligrams.
9      Q. Can you spell that for me?
10     A. I think it's T-o-p-r-o-l.
11     Q. It's not a spelling test. We're just trying
12 to help the Court Reporter.
13     A. Yeah, I know.
14     Q. Have you been taking that same medication
15 since the fall of '03?
16     A. Yes, yes.
17     Q. And is your blood pressure controlled with
18 the medication?
19     A. Yes.
20     Q. I want to draw your attention to your answer
21 to interrogatory number sixteen where you list Burns
22 Security as an employer.
23     A. Okay.
24     Q. You were employed by Burns Security from

91

1  June of '04 through September of '05, is that correct?
2      A. Correct.
3      Q. Okay. And why did you leave Burns Security?
4      A. I went to Wackahut at the nuclear plant.
5      Q. Okay. And then it looks like you were also
6  working for IPC International?
7      A. Correct.
8      Q. Okay. So you're actually working two jobs
9  currently?
10     A. Correct.
11     Q. I want to draw your attention to your answer
12 to interrogatory number twenty where you list your
13 ex-wife and your daughter, Rachel?
14     A. Okay.
15     Q. Are you currently supporting your daughter,
16 Rachel?
17     A. No, she's twenty-three years old.
18     Q. And what about your ex-wife, do you support
19 her?
20     A. Do I support her?
21     Q. Yeah.
22     A. No.
23     Q. Okay. Now I previously showed you your
24 complaint, which was marked for identification

92

1  purposes as Timm Exhibit Two. And now I draw your
2  attention to paragraph eight of that complaint.
3      A. Oh, paragraph eight.
4      Q. Page 3, paragraph eight, the last full
5  sentence, the involvement and conduct of each of those
6  female employees with respect to the incident giving
7  rise to the discharge of the Plaintiff, Alan Timm, was
8  as or more serious than that of the Plaintiff, Alan
9  Timm.
10         So the first question I have for you is
11 with respect to Correctional Officer Hoffmeyer. What
12 conduct of hers was more serious than that of yours in
13 this incident?
14     A. That if there was a concern of a medical
15 emergency, that she did not have to have my approval
16 to open the door. She could have opened the door by
17 herself, and she didn't need me there on an emergency.
18     Q. Okay. Is there anything else upon which you
19 base that statement that her conduct was as or more
20 serious than yours?
21     A. Uhm, meaning why I say that, is that what
22 you mean?
23     Q. Right. Why do you say that her conduct was
24 as or more serious than yours?

93

1    A. Because in the course of your duties, if
2 there's a medical emergency, you don't need a
3 supervisor to check on a medical emergency if there is
4 a medical emergency. But, then again, the state
5 cannot define a medical emergency.
6    Q. All right. Other than you feel she had a
7 responsibility to respond regardless of whether or not
8 you were involved, is there anything else that you
9 base this statement upon that her conduct was as or
10 more serious than yours?
11    A. I don't know.
12    Q. You don't know or no?
13    A. Well, the fact, the fact of the discipline
14 as I was reading the whole sentence, the fact that the
15 discipline that was handed down and how the state
16 reduced hers without a bat of an eye after the initial
17 discipline was handed out and before it went to
18 arbitration, the state reduced hers before it even got
19 to arbitration. And it just seemed like they were
20 favoring her before they even or after they heard
21 mine.
22    Q. Okay. Now about the nurse? And, again,
23 what was the name of the nurse?
       A. Janice Miller.

94

1    Q. Okay. And what was it about her conduct
2 that was as or more serious than that of you?
3    A. She's medically trained. She's got the
4 medical degree. We don't have the medical degree.
5 And yet we inform the nursing staff what's going on.
6 And all we can do is just rely on what we're told.
7 And that's what we did on this case. We told the
8 nurse what was happening, and she told us what to do.
9 And that's what we did.
10    Q. Earlier you mentioned that you nudged Davis.
11 Do you recall that?
12    A. Yes.
13    Q. How did you nudge her?
14    A. Uhm, I think if I'm not mistaken, beings I
15 was standing up and so tall, I think in the report I
16 nudged her with my foot on the hip. And I didn't feel
17 nothing, you know, no movement in my leg. So then I
18 went down, and I nudged her on the hip and still
19 didn't feel anything. And then that's when I went up
20 and felt her pulse on her neck.
21    Q. You said you went down and nudged her, were
22 you indicating with your arm at that point? What did
23 you mean by you went down and nudged her?
24    A. Yes, I went down and nudged her with my hand

95

1 on her hip. And she didn't move. And then I went up
2 to her neck.
3    Q. That's what I thought, but she can't take
4 down, you were moving your arm, but you weren't saying
5 with your arm. That's what I was trying to clarify.
6    A. Okay.
7    Q. Let me check here real quick. I want to
8 show you what I've marked for identification purposes
9 as Timm Exhibit Five and ask you if you recognize that
10 document?
11    A. Oh, yes.
12    Q. And what is it?
13    A. Uhm, it's my investigation by Emerick.
14    Q. Okay. There are eleven pages to this,
15 correct?
16    A. Yes.
17    Q. And down on the bottom left hand corner of
18 Pages 2 through 11, is that your signature that
19 appears?
20    A. Yes.
21    Q. And then there's another signature that says
22 interview signature, and there is a witness. Do you
23 know whose signature that is, the witness?
24    A. Jim Stison.

96

1    Q. Was he your Afscme steward?
2    A. Yes.
3    Q. Now if you look on the second page of
4 this exhibit, let's see, six rows up from the bottom
5 there's a correction. And then to the right it looks
6 like the initials ALT. Are those your initials?
7    A. Where?
8    Q. Do you see what I'm --
9    A. Yes.
10    MR. BAKER: What page are you
11 referring to?
12    Q. Page 2, I'm sorry. It's six lines up from
13 the bottom on the right hand side. I'm sorry. Are
14 those your initials?
15    A. Yes.
16    Q. And is this a report that was written up
17 following an interview with you during which time your
18 shop steward was present?
19    MR. BAKER: Objection, asked
20 and answered.
21    MR. WALTER: You can answer if
22 you can.
23    THE WITNESS: It was written
24 during, not after. It was written during as we went.

97

1        MR. WALTER:  Are there any
2    misstatements in here that you're aware of?
3        MR. BAKER:  Out of fairness, I
     think he should have an opportunity to read it, to go
5    through it.
6        MR. WALTER:  That's fine if he
7    wants to take the time to read it.
8        MR. BAKER:  I want him to take
9    the time before he answers your question.
10        MR. WALTER:  Sure.
11        MR. BAKER:  We can take a short
12    break.
13        (Recess Taken.)
14        THE WITNESS:  Just besides the
15    fact how she worded a couple of things; but I know she
16    was writing as fast as we were talking, so.
17    Q.  Substantively it appears accurate?
18    A.  Yes.
19    Q.  I don't have any additional questions at
20    this time.
21        CROSS EXAMINATION.
22        CONDUCTED BY MR. BAKER:
23    Q.  I just have a couple questions to clarify
     the record.

98

1        Alan, do I understand that Officer
2    Hoffmeyer was the wing officer in the segregation unit
3    on November 4th?
4    A.  Yes.
5    Q.  And she had responsibility for two wings in
6    K building or in the segregation unit?
7    A.  Yes.
8    Q.  And those are C and D wings?
9    A.  Yes.
10    Q.  How many inmates were housed on November 4th
11    in each of those units if you remember?
12    A.  It could hold a hundred.  That would be
13    fifty on a side would be the capacity.
14    Q.  Fifty in each wing?
15    A.  No, fifty.
16    Q.  In the building as a whole?
17    A.  Right.
18    Q.  Okay.  So does that mean there would be
19    twenty-five on a wing if it was fully occupied?
20    A.  Yeah, one wing had 12 rooms and the other
21    wing had 13 rooms.
22    Q.  Okay.  Now would a wing officer spend her
23    work time actually being on the wing she was assigned?
24    A.  No.

99

1    Q.  Okay.  What would she do?
2    A.  You're required to do a wing check, which is
3    every twenty minutes.  And you make notation of that
4    in a wing checkbook.
5    Q.  Okay.  So can you take us through what a
6    wing check is?
7    A.  You just walk, you walk down the wing; and
8    you don't hear nothing, you don't -- you can look in
9    the cells if you want or you can just walk in down and
10    walk around and walk back off the wing.
11    Q.  Would you walk into the cells?
12    A.  No, no, the doors are locked, the doors are
13    shut.
14    Q.  Okay.  And does the wing officer have keys
15    to the cells?
16    A.  Yes.
17    Q.  Now if a wing officer has reason to believe
18    that an inmate has some health care emergency, can a
19    wing officer contact the medical unit or the nursing
20    unit without getting clearance from her sergeant?
21    A.  Yes.
22    Q.  Okay.  Now if a wing officer or for that
23    matter a sergeant out in any unit but particularly a
24    segregation unit has some reason to believe that an

100

1    inmate needs prompt medical attention or might need
2    prompt medical attention, can those officers take an
3    inmate to the medical unit or to the nurses on their
4    own volition?
5    A.  No.
6    Q.  What do they have to do before they can get
7    an inmate to that unit?
8    A.  Are you talking general or seg?
9    Q.  Well, let's talk about seg.
10    A.  Uhm, the seg, to get to the clinic, they
11    have to drop a note, a referral, and be put on the
12    sick call list.
13    Q.  What about if it's something where you think
14    it's not something that can wait a couple days, I
15    think the inmate needs some medical attention right
16    away?
17    A.  You can call and inform them what's going
18    on, and they will advise you what to do.
19    Q.  Okay.  But I take it you cannot take the
20    inmate to the medical unit in that situation without
21    the approval of the nurses or some physician?
22    A.  Correct.
23    Q.  Okay.  The sergeant in the segregation unit,
24    what responsibility do you have to periodically walk

1  down the wings to check on inmates?

2      A.  Can you --

3      Q.  Let me back up for a moment.

4          My understanding from your testimony is

5  that a wing officer has to make periodic checks of the

6  wing?

7      A.  Correct.

8      Q.  And I think you said that they have to do it

9  every twenty minutes?

10     A.  Correct.

11     Q.  So a wing officer in a matter of twenty

12 minute intervals would check on each of the wings he

13 or she was assigned, am I correct?

14     A.  Correct.

15     Q.  So in a given hour, a wing officer if he's

16 doing his job or she's doing her job would make three

17 checks on each wing that he or she was assigned?

18     A.  Correct.

19     Q.  Okay.  What about a sergeant?  What are your

20 responsibilities in making wing checks?

21     A.  You're mainly there just to supervise the

22 officer and not necessarily required to make wing

23 checks.

24     Q.  You say not necessarily required.  What do

1  you mean by that?

2      A.  There's nothing in writing that says that we

3  had to, like the officers have a book they have to

4  sign for every twenty minutes.

5      Q.  Okay.

6      A.  There's nothing that we have to initial or

7  sign or anything that says that we have to do a wing

8  check.

9      Q.  Okay.  Now I believe you indicated on this

10 particular day, November 4th, 2003, there was a period

11 of time where you were away from the segregation unit.

12 I think you saw an assistant warden for a little

13 while, and then you saw someone else concerning a

14 Christmas party as I recall.  I don't recall the names

15 of the individuals.  Am I correct?

16     A.  Yes.

17     Q.  If someone working on your unit that day had

18 needed to communicate with you while you were away

19 from the unit, what would the process be for doing

    that?

21     A.  They could either call me on the radio

22 because all staff has radios or they could call the

23 control center and have control center call me on the

24 radio.

1      Q.  Okay.  But I think you indicated that you

2  did receive a call that Correctional Officer Sila --

3      A.  Sila, yes.

4      Q.  -- Sila was on the unit.  And you returned

5  to the unit at that time, am I correct?

6      A.  Correct.

7      Q.  Prior to that, had you received any calls

8  from either Correctional Officer Hoffmeyer or anyone

9  else concerning anything related to the unit?

10     A.  No.

11     Q.  Okay.  One last area.

12         I'm trying to get a visual picture

13 painted in my mind of a room in the segregation unit.

14 I tend to call them cells.  Is that what they used to

15 be called?

16     A.  Yes.

17     Q.  Okay.  Now I'm assuming that the cell has a

18 door which is an entry way?

19     A.  Correct.

20     Q.  Can you describe the door for me?

21     A.  It's -- they're not a solid door, but

22 they're a steel door, probably, I don't know what kind

23 of metal they're made out of or the thickness, I mean.

24 They're locked with a, I think the length is I think

1  three inches, it's four.  Size wise, I would say maybe

2  handicapped size, if not bigger than a handicapped

3  sized door.

4      Q.  Now it's a door rather than bars?

5      A.  Correct.

6      Q.  Okay.  So if I want to see into that

7  particular room or cell through the door, how do I do

8  it?

9      A.  You either, up at the top of the door you

10 have a, I think it's 9 by 9 window or you can open the

11 food slot, which is down at the waist level.

12     Q.  Okay.  And if I wanted to look into the

13 cell, is there any other way to do it?  Are there any

14 windows on the walls?

15     A.  No, no.

16     Q.  Okay.  That day did you ever receive any

17 information that might suggest that Inmate Davis might

18 be faking an illness?

19     A.  Just her roommate, just from her roommate.

20     Q.  What about Hoffmeyer, did she ever say

21 anything to suggest --

22         MR. WALTER:  Objection,

23 leading.  You can answer.

24         THE WITNESS:  She, Hoffmeyer

105

1  did come back and say that her roommate did say that
2  she was faking it.
3      Q. Do you recall when Hoffmeyer told you that
4  in relation to the time you visited the inmate's cell
5  for the first time?
6      A. It was after I had visited the cell the
7  first time.
8      Q. Okay. Lastly, I want to count the number of
9  times that you saw this inmate in her cell that day
10 beginning with when she returned from her ticket
11 hearing, okay?
12     A. Okay.
13     Q. Were you present when the inmate returned
14 from her hearing and went into the cell?
15     A. I'm not sure if I was on a unit or if I took
16 the rec line out, was out with the rec line at that
17 time.
18     Q. Okay. When was the first time you saw this
19 inmate in the cell after she came back from her
20 hearing?
21     A. Probably 11:00, 11:30 after we brought the
22 rec line back because the rec line, some of the rec
23 line that was out had to go down the C wing. And when
24 they come in, they went and stood by their doors and

106

1  then I helped them put the inmates back in their room.
2      Q. Okay. Now I understand that you went down
3  to check on this inmate with Officer Hoffmeyer at one
4  time?
5      A. Yes.
6      Q. Would that have been after the inmate's
7  return from the recreation?
8      A. Yes.
9      Q. Would that have been the second time you saw
10 the inmate after she came back from her ticket
11 hearing?
12     A. Was that the first time I saw her after the
13 ticket hearing? Is that what you asked?
14     Q. No, I'm asking if that was the second time
15 you saw her after the ticket hearing.
16     A. Oh, the second time. With Hoffmeyer, no,
17 that would have been the first time.
18     Q. First time with Hoffmeyer?
19     A. Yes, first time, I'm pretty sure.
20     Q. Okay. And then I'm a little confused. Did
21 you see her when you brought inmates back from the
22 recreation session?
23     A. No, we didn't have to look in her door
24 because her roommate was in there.

107

1      Q. Okay. So the first time you saw her then
2  was when you went down with Officer Hoffmeyer?
3      A. Yes.
4      Q. Okay. And you've already testified what
5  occurred then, I believe.
6          And I understand then you saw her again
7  or you went into her cell and you nudged her. And she
8  was non-responsive. And it was about that time that
9  the medical people were coming down, am I correct?
10     A. Correct.
11     Q. And that was after you came back from your
12 lunch or from your visit?
13     A. Correct.
14     Q. With the two people outside your unit?
15     A. Correct.
16     Q. Are those the only two times you saw this
17 inmate?
18     A. That's what I can recall, yes.
19     Q. Okay. I have nothing further.
20          MR. WALTER: No additional.
21          (Signature Reserved).
22          (Deposition Concluded).
23
24

108

1          SIGNATURE AND ERRATA SHEET.
2      I, ALAN TIMM, have read the foregoing testimony,
3  given by me, taken on February 12, 2007, at the Law
   Offices of Baker, Baker & Krajewski, 415 South Seventh
4  Street, Springfield, Illinois, in the case of Timm vs.
   Illinois Department of Corrections, Case No. 05-1276,
5  and have made any and all necessary corrections below:
6  Page No._____ Line No.____ Reason for Change:
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20          _____
            Signature of Witness
21
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS_____DAY OF_____, 2007.
23
24    Notary Public